# EXHIBIT 8

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**FORM 10-Q**

(Mark One)

☒    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2023

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

**Commission file number 001-41042**

◇ R I V I A N

**Rivian Automotive, Inc.**

(Exact name of registrant as specified in its charter)

| **Delaware** | **14600 Myford Road**<br>**Irvine, California 92606** | **47-3544981** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Address of Principal executive offices) (ZIP Code) | (I.R.S. Employer Identification No.) |
| **(888) 748-4261** | | **N/A** |
| (Registrant's telephone number, including area code) | | (Former name, former address and former fiscal year, if changed since last report) |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Class A common stock, $0.001 par value per share | RIVN | The Nasdaq Stock Market |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of October 24, 2023, 949,892,592 shares of the registrant's Class A common stock were outstanding, and 7,825,000 shares of the registrant's Class B common stock were outstanding.

Exhibit 8 - Page 488

**RIVIAN AUTOMOTIVE, INC.**
**FORM 10-Q**
**TABLE OF CONTENTS**

| | Page |
|---|---|
| Forward-Looking Statements | 2 |
| Risk Factors Summary | 2 |
| Part I. Financial Information | 4 |
| Item 1. Financial Statements (unaudited) | 4 |
| Condensed Consolidated Balance Sheets | 4 |
| Condensed Consolidated Statements of Operations | 5 |
| Condensed Consolidated Statements of Comprehensive Loss | 5 |
| Condensed Consolidated Statements of Changes in Stockholders' Equity | 6 |
| Condensed Consolidated Statements of Cash Flows | 7 |
| Notes to Condensed Consolidated Financial Statements | 8 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item 3. Quantitative and Qualitative Disclosures about Market Risk | 24 |
| Item 4. Controls and Procedures | 25 |
| Part II. Other Information | 27 |
| Item 1. Legal Proceedings | 27 |
| Item 1A. Risk Factors | 28 |
| Item 2. Unregistered Sales of Equity Securities, Use of Proceeds, and Issuer Purchases of Equity Securities | 64 |
| Item 3. Defaults Upon Senior Securities | 64 |
| Item 4. Mine Safety Disclosures | 64 |
| Item 5. Other Information | 64 |
| Item 6. Exhibits | 66 |
| Signatures | 68 |

Exhibit 8 - Page 489

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q ("Form 10-Q") contains forward-looking statements. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical facts contained in this Form 10-Q may be forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "targets," "projects," "contemplates," "believes," "estimates," "forecasts," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. Forward-looking statements contained in this Form 10-Q include, but are not limited to, statements regarding our future results of operations and financial position, industry and business trends, equity compensation, business strategy, plans, market growth, intended use of proceeds from the 2029 Green Convertible Notes (as defined herein) and 2030 Green Convertible Notes (as defined herein), and our objectives for future operations.

The forward-looking statements in this Form 10-Q are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition, and results of operations. Forward-looking statements involve known and unknown risks, uncertainties, and other important factors that may cause our actual results, performance, or achievements to be materially different from any future results, performance, or achievements expressed or implied by the forward-looking statements, including, but not limited to, the important factors discussed in Part II, Item 1A "Risk Factors" and elsewhere in this Form 10-Q as well as in any subsequent filings. The forward-looking statements in this Form 10-Q are based upon information available to us as of the date of this Form 10-Q, and while we believe such information is a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and you are cautioned not to unduly rely upon these statements.

You should read this Form 10-Q and the documents that we reference in this Form 10-Q and have filed as exhibits to this Form 10-Q with the understanding that our actual future results, performance, and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements. These forward-looking statements speak only as of the date of this Form 10-Q. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained in this Form 10-Q, whether as a result of any new information, future events or otherwise.

As used in this Form 10-Q, unless otherwise stated or the context requires otherwise, references to "Rivian," the "Company," "we," "us," and "our," refer to Rivian Automotive, Inc. and its consolidated subsidiaries.

**RISK FACTORS SUMMARY**

Our business is subject to a number of risks and uncertainties, including those described in Part II, Item 1A "Risk Factors" of this Form 10-Q. You should carefully consider these risks and uncertainties in evaluating the information contained in this Form 10-Q as the outcome of one or more of these risks or uncertainties could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows. The principal risks and uncertainties affecting our business include the following:

- We are a growth stage company with limited operating history and a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future. We may underestimate or not effectively manage the capital expenditures and costs associated with our business and operations, which could have a material and adverse effect on our business, prospects, financial condition, results of operations, and cash flows. We may also require additional financing to support our business, which may not be available in a timely manner or on terms that are acceptable, or at all.
- Our ability to develop and manufacture vehicles of sufficient quality and appeal to customers on schedule and on a large scale is unproven, and we have experienced, and may in the future experience, significant delays in the manufacture and delivery of our vehicles, which could harm our business, prospects, financial condition, results of operations, and cash flows.
- We have experienced, and could experience in the future, cost increases and disruptions in supply of raw materials or other components used in our vehicles.

2

Exhibit 8 - Page 490

- We are dependent on our existing suppliers, a significant number of which are single or limited source suppliers, and are also dependent on our ability to source suppliers, for our critical components, and to complete the building out of our supply chain, while effectively managing the risks due to such relationships.
- We expect that a significant portion of our near-term revenue will be from one customer that is an affiliate of one of our principal stockholders. If we are unable to maintain this relationship, or if this customer purchases significantly fewer vehicles than we currently anticipate, then our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.
- The success of our business depends on attracting and retaining a large number of customers. If we are unable to do so, we will not be able to achieve profitability.
- The automotive market is highly competitive, and we may not be successful in competing in this industry.
- We are highly dependent on the services and reputation of Robert J. Scaringe, our Founder and Chief Executive Officer ("CEO").
- Our distribution model is different from the predominant current distribution model for automobile manufacturers and is subject to regulatory limitations on our ability to sell and service vehicles directly, which subjects us to substantial risk and makes evaluating our business, prospects, financial condition, results of operations, and cash flows difficult.
- Breaches in data security, failure of information security systems, cyber attacks or other security or privacy-related incidents could have a material adverse effect on our reputation and brand, harm our business, prospects, financial condition, results of operations, and cash flows and subject us to legal or regulatory fines or damages.
- We are, and may in the future become, subject to patent, trademark and/or other intellectual property infringement claims, which may be time-consuming, cause us to incur significant liability, and increase our costs of doing business.
- Our vehicles are subject to motor vehicle safety standards and the failure to satisfy such mandated safety standards would have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.
- We may be exposed to delays, limitations, and risks related to the environmental permits and other permits and approvals required to operate or expand operations at our manufacturing facility and any future facilities.

Exhibit 8 - Page 491

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements (unaudited)**

**RIVIAN AUTOMOTIVE, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in millions, except per share amounts)
(unaudited)

| | December 31, 2022 | September 30, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents (Note 12) | $        11,568 | $         7,941 |
| Short-term investments (Note 12) | - | 1,192 |
| Accounts receivable, net | 102 | 237 |
| Inventory (Note 3) | 1,348 | 2,530 |
| Other current assets | 112 | 186 |
| Total current assets | 13,130 | 12,086 |
| Property, plant, and equipment, net (Note 4) | 3,758 | 3,810 |
| Operating lease assets, net | 330 | 345 |
| Other non-current assets | 658 | 215 |
| Total assets | $        17,876 | $        16,456 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $         1,000 | $         1,134 |
| Accrued liabilities (Note 6) | 1,154 | 1,116 |
| Current portion of lease liabilities and other current liabilities | 270 | 374 |
| Total current liabilities | 2,424 | 2,624 |
| Long-term debt (Note 5) | 1,231 | 2,720 |
| Non-current lease liabilities | 311 | 319 |
| Other non-current liabilities | 111 | 241 |
| Total liabilities | 4,077 | 5,904 |
| Commitments and contingencies (Note 10) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value; 10 shares authorized and 0 shares issued and outstanding as of December 31, 2022 and September 30, 2023 | - | - |
| Common stock, $0.001 par value; 3,508 and 3,508 shares authorized and 926 and 956 shares issued and outstanding as of December 31, 2022 and September 30, 2023, respectively (Note 11) | 1 | 1 |
| Additional paid-in capital | 26,926 | 27,590 |
| Accumulated deficit | (13,126) | (17,037) |
| Accumulated other comprehensive loss | (2) | (2) |
| Total stockholders' equity | 13,799 | 10,552 |
| Total liabilities and stockholders' equity | $        17,876 | $        16,456 |

See accompanying notes to these condensed consolidated financial statements.

4

Exhibit 8 - Page 492

**RIVIAN AUTOMOTIVE, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(in millions, except per share amounts)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2023 | 2022 | 2023 |
| Revenues (Note 2) | $ 536 | $ 1,337 | $ 995 | $ 3,119 |
| Cost of revenues | 1,453 | 1,814 | 3,118 | 4,543 |
| Gross profit | (917) | (477) | (2,123) | (1,424) |
| Operating expenses | | | | |
| Research and development | 452 | 529 | 1,542 | 1,469 |
| Selling, general, and administrative | 405 | 434 | 1,396 | 1,265 |
| Total operating expenses | 857 | 963 | 2,938 | 2,734 |
| Loss from operations | (1,774) | (1,440) | (5,061) | (4,158) |
| Interest income | 69 | 126 | 94 | 391 |
| Interest expense (Note 5) | (24) | (55) | (70) | (147) |
| Other income, net | 6 | 2 | 12 | 4 |
| Loss before income taxes | (1,723) | (1,367) | (5,025) | (3,910) |
| Provision for income taxes | (1) | - | (4) | (1) |
| Net loss | $ (1,724) | $ (1,367) | $ (5,029) | $ (3,911) |
| Net loss attributable to common stockholders, basic and diluted | $ (1,724) | $ (1,367) | $ (5,029) | $ (3,911) |
| Net loss per share attributable to Class A and Class B common stockholders, basic and diluted (Note 11) | $ (1.88) | $ (1.44) | $ (5.53) | $ (4.15) |
| Weighted-average common shares outstanding, basic and diluted | 918 | 952 | 909 | 942 |

**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
(in millions)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2023 | 2022 | 2023 |
| Net loss | $ (1,724) | $ (1,367) | $ (5,029) | $ (3,911) |
| Other comprehensive loss | (3) | (2) | (4) | - |
| Comprehensive loss | $ (1,727) | $ (1,369) | $ (5,033) | $ (3,911) |

See accompanying notes to these condensed consolidated financial statements.

5

Exhibit 8 - Page 493

**RIVIAN AUTOMOTIVE, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(in millions)
(unaudited)

| | Stockholders' Equity | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total |
| | Shares | Amount | | | | |
| **BALANCE - December 31, 2021** | 900 | $ 1 | $ 25,887 | $ (6,374) | $ - | $ 19,514 |
| Capital stock issuance | 1 | - | 1 | - | - | 1 |
| Stock-based compensation | - | - | 338 | - | - | 338 |
| Net loss | - | - | - | (1,593) | - | (1,593) |
| **BALANCE - March 31, 2022** | 901 | 1 | 26,226 | (7,967) | - | 18,260 |
| Capital stock issuance including employee stock purchase plan | 15 | - | 57 | - | - | 57 |
| Stock-based compensation | - | - | 264 | - | - | 264 |
| Other comprehensive loss | - | - | - | - | (1) | (1) |
| Net loss | - | - | - | (1,712) | - | (1,712) |
| **BALANCE - June 30, 2022** | 916 | 1 | 26,547 | (9,679) | (1) | 16,868 |
| Capital stock issuance | 5 | - | 7 | - | - | 7 |
| Stock-based compensation | - | - | 189 | - | - | 189 |
| Other comprehensive loss | - | - | - | - | (3) | (3) |
| Net loss | - | - | - | (1,724) | - | (1,724) |
| **BALANCE - September 30, 2022** | 921 | $ 1 | $ 26,743 | $ (11,403) | $ (4) | $ 15,337 |
| | | | | | | |
| **BALANCE - December 31, 2022** | 926 | $ 1 | $ 26,926 | $ (13,126) | $ (2) | $ 13,799 |
| Capital stock issuance | 13 | - | 5 | - | - | 5 |
| Stock-based compensation | - | - | 286 | - | - | 286 |
| Other comprehensive income | - | - | - | - | 1 | 1 |
| Net loss | - | - | - | (1,349) | - | (1,349) |
| **BALANCE - March 31, 2023** | 939 | 1 | 27,217 | (14,475) | (1) | 12,742 |
| Capital stock issuance including employee stock purchase plan | 7 | - | 34 | - | - | 34 |
| Stock-based compensation | - | - | 132 | - | - | 132 |
| Other comprehensive income | - | - | - | - | 1 | 1 |
| Net loss | - | - | - | (1,195) | - | (1,195) |
| **BALANCE - June 30, 2023** | 946 | 1 | 27,383 | (15,670) | - | 11,714 |
| Capital stock issuance | 10 | - | 2 | - | - | 2 |
| Stock-based compensation | - | - | 205 | - | - | 205 |
| Other comprehensive loss | - | - | - | - | (2) | (2) |
| Net loss | - | - | - | (1,367) | - | (1,367) |
| **BALANCE - September 30, 2023** | 956 | $ 1 | $ 27,590 | $ (17,037) | $ (2) | $ 10,552 |

See accompanying notes to these condensed consolidated financial statements.

6

Exhibit 8 - Page 494

**RIVIAN AUTOMOTIVE, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in millions)
(unaudited)

| | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | | 2022 | | 2023 |
| Cash flows from operating activities: | | | | |
| Net loss | $ | (5,029) | $ | (3,911) |
| Depreciation and amortization | | 453 | | 667 |
| Stock-based compensation expense | | 852 | | 606 |
| Inventory LCNRV charge and losses on firm purchase commitments | | 696 | | 114 |
| Other non-cash activities | | 87 | | 46 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable, net | | (82) | | (135) |
| Inventory | | (1,203) | | (1,471) |
| Other current assets | | 1 | | (62) |
| Other non-current assets | | (14) | | (67) |
| Accounts payable and accrued liabilities | | 479 | | 220 |
| Other current liabilities | | 97 | | 94 |
| Other non-current liabilities | | 57 | | 140 |
| Net cash used in operating activities | | (3,606) | | (3,759) |
| | | | | |
| Cash flows from investing activities: | | | | |
| Purchase of short-term investments | | - | | (1,405) |
| Maturities of short-term investments | | - | | 225 |
| Capital expenditures | | (1,075) | | (728) |
| Net cash used in investing activities | | (1,075) | | (1,908) |
| | | | | |
| Cash flows from financing activities: | | | | |
| Proceeds from issuance of capital stock including employee stock purchase plan | | 65 | | 39 |
| Proceeds from issuance of convertible notes | | - | | 1,485 |
| Other financing activities | | (3) | | (15) |
| Net cash provided by financing activities | | 62 | | 1,509 |
| | | | | |
| Effect of exchange rate changes on cash and cash equivalents | | (4) | | - |
| Net change in cash | | (4,623) | | (4,158) |
| Cash, cash equivalents, and restricted cash-Beginning of period | | 18,423 | | 12,099 |
| Cash, cash equivalents, and restricted cash-End of period | $ | 13,800 | $ | 7,941 |
| | | | | |
| Supplemental disclosure of non-cash investing and financing activities: | | | | |
| Capital expenditures included in liabilities | $ | 374 | $ | 390 |
| Capital stock issued to settle bonuses | $ | - | $ | 137 |
| Right-of-use assets obtained in exchange for operating lease liabilities | $ | 104 | $ | 66 |

See accompanying notes to these condensed consolidated financial statements.

Exhibit 8 - Page 495

**RIVIAN AUTOMOTIVE, INC.**
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**1.**
**NATURE OF OPERATIONS AND PRESENTATION**

*Description and Organization*

Rivian Automotive, Inc. (together with its consolidated subsidiaries, "Rivian" or the "Company") was incorporated as a Delaware corporation on March 26, 2015. Rivian was formed for the purpose of designing, developing, manufacturing, and selling category-defining electric vehicles ("EVs"), accessories, and related services directly to customers in the consumer and commercial markets. The nature of the Company's operations is primarily the production and sale of EVs in the United States of America ("United States").

*Basis of Presentation - Interim Financial Statements*

The accompanying condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") and the applicable rules and regulations of the Securities and Exchange Commission ("SEC") regarding interim financial information. Accordingly, they do not include all disclosures, including certain notes, required by U.S. GAAP on an annual reporting basis. These condensed consolidated financial statements are unaudited and, in the opinion of management, reflect all normal recurring adjustments necessary to fairly present the financial position, results of operations, cash flows, and change in equity for the periods presented. Results for the periods presented are not necessarily indicative of the results that may be expected for any subsequent period. These unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and accompanying notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2022 ("Form 10-K"). Certain amounts in the prior period condensed consolidated financial statements have been aggregated to conform to current period presentation.

**2.**
**SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Use of Estimates*

Accounting estimates are an integral part of the condensed consolidated financial statements. These estimates require the use of judgments and assumptions that may affect the reported amounts of assets, liabilities, revenues, and expenses in the periods presented. The Company has determined that the accounting estimates and related assumptions employed by the Company are appropriate and the resulting balances are reasonable under the circumstances. However, due to the inherent uncertainties involved in making estimates, actual results could differ from original estimates, requiring adjustments to these amounts in future periods.

*Cash and Cash Equivalents and Short-Term Investments*

Cash and cash equivalents include cash in banks and highly liquid investments with maturities of three months or less. Short-term investments are available-for-sale debt securities with maturities over three and up to twelve months recorded in "Short-term investments" on the Condensed Consolidated Balance Sheets. The Company's Short-term investments are measured at fair value with unrealized gains and losses recorded in other comprehensive income on the Condensed Consolidated Statements of Comprehensive Loss with reclassification to net income upon maturity or sale of the security.

"Cash and cash equivalents" were $11,568 million and $ 7,941 million, and "Short-term investments" were $0 million and $1,192 million as of December 31, 2022 and September 30, 2023, respectively, on the Condensed Consolidated Balance Sheets. "Cash and cash equivalents" and "Short-term investments" together were $11,568 million and $9,133 million as of December 31, 2022 and September 30, 2023, respectively. Refer to Note 12 "Fair Value Measurements" for more information about cash and cash equivalents and short-term investments.

8

Exhibit 8 - Page 496

**RIVIAN AUTOMOTIVE, INC.**
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Restricted Cash*

Restricted cash is recorded in "Other non-current assets" on the Company's Condensed Consolidated Balance Sheets and was $531 million and $0 as of December 31, 2022 and September 30, 2023, respectively. Restricted cash primarily consisted of the balance of an account under the dominion and control of the administrative agent under the senior secured asset-based revolving credit facility ("ABL Facility").

In April 2023, all of the Company's restricted cash associated with the ABL Facility was released due to expanded assets in the borrowing base in conjunction with the ABL Facility amendment. Refer to Note 5 "Debt" for more information about the ABL Facility amendment.

*Derivative Instruments*

In the normal course of business, the Company is exposed to global market risks, including the effect of changes in certain commodity prices, interest rates, and foreign currency exchange rates, and may enter into derivative contracts, such as forwards, options, swaps, or other instruments, to manage these risks. Derivative instruments are recorded on the Condensed Consolidated Balance Sheets in either "Other current assets" or "Current portion of lease liabilities and other current liabilities" and are measured at fair value. They are classified within Level 2 of the fair value hierarchy because they are valued using observable inputs other than quoted prices for identical assets or liabilities in active markets.

For commodity contracts, the Company records gains and losses resulting from changes in fair value in "Cost of revenues" in the Condensed Consolidated Statements of Operations and cash flows in "Cash flows from operating activities" in the Condensed Consolidated Statements of Cash Flows. The Company also may enter into master netting agreements with its counterparties to allow for netting of transactions with the same counterparty. The Company does not utilize derivative instruments for trading or speculative purposes.

The Company has entered into commodity contracts, and the resulting asset, liability, and aggregate notional amount were not material as of December 31, 2022 and September 30, 2023. These derivatives are economic hedges used to manage overall price risk and have not been designated as hedging instruments. During the three and nine months ended September 30, 2022 and 2023, losses resulting from changes in fair value were not material.

*Revenues*

The Company primarily recognizes revenue from the sale of EVs. The Company's contract liabilities are primarily related to payments collected prior to delivery of the EV, generally satisfied within one quarter or less, over-the-air ("OTA") vehicle software updates, generally satisfied over the estimated useful life of the EV, and extended service contracts, satisfied over the coverage period. The Company's contract liabilities were not material as of December 31, 2022. As of September 30, 2023, the Company's contract liabilities were $186 million, with $77 million recorded in "Current portion of lease liabilities and other current liabilities" and $109 million recorded in "Other non-current liabilities" on the Condensed Consolidated Balance Sheets.

*Product Warranty*

The following table summarizes the Company's warranty reserve recorded by line item on the Condensed Consolidated Balance Sheets (in millions):

| | December 31, 2022 | September 30, 2023 |
|---|---|---|
| Current portion of lease liabilities and other current liabilities | $ 30 | $ 90 |
| Other non-current liabilities | 70 | 133 |
| Total warranty reserve | $ 100 | $ 223 |

9

Exhibit 8 - Page 497

**RIVIAN AUTOMOTIVE, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited)

*Concentration of Risk*

*Counterparty Credit Risk*

Financial instruments that potentially subject the Company to concentration of counterparty credit risk consist of cash and cash equivalents, short-term investments, customer deposits, derivative instruments, and debt. The Company is exposed to credit risk on cash to the extent that a balance with a financial institution exceeds the Federal Deposit Insurance Company insurance limits. The Company is exposed to credit risk on cash equivalents and short-term investments to the extent that counterparties are unable to settle maturities or sales of investments and on customer deposits to the extent that counterparties are unable to complete the corresponding purchase transaction. The Company is exposed to credit risk on derivative instruments to the extent that counterparties are unable to settle derivative asset positions and on debt to the extent that the ABL Facility lenders are not able to extend credit. The degree of counterparty credit risk varies based on many factors, including the duration of the transaction and the contractual terms of the agreement.

As of December 31, 2022 and September 30, 2023, all of the Company's cash, typically in amounts exceeding insured limits, was distributed across several large financial institutions that the Company believes are of high credit quality. Management evaluates and approves credit standards and oversees the credit risk management function related to cash equivalents, short-term investments, and customer deposits. As of December 31, 2022 and September 30, 2023, the counterparties to the Company's derivative instruments and the ABL Facility lenders are financial institutions that the Company believes are of high credit quality.

*Supply Risk*

The Company is subject to risks related to its dependence on its suppliers, the majority of which are single source providers of input materials or components for the Company's products. Any inability or unwillingness of the Company's suppliers to deliver necessary input materials or product components, including semiconductors, at timing, prices, quality, and volumes that are acceptable to the Company could have a material impact on the Company's business, prospects, financial condition, results of operations, and cash flows. Fluctuations in the cost of input materials or product components and supply interruptions or shortages could materially impact the Company's business.

**3.**
**INVENTORY AND INVENTORY VALUATION**

The following table summarizes the components of "Inventory" on the Condensed Consolidated Balance Sheets (in millions):

|  | December 31, 2022 | September 30, 2023 |
|---|---|---|
| Raw materials and work in progress | $ 949 | $ 1,713 |
| Finished goods | 399 | 817 |
| Total inventory | $ 1,348 | $ 2,530 |

Inventory is stated at the lower of cost or net realizable value ("LCNRV") and consists of raw materials, work in progress, finished goods, and service parts. The balance of the Company's inventory was written down by $582 million and $ 292 million from its cost to its net realizable value as of December 31, 2022 and September 30, 2023, respectively. Additionally, the Company has LCNRV losses related to firm purchase commitments which were $338 million and $160 million as of December 31, 2022 and September 30, 2023, respectively, and are reflected in the inventory component of "Accrued liabilities" on the Condensed Consolidated Balance Sheets. Refer to Note 6 "Accrued Liabilities" for more information about Accrued liabilities.

The Company recorded a $696 million and $114 million charge to reflect the LCNRV of inventory and losses on firm purchase commitments as of September 30, 2022 and September 30, 2023, respectively, in "Cost of revenues" in the Company's Condensed Consolidated Statements of Operations.

Exhibit 8 - Page 498

**RIVIAN AUTOMOTIVE, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited)

**4.**
**PROPERTY, PLANT, AND EQUIPMENT, NET**

The following table summarizes the components of "Property, plant, and equipment, net" on the Condensed Consolidated Balance Sheets (in millions):

| | December 31, 2022 | September 30, 2023 |
|---|---|---|
| Land, buildings, and building improvements | $ 636 | $ 827 |
| Leasehold improvements | 297 | 378 |
| Machinery, equipment, vehicles, and office furniture | 2,456 | 2,870 |
| Computer equipment, hardware, and software | 409 | 485 |
| Construction in progress | 843 | 788 |
| Total property, plant, and equipment | 4,641 | 5,348 |
| Accumulated depreciation and amortization | (883) | (1,538) |
| Total property, plant, and equipment, net | $ 3,758 | $ 3,810 |

Depreciation and amortization expense was $172 million and $ 252 million for the three months ended September 30, 2022 and 2023, respectively, and $451 million and $655 million for the nine months ended September 30, 2022 and 2023, respectively.

**5.**
**DEBT**

The following table summarizes the Company's outstanding debt:

| | Maturity | December 31, 2022 | | September 30, 2023 | |
|---|---|---|---|---|---|
| | | Amount (in millions) | Effective Interest Rate | Amount (in millions) | Effective Interest Rate |
| 2026 Notes | 2026 | $ 1,250 | 11.3 % | $ 1,250 | 11.5 % |
| 2029 Green Convertible Notes | 2029 | - | - | 1,500 | 4.9 % |
| Total long-term debt | | 1,250 | | 2,750 | |
| Less unamortized discount and debt issuance costs | | (19) | | (30) | |
| Long-term debt, less unamortized discount and debt issuance costs | | 1,231 | | 2,720 | |
| Less current portion | | - | | - | |
| Total long-term debt, less current portion | | $ 1,231 | | $ 2,720 | |

***ABL Facility***

In May 2021, the Company entered into an ABL Facility with a syndicate of banks that may be used for general corporate purposes. Availability under the ABL Facility was based on the lesser of the borrowing base and the committed $750 million cap and was reduced by borrowings and the issuance of letters of credit.

In April 2023, the Company amended and restated the credit agreement governing the ABL Facility. The revolving commitment doubled to $1,500 million, the letter of credit sub-limit increased from $500 million to $1,000 million, the eligibility of assets in the borrowing base expanded, all of the restricted cash associated with the ABL Facility was released, the interest rate benchmark was modified to the Secured Overnight Financing Rate plus 0.10% credit spread adjustment, the commitment fee was adjusted to between 0.20% and 0.25%, and the maturity was extended to April 19, 2028 (unless due earlier pending the maturity of certain debt exceeding $200 million).

As of September 30, 2023, the Company had no borrowings under the ABL Facility and $380 million of letters of credit outstanding, resulting in availability under the ABL Facility of $1,120 million after giving effect to the borrowing base and the outstanding letters of credit. As of September 30, 2023, the Company was in compliance with all covenants required by the ABL Facility.

Exhibit 8 - Page 499

**RIVIAN AUTOMOTIVE, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited)

***2026 Notes***

In October 2021, the Company issued $1,250 million aggregate principal amount of senior secured floating rate notes due October 2026 (the "2026 Notes") to certain new and existing investors of the Company. As of September 30, 2023, the interest rate payable on the 2026 Notes was 11.0%, and the Company was in compliance with all covenants required by the 2026 Notes.

The 2026 Notes are classified within Level 2 of the fair value hierarchy because they are valued using quoted prices for identical assets in markets that are not active. As of December 31, 2022 and September 30, 2023, the fair value of the 2026 Notes was $1,216 million and $1,263 million, respectively.

***2029 Green Convertible Notes***

In March 2023, the Company issued $1,500 million principal amount of green convertible unsecured senior notes due March 2029 (the "2029 Green Convertible Notes") at a discount of $15 million in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The 2029 Green Convertible Notes were issued pursuant to, and are governed by, an indenture dated March 10, 2023, between the Company and U.S. Bank Trust Company, National Association. The Company intends to allocate the net proceeds from the offering to finance, refinance, or make direct investments in, in whole or in part, one or more new or existing eligible green projects, as described in the Company's newly established green financing framework. The 2029 Green Convertible Notes accrue interest at a rate of 4.625% per annum, payable semi-annually in arrears on March 15 and September 15.

Before December 15, 2028, the 2029 Green Convertible Notes are convertible at the option of the noteholders only upon the occurrence of certain events, as described in the indenture. From and after December 15, 2028, the 2029 Green Convertible Notes are convertible at any time at the noteholders' election until the close of business on the second scheduled trading day immediately before the maturity date. The Company will settle conversions by paying or delivering, as applicable, cash, shares of the Company's Class A common stock, or a combination of cash and shares of the Company's Class A common stock, at the Company's election. The initial conversion rate is 49.6771 shares of common stock per $1,000 principal amount of 2029 Green Convertible Notes, which represents an initial conversion price of approximately $20.13 per share of the Company's Class A common stock. The conversion rate and conversion price will be subject to customary adjustments upon the occurrence of certain events.

The 2029 Green Convertible Notes are redeemable in whole or in part (subject to certain limitations) at the Company's option at any time on or after March 20, 2026 and on or before the 20th scheduled trading day immediately before the maturity date, but only if the last reported sale price per share of the Company's Class A common stock exceeds 130% of the conversion price for a specified period of time. If certain events that constitute a Fundamental Change (as defined by the indenture) for the 2029 Green Convertible Notes occur, then, subject to limited exceptions, noteholders may require the Company to repurchase their notes for cash. The cash repurchase price is equal to the principal amount of the notes to be repurchased, plus any accrued and unpaid interest, if any, to, but excluding, the applicable repurchase date. The 2029 Green Convertible Notes contain a number of customary covenants.

The 2029 Green Convertible Notes are classified within Level 2 of the fair value hierarchy because they are valued using quoted prices for identical assets in markets that are not active. As of September 30, 2023, the fair value of the 2029 Green Convertible Notes was $2,179 million.

***2030 Green Convertible Notes***

In October 2023, the Company issued $1,725 million principal amount of green convertible unsecured senior notes due October 2030 (the "2030 Green Convertible Notes") at a discount of $15 million in a private offering to qualified institutional buyers. The 2030 Green Convertible Notes accrue interest at a rate of 3.625%, payable semi-annually in arrears on April 15 and October 15. In connection with the issuance of the 2030 Green Convertible Notes, the Company paid $108 million to enter into privately negotiated capped call transactions (the "Capped Calls") with certain financial institutions to increase the effective conversion premium to approximately $31.06 per share.

12

Exhibit 8 - Page 500

**RIVIAN AUTOMOTIVE, INC.**
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**6.**
**ACCRUED LIABILITIES**

The following table summarizes the components of "Accrued liabilities" on the Condensed Consolidated Balance Sheets (in millions):

|  | December 31, 2022 | September 30, 2023 |
|---|---|---|
| Inventory | $ 367 | $ 250 |
| Capital expenditures | 265 | 275 |
| Payroll and related costs | 259 | 259 |
| Other products and services | 169 | 190 |
| Other | 94 | 142 |
| Total accrued liabilities | $ 1,154 | $ 1,116 |

**7.**
**INCOME TAXES**

The Company's provision for income taxes was not material and the effective tax rate was
0% for the three and nine months ended September 30, 2022 and 2023. The Company maintains a valuation allowance on all deferred tax assets except in certain foreign jurisdictions, as it has concluded that it is more likely than not that these assets will not be utilized.

**8.**
**STOCK-BASED COMPENSATION**

***Stock Plans***

The Company's 2015 Long-Term Incentive Plan ("2015 Stock Plan") and 2021 Incentive Award Plan ("2021 Stock Plan" and, together, "Stock Plans") permit the grant of restricted stock units ("RSUs"), stock options, and other stock-based awards to employees, non-employee directors, and consultants.

The following table summarizes the Company's stock option and restricted stock unit activity during the nine months ended September 30, 2023:

|  | Stock Options | | | | RSUs | |
|---|---|---|---|---|---|---|
|  | Number of Shares (in millions) | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value (in millions) | Number of Shares (in millions) | Weighted-Average Grant-Date Fair Value |
| Outstanding at December 31, 2022 | 61 | $ 12.98 | | | 37 | $ 38.72 |
| Granted | 3 | $ 17.31 | | | 58 | $ 14.86 |
| Exercised / Vested | (2) | $ 4.45 | | | (25) | $ 24.66 |
| Forfeited / Cancelled | - | $ - | | | (8) | $ 33.82 |
| Outstanding at September 30, 2023 | 62 | $ 13.42 | 6.2 | $ 692 | 62 | $ 22.61 |
| Vested and expected to vest at September 30, 2023 | 62 | $ 13.42 | 6.2 | $ 692 | 62 | $ 22.61 |
| Exercisable at September 30, 2023 | 30 | $ 5.35 | 5.1 | $ 574 | - | $ - |

13

Exhibit 8 - Page 501

**RIVIAN AUTOMOTIVE, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited)

The following table summarizes the Company's stock-based compensation expense for the Stock Plans and 2021 Employee Stock Purchase Plan ("ESPP") by line item in the Condensed Consolidated Statements of Operations (in millions):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2023 | 2022 | 2023 |
| Cost of revenues | $ 25 | $ 23 | $ 48 | $ 64 |
| Research and development | 133 | 133 | 386 | 289 |
| Selling, general, and administrative | 135 | 86 | 418 | 253 |
| Total stock-based compensation expense | $ 293 | $ 242 | $ 852 | $ 606 |

As of September 30, 2023, the Company's unrecognized stock-based compensation expense for unvested awards was approximately $ 1,358 million, which is expected to be recognized over a weighted-average period of 5.5 years and 1.9 years for stock options and RSUs outstanding, respectively.

**9.**
**RELATED PARTY TRANSACTIONS**

*Revenues*

The Company recorded $117 million and $401 million for the three months ended September 30, 2022 and 2023, respectively, and $133 million and $715 million for the nine months ended September 30, 2022 and 2023, respectively, in revenues from Amazon.com, Inc. and its affiliates ("Amazon"), within "Revenues" in the Condensed Consolidated Statements of Operations, primarily related to the sale of Electric Delivery Vans ("EDVs"). As of December 31, 2022 and September 30, 2023, the uncollected amounts related to these revenues in "Accounts receivable, net" on the Condensed Consolidated Balance Sheets were $60 million and $108 million, respectively. As of December 31, 2022 and September 30, 2023, contract liabilities related to these revenues, primarily related to extended service contracts, were not material. Refer to Note 2 "Summary of Significant Accounting Policies" for more information about revenue.

*Operating Expenses*

The Company obtained prototyping, engineering, and other research and development ("R&D") services from a wholly-owned subsidiary of Ford Motor Company ("Ford"), a related party of the Company as a beneficial owner of more than 10 percent of the Company's voting interests until May 2022. The related expense was recognized in "Research and development" in the Condensed Consolidated Statement of Operations during 2022, until Ford was no longer a related party, and was not material.

The Company obtains data services, including hosting, storage, and compute from Amazon. During the three and nine months ended September 30, 2022 and 2023, expenses related to these services were not material. As of December 31, 2022 and September 30, 2023, the unpaid amounts related to these services were not material.

*Unconditional Purchase Obligations and Commitments*

Refer to Note 10 "Commitments and Contingencies" for more information about unconditional purchase obligations with Amazon.

**10.**
**COMMITMENTS AND CONTINGENCIES**

*Legal Proceedings and Loss Contingencies*

The Company is involved in legal proceedings and evaluates other loss contingencies, primarily related to supplier contract and employment matters, which may result in obligations of the Company. While it is not possible to predict the outcome of these matters with certainty, the Company has estimated a reasonable range of its aggregate unsettled obligation based on possible outcomes. The liability recorded to reflect the Company's estimated obligation is within this range, and both the range and the estimated liability are not material as of December 31, 2022 and September 30, 2023. The estimated liability is

14

Exhibit 8 - Page 502

**RIVIAN AUTOMOTIVE, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited)

not reduced by expected recoveries from third parties, and the majority of the matters reflected in the estimated liability are expected to be resolved within the next 12 months.

***Unconditional Purchase Obligations***

In May 2023, the Company amended the data services agreement with Amazon which included unrecognized commitments that require the future purchase of services (an "unconditional purchase obligation").
Future payments under this unconditional purchase obligation are as follows (in millions):

|  | Future Payments |
|---|---|
| 2023 | $ 28 |
| 2024 | 62 |
| 2025 | 65 |
| 2026 | 69 |
| 2027 | 72 |
| 2028 | 22 |
| Total | $ 318 |

Refer to Note 9 "Related Party Transactions" for total amounts purchased under the data services agreement.

**11.**
**STOCKHOLDERS' EQUITY AND NET LOSS PER SHARE**

The Company has two classes of common stock: Class A common stock and Class B common stock. Shares of Class A common stock and Class B common stock are identical, except with respect to voting and conversion rights. As of December 31, 2022 and September 30, 2023, 918 million and 948 million shares of Class A common stock were issued and outstanding, respectively. As of December 31, 2022 and September 30, 2023, 8 million shares of Class B common stock were issued and outstanding. As of December 31, 2022 and September 30, 2023, 3,500 million shares of Class A common stock and 8 million shares of Class B common stock were authorized.

Because the rights of the holders of Class A and Class B common stock, including liquidation and dividend rights, are identical except with respect to voting and conversion rights, undistributed earnings are allocated on a proportionate basis. As a result, net loss per share attributable to common stockholders is the same for Class A and Class B common stock, whether on an individual or combined basis.

Diluted net loss per share is computed by giving effect to all potential shares of common stock, to the extent dilutive, including shares underlying the 2029 Green Convertible Notes, stock options, unvested RSUs, shares underlying the Company's ESPP, other stock-based awards, and stock warrants. Potential shares of common stock are excluded from the computation of diluted net loss per share if their effect would have been anti-dilutive for the periods presented or if the issuance of shares is contingent upon events that did not occur by the end of the period, in the case of the 2029 Green Convertible Notes, stock options with a market condition, and other stock-based awards.
The following table presents the number of potential shares of common stock outstanding as of the end of each period that were excluded from the computation of diluted net loss per share for each period (in millions):

|  | Three and Nine Months Ended September 30, | |
|---|---|---|
|  | 2022 | 2023 |
| 2029 Green Convertible Notes | - | 75 |
| Stock warrants | 12 | 12 |
| Stock options | 63 | 62 |
| RSUs, ESPP, and other stock-based awards | 46 | 70 |
| Total | 121 | 219 |

15

Exhibit 8 - Page 503

**RIVIAN AUTOMOTIVE, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited)

A reconciliation of the numerator and denominator used in the calculation of basic and diluted net loss per share is as follows ((in millions), except per share data):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2023 | 2022 | 2023 |
| Numerator | | | | |
| Net loss attributable to Rivian | $ (1,724) | $ (1,367) | $ (5,029) | $ (3,911) |
| Net loss attributable to common stockholders, basic and diluted | $ (1,724) | $ (1,367) | $ (5,029) | $ (3,911) |
| | | | | |
| Denominator | | | | |
| Weighted-average Class A and Class B common shares outstanding - basic | 918 | 952 | 909 | 942 |
| Effect of dilutive securities | - | - | - | - |
| Weighted-average Class A and Class B common shares outstanding - diluted | 918 | 952 | 909 | 942 |
| | | | | |
| Net loss per share attributable to Class A and Class B common stockholders, basic and diluted | $ (1.88) | $ (1.44) | $ (5.53) | $ (4.15) |

**12.**
**FAIR VALUE MEASUREMENTS**

The following table presents the fair value of the Company's cash and cash equivalents and short-term investments and their corresponding level within the fair value hierarchy:

| | December 31, 2022 | | September 30, 2023 | |
| --- | --- | --- | --- | --- |
| | Level | Amount (in millions) | Level | Amount (in millions) |
| Cash and cash equivalents: | | | | |
| Cash | | $ 2,604 | | $ 1,115 |
| Money market funds | 1 | 7,147 | 1 | 6,066 |
| Commercial paper | 1 | 845 | 2 | 461 |
| United States Treasury securities | 1 | 822 | 1 | 299 |
| Certificates of deposit | 1 | 150 | 2 | - |
| Total | | $ 11,568 | | $ 7,941 |
| | | | | |
| Short-term investments: | | | | |
| United States Treasury securities | | $ - | 1 | $ 792 |
| Time deposits | | - | 2 | 400 |
| Total | | $ - | | $ 1,192 |
| | | | | |
| Total cash and cash equivalents and short-term investments | | $ 11,568 | | $ 9,133 |

As of December 31, 2022 and September 30, 2023, the fair value of cash equivalents and short-term investments approximated their cost. Fair value measurements classified within Level 2 of the fair value hierarchy are determined using observable inputs other than quoted prices for identical assets in active markets.

Refer to Note 2 "Summary of Significant Accounting Policies" and Note 5 "Debt" for more information about the fair value of the Company's derivative instruments and debt, respectively.

16

Exhibit 8 - Page 504

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read together with the condensed consolidated financial statements and related notes included in Part I, Item 1 "Financial Statements" of this Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our Form 10-K for the year ended December 31, 2022. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth in this Form 10-Q, particularly those identified under Part II, Item 1A "Risk Factors". Our historical results are not necessarily indicative of the results that may be expected for any period in the future.*

**Overview**

Rivian exists to create products and services that help our planet transition to carbon neutral energy and transportation. Rivian designs, develops, and manufactures category-defining EVs and accessories and sells them directly to customers in the consumer and commercial markets. Rivian complements its vehicles with a full suite of proprietary, value-added services that address the entire lifecycle of the vehicle and deepen our customer relationships.

Starting with a clean sheet, we built a vertically integrated ecosystem comprised of our vehicle technology platform, cloud architecture, product development and operations, products, and services. Interconnected by our data and analytics backbone, our ecosystem is designed to deliver fast-paced innovation cycles, structural cost advantages, and exceptional customer experiences.

In the consumer market, we launched the R1 platform with our first generation of consumer vehicles: the R1T, a two-row five-passenger pickup truck, and the R1S, a three-row seven-passenger sport utility vehicle ("SUV").

In the commercial market, we launched the Rivian Commercial Vehicle ("RCV") platform. Our first vehicle on this platform is our Electric Delivery Van ("EDV"), designed and engineered by Rivian in collaboration with Amazon, our first commercial customer. Amazon has placed an initial order of 100,000 EDVs, subject to modification.

During the nine months ended September 30, 2023, we produced 39,691 vehicles and delivered 36,150 vehicles.

**Factors Affecting Our Performance**

The growth and future success of our business depends on many factors. While these factors present significant opportunities for our business, they also pose risks and challenges, including those discussed below and in Part II, Item 1A "Risk Factors," that we must successfully address to achieve growth, improve our results of operations, and generate profits.

- *Ability to Develop and Launch New Offerings.* The R1T, R1S, and EDV appear to resonate with customers based on positive responses to vehicles delivered and our order bank. We believe the Rivian brand is becoming established in the most attractive consumer and commercial vehicle market segments. However, our ability to grow revenue and expand margins will also depend on our ability to develop and launch new vehicle platforms and programs. Our future financial performance will also depend on our ability to offer services that deliver an intuitive, seamless, and compelling customer experience.

- *Ability to Attract New Customers.* Our growth will depend in large part on our ability to attract new consumer and commercial customers. We have invested heavily in developing our ecosystem and plan to continue to do so. We are in the very early stages of growth in our existing markets, and we expect to substantially raise brand awareness by connecting directly with our community through engaging content, rich digital and physical experiences, and immersive events. We anticipate that these activities will lead to additional preorders and deliveries, and, as a result, increase our base of Rivian customers. An inability to attract new customers would substantially impact our ability to grow revenue or improve our financial results.

- *Ability to Manage Costs.* In line with our current pricing strategy, selling our vehicles profitably requires successful and timely execution against multiple cost reduction objectives across the vehicle stack. Achieving these reductions requires, among other things, scaling our vehicle production volumes, timely introduction of new components and technologies into production, negotiation of unit price reductions with suppliers, and management of our labor costs. Should we not achieve such reductions in a timely manner, we could experience adverse impacts to our gross margin and consequently overall profitability.

Exhibit 8 - Page 505

- **_Ability to Scale our Ecosystem and Brand Experience._** Our go-to-market strategy requires us to scale our ecosystem quickly and effectively, including our technology platform and product development and operational infrastructure. Our future success will also depend on our ability to further develop and leverage our proprietary technology platform. Our ability to enhance our product design, engineering, and manufacturing capabilities and expand our production capacity, delivery and service operations, customer service, Rivian Adventure Network Direct Current fast charging sites ("Rivian Adventure Network"), and charging accessibility will be critical for supporting growth. We believe our long-term ability to achieve our financial targets will depend on our ability to cost-effectively scale these elements, while also delivering a unified customer and brand experience consistent with our adventurous brand commitment.

- **_Ability to Convert our Customers to Subscribers of our Services._** Services are a key part of our growth strategy. We offer a variety of services, including financing and insurance, vehicle maintenance and repair, charging, and FleetOS solutions that we believe will grow our revenue outside of vehicle sales. As we increase our base of Rivian customers and expand our services portfolio, we expect our customers to expand their usage of our service offerings over the full lifecycle of their vehicle ownership. We believe the services portion of our business will have the benefit of enabling a higher-margin, recurring revenue stream for each vehicle, therefore improving our margin profile. Our ability to grow revenue and our long-term financial performance will depend in part on our ability to drive adoption of these offerings.

- **_Ability to Invest in our Production and Capabilities._** We believe that customer acquisition and retention is contingent on our ability to produce innovative offerings, including vehicles that deliver the broadest combination of performance, utility, and capability, as well as services that enhance the ownership journey through new features, functions, and a best-in-class customer experience. To this end, we intend to continue making investments, including technology updates, to drive growth as we scale vehicle production and deliveries, expand our offerings, and strengthen our core capabilities. As we invest in our business for long-term growth, leading to increases in operating expenses as well as capital expenditures, we expect to experience planned manufacturing shutdowns and additional losses, which could delay our ability to achieve profitability and positive operating cash flow. In addition, any delays in the timing or execution of these investments could have an adverse impact on our prospects, financial condition, results of operations, and cash flows. Furthermore, we anticipate that these future investments will require significant external debt and/or equity financing.

- **_Ability to Develop and Manage a Resilient Supply Chain._** Our ability to manufacture vehicles and develop future solutions is dependent on the continued supply of input materials (_e.g._, lithium and nickel) and product components (_e.g.,_ semiconductors). Any inability or unwillingness of our suppliers to deliver necessary input materials or product components at timing, prices, quality, and volumes that are acceptable to us could have a material impact on our business, prospects, financial condition, results of operations, and cash flows. Fluctuations in the cost of input materials or product components and supply interruptions or shortages could materially impact our business. We have experienced and may continue to experience cost fluctuations and disruptions in supply of input materials and product components that could impact our financial performance. Over the prior year, there was some softening in the cost of key metals, including steel, copper, resin, aluminum, and cobalt. Even though prices for lithium and other battery metals have seen recent sustained decreases from peak levels, prices are expected to remain volatile for the foreseeable future. Given the current supply chain environment, we believe our production ramp and rate in our Normal Factory will be limited by supply chain factors in the near future. For example, we have received claims from our suppliers related to supplier contract changes for which we have incurred payment obligations and may in the future incur additional payment charges. See Note 10 "Commitments and Contingencies" to our condensed consolidated financial statements included in this Form 10-Q for more information on supplier contingencies. We also must manage the risk of field service actions, including product recalls, with respect to components from suppliers. We continue to work diligently and collaboratively with suppliers to identify and proactively address problems or constraints as quickly as possible.

- **_Ability to Grow in New Geographies._** We plan to invest in international operations and grow our business outside of our existing operations. We believe we are well-positioned for international expansion with the vehicle segments in which we currently or expect to operate. Other factors that we believe will aid our successful international growth include: the highly flexible, modular nature of our platforms, which we anticipate will provide us the ability to introduce new vehicle programs and configurations; our digital-first approach, which we anticipate will allow us to

18

Exhibit 8 - Page 506

expand quickly; and our product development expertise, which we anticipate will enable us to offer significant customization for diverse international markets and demographics.

Our international expansion has significant associated investment requirements, such as capital spending related to infrastructure, including additional manufacturing capacity, delivery and service operations, charging networks, and personnel. International expansion is also subject to a variety of risks, including local competition, multilingual customer support and servicing, delivery logistics, and compliance with foreign laws and regulations related to vehicle sales, data privacy, financing, taxes, labor and employment, and foreign exchange.

- ***Ability to Maintain Our Culture, Attract and Retain Talent, and Scale Our Team.*** We believe our culture has been a key contributor to the positive response from our customers, and our mission promotes a sense of greater purpose and fulfillment in our employees. We have invested in building a strong culture and believe it is one of our most important and sustainable sources of competitive advantage. Any failure to preserve our culture could negatively affect our ability to retain and recruit personnel, which is critical to our growth, and to effectively pursue our objectives. If we are unable to retain or hire key personnel, our business and competitive position may be harmed, resulting in an adverse impact to our prospects, financial condition, results of operations, and cash flows.

- ***Seasonality.*** Historically, the automotive industry has experienced higher revenue in the spring and summer months. Additionally, we expect volumes of commercial vehicle sales to be less in the winter months, as customers shift their focus to making last mile deliveries during holidays, rather than incorporating more vehicles into their fleet. We do not expect such seasonality in demand to significantly impact our operations in the near-term as we scale our business due to our backlog of preorders; however, we may experience seasonal variations in our business in the long-term.

- ***Inflation and Rising Interest Rates.*** The United States economy has experienced inflation in various market segments. In order to help slow inflation, the Federal Reserve Bank in the United States has raised interest rates rapidly and substantially in recent years, and it is expected that interest rates will remain elevated for longer than previously anticipated. This may result in vehicle financing becoming less affordable to customers, influence customers' buying decisions to less expensive vehicles, or cause tightening of lending standards. If we are unable to fully offset higher costs through price increases or other measures, especially in the near-term as we continue to work through the backlog of preorders, or if we experience lower demand for our vehicles, we could experience an adverse impact on our business, prospects, financial condition, results of operations, and cash flows.

19

Exhibit 8 - Page 507

**Results of Operations**

The following tables set forth our consolidated results of operations and production and delivery volumes for the periods presented (in millions, except for production and delivery volumes). The period-to-period comparisons of our historical results are not necessarily indicative of the results that may be expected in the future.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2023 | 2022 | 2023 |
|---|---|---|---|---|
| Revenues | $ 536 | $ 1,337 | $ 995 | $ 3,119 |
| Cost of revenues | 1,453 | 1,814 | 3,118 | 4,543 |
| Gross profit | (917) | (477) | (2,123) | (1,424) |
| Operating expenses | | | | |
| Research and development | 452 | 529 | 1,542 | 1,469 |
| Selling, general, and administrative | 405 | 434 | 1,396 | 1,265 |
| Total operating expenses | 857 | 963 | 2,938 | 2,734 |
| Loss from operations | (1,774) | (1,440) | (5,061) | (4,158) |
| Interest income | 69 | 126 | 94 | 391 |
| Interest expense | (24) | (55) | (70) | (147) |
| Other income, net | 6 | 2 | 12 | 4 |
| Loss before income taxes | (1,723) | (1,367) | (5,025) | (3,910) |
| Provision for income taxes | (1) | - | (4) | (1) |
| Net loss | $ (1,724) | $ (1,367) | $ (5,029) | $ (3,911) |
| | | | | |
| Production volume | 7,363 | 16,304 | 14,317 | 39,691 |
| Delivery volume | 6,584 | 15,564 | 12,278 | 36,150 |

*Comparison of the Three and Nine Months Ended September 30, 2022 and 2023*

*Revenues*

| (in millions except delivery volume) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | 2022 | 2023 | $ Change | % Change | 2022 | 2023 | $ Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Revenues | $ 536 | $ 1,337 | $ 801 | 149% | $ 995 | $ 3,119 | $ 2,124 | 213% |
| | | | | | | | | |
| Delivery volume | 6,584 | 15,564 | 8,980 | 136% | 12,278 | 36,150 | 23,872 | 194% |

For the three and nine months ended September 30, 2023, we recognized revenues of $1,337 million, and $3,119 million, respectively, including $34 million from sales of regulatory environmental credits in the nine months ended September 30, 2023.

Revenues increased compared to the three and nine months ended September 30, 2022, primarily due to an increase in deliveries of 8,980 and 23,872 vehicles during the three and nine months ended September 30, 2023, respectively.

Exhibit 8 - Page 508

*Cost of revenues and gross profit*

| (in millions except production and delivery volumes) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | 2023 | $ Change | % Change | 2022 | 2023 | $ Change | % Change |
| Cost of revenues | $ 1,453 | $ 1,814 | $ 361 | 25% | $ 3,118 | $ 4,543 | $ 1,425 | 46% |
| Gross profit | $ (917) | $ (477) | $ 440 | 48% | $ (2,123) | $ (1,424) | $ 699 | 33% |
| | | | | | | | | |
| Delivery volume | 6,584 | 15,564 | 8,980 | 136% | 12,278 | 36,150 | 23,872 | 194% |
| Production volume | 7,363 | 16,304 | 8,941 | 121% | 14,317 | 39,691 | 25,374 | 177% |

For the three months ended September 30, 2023, we incurred cost of revenues of $1,814 million, including $176 million of depreciation and amortization expense. Cost of revenues increased compared to the three months ended September 30, 2022, primarily due to an increase in production and deliveries of 8,941 and 8,980 vehicles, respectively and a $54 million increase in depreciation expense.

For the nine months ended September 30, 2023, we incurred cost of revenues of $4,543 million, including $466 million of depreciation and amortization expense. Cost of revenues increased compared to the nine months ended September 30, 2022, primarily due to an increase in production and deliveries of 25,374 and 23,872 vehicles, respectively, and a $137 million increase in depreciation expense partially offset by a decrease in charges to reflect the LCNRV of inventory and losses on firm purchase commitments from $696 million to $114 million. We expect the size of LCNRV write-downs and losses on firm purchase commitments to decrease over time, which we expect will have the effect of decreasing our cost of revenues per vehicle.

On August 16, 2022, the Inflation Reduction Act of 2022 (the "IRA") was enacted and includes multiple clean energy incentives, including an incentive related to battery component production. For the three and nine months ended September 30, 2023, the impact of the IRA on our results of operations was not material. We will continue to evaluate the expected future impact of the IRA on our business, financial condition, and cash flows as additional regulatory guidance is issued.

Negative gross profit decreased for the three and nine months ended September 30, 2023 compared to the three and nine months ended September 30, 2022, primarily due to ramping production and reductions in materials costs and conversion costs (i.e., labor, depreciation, and overhead) on a per unit basis combined with increased average selling prices. As we continue ramping production lines designed for higher volumes, we have experienced, and will continue to experience, negative gross profit as conversion costs are allocated across volumes lower than total capacity. However, we expect negative gross profit to continue improving on a per-vehicle basis as we increase overall production levels, implement new in-vehicle technologies, increase average selling prices, and achieve commercial cost savings on material costs.

*Research and development*

| (in millions) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | 2023 | $ Change | % Change | 2022 | 2023 | $ Change | % Change |
| Research and development | $ 452 | $ 529 | $ 77 | 17% | $ 1,542 | $ 1,469 | $ (73) | (5)% |

For the three months ended September 30, 2023, we incurred R&D expenses of $529 million, including $50 million of depreciation and amortization expense. R&D expenses increased compared to the three months ended September 30, 2022, primarily due to a $52 million increase in engineering, design, and development costs and other related project costs for future technologies and a $19 million increase in depreciation and amortization expenses.

For the nine months ended September 30, 2023, we incurred R&D expenses of $1,469 million, including $119 million of depreciation and amortization expense. R&D expenses decreased compared to the nine months ended September 30, 2022, primarily due to a $97 million decrease in stock-based compensation resulting from a decrease in expense for awards granted prior to the IPO with accelerated expense recognition due to the IPO as a performance condition and a $92 million decrease in payroll and related expenses resulting from decreased headcount and decreased number of contractors, partially offset by a $70 million increase in engineering, design, and development costs and other related project costs for future technologies and a $53 million increase in depreciation and amortization.

21

Exhibit 8 - Page 509

We plan to continue investing in future vehicle platforms and new in-vehicle technologies as well as further vertical integration of manufacturing.

*Selling, general, and administrative*

| (in millions) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | 2023 | $ Change | % Change | 2022 | 2023 | $ Change | % Change |
| Selling, general, and administrative | $ 405 | $ 434 | $ 29 | 7% | $ 1,396 | $ 1,265 | $ (131) | (9)% |

For the three months ended September 30, 2023, we incurred SG&A expenses of $434 million, including $30 million of depreciation and amortization expense. SG&A expenses increased compared to three months ended September 30, 2022, primarily due to a $52 million increase in payroll and related expenses resulting from an increase in headcount as well as other miscellaneous operating expenses to support commercial go-to-market operations and corporate initiatives partially offset by a $49 million decrease in stock-based compensation expense primarily related to a decrease in expense for awards granted prior to the IPO with accelerated expense recognition due to the IPO as a performance condition.

For the nine months ended September 30, 2023, we incurred SG&A expenses of $1,265 million, including $82 million of depreciation and amortization expense. SG&A expenses decreased compared to the nine months ended September 30, 2022, primarily due to a $165 million decrease in stock-based compensation resulting from a decrease in expense for awards granted prior to the IPO with accelerated expense recognition due to the IPO as a performance condition partially offset by a $36 million increase in payroll and related expenses from certain increases in headcount.

We plan to make continued investments in our facilities, commercial operations, and technology for our future operations.

*Other income (expense)*

| (in millions) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | 2023 | $ Change | % Change | 2022 | 2023 | $ Change | % Change |
| Interest income | $ 69 | $ 126 | $ 57 | 83% | $ 94 | $ 391 | $ 297 | 316% |
| Interest expense | $ (24) | $ (55) | $ (31) | (129)% | $ (70) | $ (147) | $ (77) | (110)% |
| Other income, net | $ 6 | $ 2 | $ (4) | (67)% | $ 12 | $ 4 | $ (8) | (67)% |

Interest income increased for the three and nine months ended September 30, 2023 compared to the three and nine months ended September 30, 2022, primarily due to higher interest rates.

Interest expense increased for the three and nine months ended September 30, 2023 compared to the three and nine months ended September 30, 2022, primarily due to higher interest rates and the issuance of the 2029 Green Convertible Notes. We expect interest expense to increase in the near term, as a result of the recent issuance of the 2030 Green Convertible Notes and elevated interest rate environment. See Note 5 "Debt" to our condensed consolidated financial statements included in this Form 10-Q for more information on the 2029 Green Convertible Notes and 2030 Green Convertible Notes.

*Provision for income taxes*

As of September 30, 2022 and 2023, the majority of our deferred tax assets were comprised of net operating losses generated primarily in the United States and tax credit carryforwards, and for both periods, these assets were fully offset by a valuation allowance.

**Liquidity and Capital Resources**

Our operations have been financed primarily through net proceeds from the sale of securities, including in our IPO, and from borrowings. The following table summarizes our liquidity (in millions):

22

Exhibit 8 - Page 510

| | December 31, 2022 | September 30, 2023 |
|---|---|---|
| Cash and cash equivalents | $ 11,568 | $ 7,941 |
| Short-term investments | - | 1,192 |
| Availability under ABL Facility | 343 | 1,120 |
| Total liquidity | $ 11,911 | $ 10,253 |

In March 2023, we issued $1,500 million principal amount of green convertible unsecured senior notes due March 2029 (the "2029 Green Convertible Notes") at a discount of $15 million in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The 2029 Green Convertible Notes were issued pursuant to, and are governed by, an indenture dated March 10, 2023, between us and U.S. Bank Trust Company, National Association. The 2029 Green Convertible Notes accrue interest at a rate of 4.625% per annum, payable semi-annually in arrears on March 15 and September 15. See Note 5 "Debt" to our condensed consolidated financial statements included in this Form 10-Q for more information on the 2029 Green Convertible Notes.

In April 2023, we amended and restated the credit agreement governing the ABL Facility and released all the restricted cash associated with the ABL Facility. See Note 5 "Debt" to our condensed consolidated financial statements included in this Form 10-Q for more information about the ABL Facility amendment.

In October 2023, the Company issued $1,725 million principal amount of green convertible unsecured senior notes due October 2030 (the "2030 Green Convertible Notes") at a discount of $15 million in a private offering to qualified institutional buyers. The 2030 Green Convertible Notes accrue interest at a rate of 3.625%, payable semi-annually in arrears on April 15 and October 15. In connection with the issuance of the 2030 Green Convertible Notes, the Company paid $108 million to enter into privately negotiated capped call transactions (the "Capped Calls") with certain financial institutions to increase the effective conversion premium to approximately $31.06 per share. As the offering was not complete until after quarter-end, the $1,602 million net proceeds, after deducting the debt discount and capped call premium, was not included in our third quarter cash, cash equivalents, and short-term investments balance of $9,133 million. We intend to allocate the net proceeds from the issuances of the 2029 Green Convertible Notes and 2030 Green Convertible Notes to finance, refinance, or make direct investments in, in whole or in part, one or more new or existing eligible green projects, as described in our newly established green financing framework.

We have generated significant losses from operations, as reflected in our accumulated deficit of $13,126 million and $17,037 million as of December 31, 2022 and September 30, 2023, respectively. Additionally, we have generated significant negative cash flows from operations and investing activities as we continue to support the growth of our business. We anticipate continuing to make significant capital investments over the next several years to focus on ramping up production as we strategically expand infrastructure, including additional manufacturing capacity both domestically and internationally. We also anticipate continuing to make significant investments in future growth initiatives, including vehicle and other technology and software, tooling for current vehicle platforms, future vehicle manufacturing lines, battery technology and supply, and our service and retail network.

We do not have any material commitments related to these ongoing investments that we cannot cancel without a significant penalty. As of December 31, 2022 and September 30, 2023, our known commitments are disclosed in Note 4 "Inventory and Inventory Valuation", Note 6 "Leases", Note 7 "Debt", and Note 13 "Commitments and Contingencies" to the consolidated financial statements in our Form 10-K and Note 3 "Inventory and Inventory Valuation", Note 5 "Debt", and Note 10 "Commitments and Contingencies" to the condensed consolidated financial statements included in this Form 10-Q.

We believe our existing balance of cash and cash equivalents and short-term investments, in addition to amounts available for borrowing under the ABL Facility, will be sufficient to meet our operating expenses, working capital, and capital expenditure needs for at least the next 12 months.

Our future operating losses and capital requirements may vary materially from those currently planned and will depend on many factors, including our rate of revenue growth, the timing and extent of spending on R&D efforts and other growth initiatives, the timing, nature, and rate of expansion of manufacturing activities, our ability to drive cost reductions across the business through improved efficiencies, the timing of new products and services, market acceptance of our offerings, and overall economic conditions. Furthermore, we anticipate that future investments will require significant debt and/or equity financing. The sale of additional equity would result in dilution to our stockholders. The incurrence of additional debt would result in debt service obligations, and the instruments governing such debt could provide for operational and/or financial

Exhibit 8 - Page 511

covenants that restrict our operations. There can be no assurances that we will be able to raise additional capital on favorable terms or at all. The inability to raise capital would adversely affect our ability to achieve our business objectives.

**Cash Flows**

| | Nine Months Ended September 30, | |
|---|---|---|
| (in millions) | 2022 | 2023 |
| Net cash used in operating activities | $ (3,606) | $ (3,759) |
| Net cash used in investing activities | $ (1,075) | $ (1,908) |
| Net cash provided by financing activities | $ 62 | $ 1,509 |

*Operating Activities*

Net cash used in operating activities increased during the nine months ended September 30, 2023 compared to the nine months ended September 30, 2022, primarily driven by higher buildup of inventory levels to support our increasing production levels and timing of payments to suppliers, partially offset by gross profit improvement and increased interest income.

*Investing Activities*

Net cash used in investing activities increased during the nine months ended September 30, 2023 compared to the nine months ended September 30, 2022, primarily driven by the purchase of short-term investments, partially offset by a reduction in equipment and construction spend as compared to the earlier stages of our production ramp at our Normal Factory in the prior year and maturities of short-term investments. During the nine months ended September 30, 2023, we continued to invest in the growth of our business at our Normal Factory, our next generation vehicle platforms and technologies, and our go-to-market infrastructure.

*Financing Activities*

Net cash provided by financing activities during the nine months ended September 30, 2023 was primarily driven by proceeds from the issuance of the 2029 Green Convertible Notes.

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, which have been prepared in accordance with U.S. GAAP. In preparing the condensed consolidated financial statements, we make estimates and judgments that affect the reported amounts of assets, liabilities, stockholders' deficit or equity, revenue, and expenses, and related disclosures. We re-evaluate our estimates on an ongoing basis. Our estimates are based on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Because of the uncertainty inherent in these matters, actual results may differ from these estimates and could differ based upon other assumptions or conditions, and such differences may be material. The critical accounting policies that reflect the more significant judgments and estimates used in the preparation of our condensed consolidated financial statements include those described in Part II, Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-K. During the nine months ended September 30, 2023, there were no material changes to our critical accounting policies and estimates from those discussed in the Form 10-K.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

Our exposure to market risk as a result of our financial instruments for the year ended December 31, 2022 is described under Part II, Item 7A "Quantitative and Qualitative Disclosures about Market Risk" in the Form 10-K. During the nine months ended September 30, 2023, we issued $1,500 million principal amount of 2029 Green Convertible Notes. As the 2029 Green Convertible Notes have a fixed annual interest rate, we have no interest expense exposure associated with changes in interest rates; however, the fair value of the 2029 Green Convertible Notes is impacted as interest rates change. The fair value of the 2029 Green Convertible Notes will generally increase as interest rates fall and decrease as interest rates rise. In addition, their fair value is subject to market risk due to the conversion feature and can be affected when the market price of our Class A common stock fluctuates. Their fair value will generally increase as our Class A common stock price increases and

24

Exhibit 8 - Page 512

will generally decrease as our Class A common stock price decreases. As we carry the 2029 Green Convertible Notes at face value less unamortized discount on our condensed consolidated balance sheet, any fair value fluctuations are presented for required disclosure purposes only but do not impact our financial position, cash flows, or results of operations. See Note 5 "Debt" to our condensed consolidated financial statements included in this Form 10-Q for more information on the 2029 Green Convertible Notes.

During the nine months ended September 30, 2023, we made short-term investments in United States Treasury securities and time deposits with maturities over three and up to twelve months. We do not enter into investments for trading or speculative purposes. However, some of our investments are exposed to market risk due to fluctuations in interest rates which may affect our interest income and the fair market value of our investments. Due to the short-term nature of our investment portfolio, we do not believe a hypothetical 100 basis point increase or decrease in interest rates would have a material effect on its fair market value. See Note 12 "Fair Value Measurements" to our condensed consolidated financial statements included in this Form 10-Q for more information on our short-term investments.

There were no other material changes in our exposure to market risk as a result of our financial instruments.

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

The Company maintains disclosure controls and procedures as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e). In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating the cost-benefit relationship of possible controls and procedures. A variety of ongoing procedures are conducted, under the supervision and with the participation of the Company's management, including the CEO and CFO, to evaluate the effectiveness of the design and operation of the Company's disclosure controls and procedures.

Based on that evaluation, our CEO and CFO concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2023 due to the material weaknesses in the Company's internal control over financial reporting, described below.

Nevertheless, based on the performance of additional procedures by management designed to ensure reliability of financial reporting, the Company's management has concluded that, notwithstanding the material weaknesses described below, the condensed consolidated financial statements, included in this Form 10-Q, fairly present, in all material respects, the Company's financial position, results of operations, and cash flows as of the dates, and for the periods presented, in conformity with U.S. GAAP.

*Previously Reported Material Weaknesses*

A material weakness is a deficiency, or combination of deficiencies, in our internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements would not be prevented or detected on a timely basis.

As disclosed in our Form 10-K, management concluded that the Company's risk assessment process was not effective in implementing controls on a timely basis in response to changes to the business operations, personnel, and other factors affecting certain financial reporting processes and related information technology ("IT") systems. As a result, the Company had ineffective Information Technology General Controls ("ITGC") related to certain systems, applications, and tools used for financial reporting; and the Company did not establish effective user access and segregation of duties controls across financially relevant functions. Therefore, the automated and manual process level controls over financial reporting which were dependent upon these ITGCs could not be relied upon.

Our management has concluded that these material weaknesses still exist as of September 30, 2023.

The control deficiencies identified did not result in misstatements to our consolidated financial statements; however, the control deficiencies described above created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis. Therefore, our management concluded that the deficiencies represent material weaknesses.

Exhibit 8 - Page 513

*Remediation Efforts to Address the Material Weaknesses*

The aforementioned material weaknesses were identified in 2021. While the Company has improved its organizational capabilities, the material weaknesses remain un-remediated as of September 30, 2023, and the Company's remediation efforts will continue to take place in 2023.

During the year ended December 31, 2022, management completed the following remedial actions:
- performed a risk assessment over the IT systems used as part of financial reporting and business processes, including the various layers of technology;
- implemented processes to identify sensitive access and segregation of duties risks across relevant business and IT functions, implemented tools and systems to support the ongoing maintenance and evaluation of the risks and controls, and implemented controls to address risks within certain privileged IT access;
- designed, developed, and deployed an enhanced ITGC framework, including the implementation of a number of systems and tools to enable the effectiveness and consistent execution of these controls; and
- hired critical leadership roles with public company and internal control experience responsible for designing, implementing, and monitoring our ITGCs, including the Chief Information Officer, Chief Operations Officer, Vice President Corporate Controller, and Head of SOX Compliance.

During the nine months ended September 30, 2023, management completed the following remedial actions:
- further refined remediation plans for all known ITGC, user access, and segregation of duties deficiencies;
- continued execution and completion of certain elements of those remediation plans, including removing unnecessary and excessive access, implementation of additional automation in provisioning and deprovisioning controls and monitoring of user access, and enhancing monitoring of the execution of our ITGC; and
- continued hiring of critical resources to drive our remediation efforts, including the Vice President of Global Financial Systems - Enterprise Data, Vice President of Internal Controls and Compliance, and Chief Information Security Officer.

In addition to the remedial actions taken to date, the Company is continuing to evaluate, and modify where necessary, the procedures to implement in order to remediate the material weaknesses described above. The remaining steps on the remediation plan include:
- continuing to execute processes and controls to better manage and monitor our segregation of duties risks, including the usage of technology and tools for segregation of duties within the Company's systems, applications, and tools;
- continuing to execute ITGCs to manage access and program changes within our IT environment and to support the evaluation, monitoring, and ongoing effectiveness of key application controls and key reports; including:
  - controls and the usage of technology and tools over consistent provisioning, deprovisioning, and periodic reviews of user access;
  - monitoring processes to drive improved execution of ITGCs, including assessing the impact of business and technology changes for the continued alignment with financial reporting needs; and
- continuing to provide our resources with a structure to implement, monitor, and maintain ITGCs, with a focus on user access and segregation of duties controls.

The actions that we are taking are subject to ongoing management review and audit committee oversight. We will not be able to conclude whether the steps we are taking will fully remediate the material weaknesses in our internal control over financial reporting until we have completed our remediation efforts and subsequently evaluated their effectiveness. We may also conclude that additional measures are required to remediate the material weaknesses in our internal control over financial reporting.

*Changes in Internal Control Over Financial Reporting*

Except for the remediation measures in connection with the material weaknesses described above, there were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the quarter ended September 30, 2023 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

26

Exhibit 8 - Page 514

**PART II. OTHER INFORMATION**

**Item 1. Legal Proceedings**

Currently we are involved in, or may in the future be involved in, legal proceedings, claims or government investigations in the ordinary course of business relating to, among other things, commercial matters and contracts, intellectual property, labor and employment, discrimination, false or misleading advertising, regulatory matters, competition, pricing, tax, consumer rights/protection, torts/personal injury, real estate matters, property rights, data privacy/data protection, and securities.

These matters also include the following:

- On July 17, 2020, Tesla, Inc. ("Tesla") filed suit against Rivian Automotive, Inc., Rivian Automotive, LLC and a number of former Tesla/current Rivian group employees in California Superior Court, Santa Clara County. The remaining claims in the current operative pleading, the Fourth Amended Complaint ("4AC") filed on September 28, 2021, are claims for trade secret misappropriation against Rivian and various individual defendants and breach of contract against the individual defendants (but not against Rivian). Tesla alleges that the individual defendants took confidential and trade secret documents and information at Rivian's direction when they left Tesla's employ to join Rivian, including recruitment and personnel information, sales data, service data, manufacturing information, new market expansion information, and documents and code relating to battery technology. Tesla also alleges that by doing so, the individual defendants breached their non-disclosure and other agreements with Tesla. The 4AC seeks damages, injunctive relief and attorneys' fees, among other things. We believe Tesla's claims are meritless and intend to vigorously defend against this lawsuit.

- Between March 7, 2022 and April 19, 2022, three alleged stockholders filed lawsuits against Rivian Automotive, Inc., certain of our officers and directors, and Rivian's IPO underwriters on behalf of a putative class of purchasers of Rivian common stock in our IPO. The three suits were consolidated under the caption *Crews v. Rivian Automotive, Inc., et al.* 22-cv-01524-RGK-E (C.D. Cal.). On July 22, 2022 the lead plaintiff filed an amended consolidated complaint, alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Exchange Act and seeking damages, equitable relief and attorneys' fees and costs. By Order dated February 16, 2023 the Rivian defendants and the underwriter defendants' motions to dismiss were granted with leave to amend. An Amended Complaint was filed on March 2, 2023 and on March 16, 2023 defendants filed Motions to Dismiss, which were denied by Order dated July 3, 2023. We believe the alleged stockholders' claims are meritless and intend to vigorously defend against this lawsuit. A similar lawsuit styled *Smith, et al. v. Rivian Automotive, Inc., et al.*, 30-2023-01310105-CU-SL-CXC, was filed by two alleged stockholders in California Superior Court, Orange County on February 28, 2023. The Complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933 and seeks damages, declaratory judgment and attorneys' fees and costs. Defendants filed a Motion to Dismiss the Complaint on April 6, 2023, which was granted by Order dated June 30, 2023. Plaintiffs filed a Notice of Appeal on September 1, 2023.

- On July 8, 2022, the State of Georgia filed a petition with the Morgan County (Georgia) Superior Court to validate $15 billion in revenue bonds that would establish the financing structure that is necessary for the provision of certain incentives for Rivian's planned manufacturing site in Georgia. In its petition, the State claimed that the bonds were authorized under the laws of the State of Georgia and the procedural and substantive requirements for bond validation had been met, and as such, the State sought bond validation. The Court denied the petition by Order dated September 29, 2022. The State filed a Notice of Appeal on October 28, 2022 and the Court of Appeals issued its opinion on April 28, 2023, affirming in part and reversing in part the Superior Court's Order. Appellee Intervenors filed a Petition for Certiorari, which was denied by the Supreme Court of Georgia on July 13, 2023. After remittiturs issued, on August 15, 2023 the Superior Court issued an Order and Final Judgment confirming and validating the bonds.

- On January 27, 2023, six individuals filed a Complaint in Morgan County (Georgia) Superior Court against Morgan County, Georgia. The lawsuit seeks declaratory and injunctive relief related to the property where Rivian Horizon's planned manufacturing plant is to be located. More specifically, it seeks a declaratory judgment that the property, and Rivian Horizon's proposed project thereon, is subject to local and state zoning laws and an injunction compelling Morgan County to enforce the zoning laws. On August 2, 2023, the court granted the motion to intervene in this suit filed by the State of Georgia and the Joint Development Authority of Jasper County, Morgan County, Newton County

27

Exhibit 8 - Page 515

and Walton County. On January 31, 2023, the same plaintiffs filed a Complaint in Fulton County (Georgia) Superior Court against the State of Georgia. The lawsuit seeks declaratory and injunctive relief related to the property where Rivian Horizon's planned manufacturing plant is to be located. More specifically, it seeks a declaratory judgment that the property, and Rivian Horizon's proposed project thereon, is subject to local and state zoning laws and an injunction (1) compelling the State to enforce the zoning laws, and (2) enjoining the State (and its groups/agencies) from taking further action on this project until the zoning laws are complied with. The State of Georgia has moved to dismiss or transfer this suit. Although Rivian Horizon is not a party to either of these lawsuits nor are any of its direct or indirect parents or subsidiaries, there is a possibility that Rivian Horizon could become a party to the proceedings or that these suits or their outcomes could affect the timing and/or construction of the planned manufacturing plant in Georgia. On April 21, 2023 another lawsuit was filed related to the property where Rivian Horizon's planned manufacturing plant is to be located. *Jenkins v. Rivian Automotive, LLC, et al.*, Case No. 23-cv-00047-CDL (M.D. Ga.) includes claims for alleged violations of the Clean Water Act, negligence/negligence per se, and trespass/nuisance and seeks civil penalties, damages, injunctive relief, punitive damages, and attorneys' fees and costs. An amended complaint was filed on July 5, 2023, and on July 13, 2023 defendants filed motions to dismiss the amended complaint. On August 23, 2023 plaintiff voluntarily dismissed the amended complaint without prejudice.

While it is not possible to predict the outcome of these matters with certainty, based on our current knowledge, we do not believe that the final outcome of these pending matters is likely to have a material adverse effect on our business, results of operations, or financial condition.

Notwithstanding this belief, there is always the risk that a proceeding, claim or investigation will have a material impact on our business, results of operations, or financial condition. Regardless of the final outcome, litigation can have an adverse impact on us due to defense and settlement costs, diversion of management resources, harm to our reputation and brand, and other factors. For additional information about the legal proceedings we may be subject to and risks to our business relating to litigation, see the risk factors set forth in Part II, Item 1A "Risk Factors" and Note 10 "Commitments and Contingencies" to our condensed consolidated financial statements included in this Form 10-Q.

**Item 1A. Risk Factors**

*Our business is subject to various risks and uncertainties, including those described below, that may cause actual results to differ materially from historical performance or projected future performance expressed in forward-looking statements made by us. We encourage you to consider carefully the risk factors described below in evaluating the information in this* Form 10-Q *as the outcome of one or more of these risks and uncertainties could have a material adverse effect on our financial condition, results of operations, and cash flows as well as on our reputation, business, growth, future prospects, and ability to accomplish our strategic objectives.*

**Risks Related to Our Business**

**We are a growth stage company with limited operating history and a history of losses and expect to incur significant expenses and continuing losses for the foreseeable future. We may underestimate or not effectively manage the capital expenditures and costs associated with our business and operations, which could have a material and adverse effect on our business, prospects, financial condition, results of operations, and cash flows. We may also require additional financing to support our business, which may not be available in a timely manner or on terms that are acceptable, or at all.**

We have incurred net losses since our inception, including net losses of $5,029 million for the nine months ended September 30, 2022 and $3,911 million for the nine months ended September 30, 2023. Our costs will continue to be significant in the foreseeable future as we grow our go-to-market operations and sales of our vehicles, scale our operations, identify and commit resources to consider and address new areas of demand, including new geographies, and incur costs from operating as a public company. These expenditures include production costs, such as raw materials, labor and logistics costs, research and development investments and expenses, sales and distribution expenses, costs in connection with expanding our charging networks, and general and administrative expenses, and our level of expenditures will be significantly affected by consumer demand for our current products and services along with anticipated demand for future products and services. We do not expect to be profitable for the foreseeable future as we invest in our business, build capacity, and ramp up operations, and there is no assurance that we will ever achieve or be able to maintain profitability in the future. Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating

28

Exhibit 8 - Page 516

expenditures and our capital expenditures. If we are unable to efficiently manage our costs, our business, prospects, financial condition, results of operations, and cash flows would be materially and adversely affected.

As we have transitioned from an early-stage company focused on research and development activities to the large-scale manufacture, sale, and support of vehicles, we have required and expect to continue to require significant capital to develop and grow our business, including developing our vehicles to be manufactured at volume, rolling out our go-to-market infrastructure as well as building our brand and investing in our next generation technologies and products. Our future capital requirements are subject to uncertainty, particularly since we have a limited operating history as well as limited historical data on the demand for our products and services and the costs that we will incur over time in delivering these products and services to our customers. In addition, we have limited insight into trends that may emerge and affect our business as we operate in a relatively new industry segment that is rapidly evolving and highly competitive. As a result, actual capital requirements may be different from or greater than those we currently anticipate. Furthermore, we maintain the majority of our cash and cash equivalents in accounts with major United States and multi-national financial institutions, and our deposits at these institutions exceed insured limits. Market conditions can impact the viability of these institutions. In the event of failure of any of the financial institutions where we maintain our cash and cash equivalents, there can be no assurance that we would be able to access uninsured funds in a timely manner or at all. Any inability to access or delay in accessing these funds could adversely affect our business and financial position.

We expect that we will need to seek additional equity or debt financing in both the near- and long-term to finance a portion of our costs and capital expenditures. Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors. These include general conditions in the global economy and financial markets, which continue to experience volatility and disruptions due to inflation and interest rate changes, investor and customer acceptance of our business model, and market confidence in our ability to execute against our business plans. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. Any additional indebtedness we incur would result in increased debt service obligations and could involve additional restrictive covenants relating to our capital raising activities and other financial and operational matters, and the sale of additional equity or equity-linked securities would result in dilution for our stockholders. If we are unable to raise sufficient funds or obtain funding on terms satisfactory to us, we may have to significantly reduce our spending, delay or cancel our planned activities or substantially change our corporate structure, and we may not have sufficient resources to conduct our business as projected. This could mean that we would be forced to curtail or discontinue our operations, which could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**Our ability to develop and manufacture vehicles of sufficient quality and appeal to customers on schedule and on a large scale is unproven, and we have experienced, and may in the future experience, significant delays in the manufacture and delivery of our vehicles, which could harm our business, prospects, financial condition, results of operations, and cash flows.**

Our business depends in large part on our ability to develop, manufacture, obtain regulatory approval for, market, and sell vehicles of sufficient quality and appeal to customers on schedule and on a large scale. Our vehicles may not meet customer expectations and may not be commercially viable. Our initial deliveries for the R1T and R1S were delayed, and our production ramp is taking longer than originally expected due to operational and supply chain challenges in addition to other related factors. In addition, the cascading impacts of the COVID-19 pandemic and the ongoing military conflict between Russia and Ukraine impacted our business and operations from facility construction to equipment installation and vehicle component supply. Any further delay in the manufacture or delivery of our vehicles could materially damage our brand, business, prospects, financial condition, results of operations, and cash flows, and could cause liquidity constraints.

We launched our first consumer vehicles, the R1T and R1S, and first commercial vehicle, the EDV, and made our first deliveries in 2021. In conjunction with the launch of future products we may need to manufacture our vehicles in increasingly higher volumes than our present production capabilities at the Normal Factory. We have limited experience as an organization in high volume manufacturing of EVs, and there is no certainty as to when we will reach full vehicle production rate capacity at the Normal Factory. Even if we are successful in developing our high-volume manufacturing capability and processes and in reliably sourcing our component supply, we cannot assure that we will be able to do so in a manner that avoids significant delays and cost overruns. The continued development of and the ability to manufacture our vehicles at scale, including the R1T, R1S, and commercial fleet vehicles, such as the EDV, and other commercial products are and will be subject to risks, including with respect to:

- securing in a timely manner necessary raw materials, supplies, and components that meet our quality standards;

29

Exhibit 8 - Page 517

- our ability to negotiate and execute definitive licenses and agreements, and maintain arrangements on reasonable terms, with our various suppliers for hardware, software, or services necessary to engineer or manufacture components of our vehicles;
- quality controls, including within our manufacturing operations, that prove to be ineffective or inefficient and so drive higher than expected warranty or other costs;
- our ability to accurately forecast, purchase, warehouse, and transport components at high volumes to our manufacturing facility;
- our ability to successfully implement automation, inventory management and other systems to accommodate the increased complexity in our supply chain and components management, which may result in unexpected production disruption, storage, transportation and write-off costs;
- defects in design and/or manufacture that cause our vehicles not to perform as expected or that require repair, field actions, including product recalls, and design changes;
- delays, disruptions or increased costs in our supply chain, including raw material supplies;
- scaling our production processes to reduce the number of labor hours required to manufacture each vehicle;
- other delays, new technology introductions, which from time to time require temporary manufacturing shutdowns to implement product and technology enhancements and upgrades, backlog in manufacturing and research and development of new models, and cost overruns;
- obtaining required regulatory approvals and certifications;
- compliance with environmental, health, safety, and similar regulations;
- our ability to attract, recruit, hire, retain, and train skilled employees; and
- our ability to expand operations at existing facilities or future facilities, including plans to construct and operationalize a second manufacturing plant.

Historically, automobile customers have expected car manufacturers to periodically introduce new and improved vehicle models. To meet these expectations, we may be required to introduce new vehicle models and enhanced versions of existing models. Given that for the foreseeable future our business will depend on a limited number of models and that we have limited experience, as a company, designing, testing, manufacturing, marketing, selling, and supporting/servicing our vehicles, there can be no assurance that we will be able to meet customer expectations.

Any of the foregoing could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

**We have experienced, and could experience in the future, cost increases and disruptions in supply of raw materials or other components used in our vehicles.**

We incur significant costs related to procuring raw materials required to manufacture and assemble our vehicles. The prices we pay for these raw materials fluctuate depending on factors often beyond our control, including market conditions, inflation, changes in interest rates, and global demand for these materials, and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

Furthermore, currency fluctuations, tariffs or shortages in petroleum, and changes in economic or geopolitical conditions, including the ongoing conflict between Russia and Ukraine and in Israel and Gaza, may result in significant increases in freight charges and raw material and component costs. Substantial increases in the prices for our raw materials or components would increase our operating costs and could reduce our margins. For example, due to the global semiconductor supply shortage, other supply chain issues including the COVID-19 pandemic and the ongoing military conflict between Russia and Ukraine, and the current inflationary environment, the cost of raw materials and components required to produce our vehicles rose considerably, and we increased, and may need to continue to increase, the prices of our vehicles in response to these and future cost pressures. Price increases and other measures taken by us to offset higher costs could materially and adversely affect our reputation and brand, result in negative publicity and loss of customers and sales, and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

Changes in business or macroeconomic conditions, governmental regulations, and other factors beyond our control or that we do not presently anticipate could affect our ability to receive components from our suppliers. For example, impacts from COVID-19, including associated variants, and the ongoing military conflict between Russia and Ukraine, caused disruptions to and delays in our operations. These include shortages and delays in the supply of certain parts, including semiconductors, materials and equipment necessary to produce our vehicles, and the various internal designs and processes we adopted in an effort to remedy or mitigate impacts of such disruptions and delays resulted in higher costs. Also, if a supplied vehicle

Exhibit 8 - Page 518

component becomes the subject of a field action, including a product recall, we may be required to find an alternative component, which could increase our costs, cause vehicle production delays and subject us to costly litigation surrounding the component. In addition, if our suppliers experience substantial financial difficulties or work stoppages, cease operations, or otherwise face business disruptions, or choose to de-prioritize their supply to us, we would be required to take measures to ensure components and materials remain available. There are also increasing expectations that companies monitor the environmental and/or social performance of their supply chains, including suppliers' compliance with a variety of labor practices. Compliance can be costly, require us to establish or augment programs to diligence or monitor our suppliers, or, in the case of legislation such as the Uyghur Forced Labor Prevention Act, to design supply chains to avoid certain regions or suppliers altogether. Failure to comply may result in a variety of adverse impacts, including reputational damage, potential liability, or a denial of import for various components. In some cases, we may not be able to find alternative suppliers on acceptable terms or for the quantities that we need. The unavailability of any component or supplier has resulted, and could in the future result in production delays, idle manufacturing facilities, product design changes, loss of access to important technology and tools for producing and supporting our products and services, and increased costs, any of which could increase our costs and negatively affect our business, prospects, financial condition, results of operations, and cash flows.

As a key component of our vehicle products, our business depends on the continued supply of battery cells for our vehicles and the inability or unwillingness of battery cell manufacturers to build or operate battery cell manufacturing plants to supply the numbers of battery cells (including the applicable chemistries) required to support the growth of the electric or plug-in hybrid vehicle industry as demand for such cells increases would impact our projected manufacturing and delivery timelines, and adversely affect our business, prospects, financial condition, results of operations, or cash flows.

**We are dependent on our existing suppliers, a significant number of which are single or limited source suppliers, and are also dependent on our ability to source suppliers, for our critical components, and to complete the building out of our supply chain, while effectively managing the risks due to such relationships.**

Our success will be dependent upon our ability to enter into supplier agreements and maintain our relationships with existing suppliers who are critical and necessary to the production of our vehicles. The supply agreements we have, and may enter into with suppliers in the future, may have provisions where such agreements can be terminated in various circumstances, including potentially without cause. In the ordinary course of our business, including as a result of supplier contract changes resulting from product upgrades and adaptations, we currently have, and may in the future have, legal disputes with our suppliers, including litigation to enforce such supply agreements, which would adversely affect our ability to source components from such suppliers. If our suppliers become unable or unwilling to provide, or experience delays in providing, components, or if the supply agreements we have in place are terminated, or if any such litigation to enforce our supply agreements is not resolved in our favor, it may be difficult or impossible to find replacement components at a reasonable cost in a timely manner.

Additionally, our products contain thousands of components that we purchase from hundreds of mostly single- or limited-source suppliers, for which no immediate or readily available alternative supplier exists. Due to scarce natural resources or other component availability constraints, we may not receive the full allocation of components we have requested from a particular supplier due to supplier allocation decisions that are outside our control. While we believe that we would be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are acceptable to us. Further, any such alternative suppliers may be located a long distance from our manufacturing facilities, which may lead to increased costs or delays. In addition, as we evaluate opportunities and take steps to insource certain components, supply arrangements with current or future suppliers (with respect to other components offered by such suppliers) may be available on less favorable terms or not at all.

In addition, we are required to provide forecasts of our demand to our suppliers several months prior to the scheduled delivery of products to our prospective customers. Currently, there is limited historical basis for making judgments on the demand for our vehicles, our ability to develop, manufacture, and deliver vehicles, or our results of operations in the future. If we overestimate our requirements, our suppliers may have excess inventory, which would indirectly increase our costs. If we underestimate our requirements, our suppliers may have inadequate inventory, which could interrupt manufacturing of our products and result in delays in shipments and revenues. In addition, lead times for materials and components that our suppliers order may vary significantly and depend on factors such as the specific supplier, contract terms and demand for each component at a given time. If we fail to order sufficient quantities of product components in a timely manner, the delivery of vehicles to our customers could be delayed, which could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

31

Exhibit 8 - Page 519

If we do not enter into long-term supply agreements with guaranteed pricing for our components, or if those long-term supply agreements are not honored by our suppliers, we may be exposed to fluctuations in prices of components, materials, and equipment. Agreements for the purchase of battery cells contain or are likely to contain pricing provisions that are subject to adjustments based on changes in market prices of key commodities. Substantial increases in the prices for components, materials, and equipment would increase our operating costs and could reduce our margins if we cannot recoup the increased costs. Increasing the announced or expected prices of our vehicles in response to increased costs has previously been viewed negatively by our potential customers, and any future attempts to increase prices could have similar results, which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

We depend upon third parties to manufacture and to supply key semiconductor chip components necessary for our vehicles. We do not have long-term agreements with all of our semiconductor chip manufacturers and suppliers, and if these manufacturers or suppliers become unwilling or unable to provide an adequate supply of semiconductor chips, with respect to which there has been a global shortage, there could be no assurance that we would be able to find alternative sources in a timely manner and our business would be adversely impacted.

**We expect that a significant portion of our near-term revenue will be from one customer that is an affiliate of one of our principal stockholders. If we are unable to maintain this relationship, or if this customer purchases significantly fewer vehicles than we currently anticipate, then our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.**

In the near-term, we expect that a significant portion of our revenue will be from Amazon Logistics, Inc. ("Logistics"). Amazon.com, Inc. (together with its affiliates, "Amazon") is the parent company of both Logistics and Amazon.com NV Investment Holdings LLC ("NV Holdings"), which beneficially owns shares of our capital stock (including shares issuable upon the exercise of a warrant to purchase 3,723,050 shares of Class A common stock, as amended) representing 15.7% of our voting power as of September 30, 2023.

In February 2019, we entered into a commercial letter agreement with Amazon, and in September 2019, we entered into a related framework agreement with Logistics. We refer to these agreements, together with any work orders, purchase orders, related agreements, and amendments thereunder or thereto, collectively, as the "EDV Agreement." Under the EDV Agreement, we and Logistics have agreed to collaborate to design and develop Electric Delivery Vans ("EDVs") and/or certain component parts for use in Amazon's last mile delivery operations. Under the EDV Agreement, Logistics has the right to decide how many EDVs to purchase, which may be fewer than expected, or delay the delivery of such purchases. Certain factors outside of our control may influence Logistics' decision as to the number of EDVs to purchase from us and the timing of delivery, including Logistics' ability to deploy a charging infrastructure across their delivery stations. The EDV Agreement is non-exclusive for Logistics, and Logistics has purchased and may continue to purchase electric vehicles ("EVs"), including last mile delivery vehicles, from other manufacturers. We recently amended the EDV Agreement to change certain exclusivity and first refusal rights granted to Amazon, which previously prevented us from selling commercial vans to any other commercial customers. Under the EDV Agreement, as amended, we may sell commercial vans to third parties, subject to certain fees and limitations related to customer type and vehicle volume. See Part II, Item 5. "Other Information" for additional information on the terms of the amendment.

While the EDV Agreement provides that we will be reimbursed for certain development costs, it does not include any minimum purchase requirements or otherwise restrict Logistics from developing last mile vehicles in collaboration with, or purchasing last mile delivery vehicles from, third parties. The EDV Agreement may be terminated by either party with or without cause, subject to compliance with certain termination provisions. If we fail to adequately perform under the EDV Agreement, if fewer EDVs are purchased than we anticipate, or if either party terminates the EDV Agreement for any reason, our business, prospects, financial condition, results of operations, or cash flows would be materially and adversely affected.

**The success of our business depends on attracting and retaining a large number of customers. If we are unable to do so, we will not be able to achieve profitability.**

Our success depends on attracting a large number of potential customers to purchase our vehicles and the associated services we provide and may in the future provide to our customers. We offer our customers the ability to make preorders in the United States of America ("United States") and Canada with a cancellable and fully refundable deposit of $1,000, except for those consumers who opted into a binding purchase agreement on or after August 10, 2022 and before the Inflation Reduction Act of 2022 (the "IRA") was enacted, for whom only a portion is refundable. Deposits paid to preorder the R1T and

32

Exhibit 8 - Page 520

R1S are cancellable by the customer until the customer enters into a lease or purchase agreement. The potentially long wait from the time a preorder is made until the time the vehicle is delivered, any delays beyond expected wait times, and any changes in available configurations could also impact consumer decisions on whether to ultimately make a purchase or cancel a preorder. Because all of our preorders are cancellable, it is possible that a significant number of customers who submitted preorders for our vehicles may not purchase vehicles. Cancellations may result in lower vehicle unit sales and increased inventory, which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would be materially and adversely affected. In addition, we may incur significantly higher and more sustained marketing and promotional expenditures than we have previously incurred to attract customers. Further, our future success will also depend in part on securing additional commercial agreements with businesses and/or fleet operators for our commercial vehicles. If, for any of these reasons, we are not able to attract and maintain consumer and commercial customers, our business, prospects, financial condition, results of operations, or cash flows would be materially and adversely affected.

**The automotive market is highly competitive, and we may not be successful in competing in this industry.**

Both the automobile industry generally, and the EV segment in particular, are highly competitive, and we are competing for sales with both EV manufacturers and traditional automotive companies, including those who have or have announced consumer and commercial vehicles that may be directly competitive to ours. Many of our current and potential competitors may have significantly greater financial, technical, manufacturing, marketing, or other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale, and support of their products than we may devote to our products. We expect competition for EVs to intensify due to increased demand and a regulatory push for alternative fuel vehicles, continuing globalization, and consolidation in the worldwide automotive industry, as well as the significant volatility in oil and gasoline prices. In addition, as fleet operators begin transitioning to EVs on a mass scale, we expect that more competitors will enter the commercial fleet EV market. In addition, the existence of our commercial relationship with Amazon, coupled with its significant holdings of our securities, may deter Amazon's competitors or other third parties from contracting with us. Further, due to new entrants in the commercial fleet EV market, we may experience increased competition for components and other parts of our vehicles, which may have limited or single-source supply.

Factors affecting competition include product performance and quality, technological innovation, customer experience, brand differentiation, product design, pricing and total cost of ownership ("TCO"), and manufacturing scale and efficiency. The EV sector has recently experienced increasing price competition due in part to general economic conditions, including a rise in interest rates for vehicle loans. Several of our competitors have announced changes in pricing strategy, including vehicle price reductions, which may result in downward price pressure. We may not have the financial resources of some of our competitors to allow us to adjust pricing strategies, which may result in lower vehicle unit sales and increased inventory, a loss of customers and a loss in future market share, any of which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**We are highly dependent on the services and reputation of Robert J. Scaringe, our Founder and CEO.**

We are highly dependent on the services and reputation of Robert J. Scaringe, our Founder and CEO. Dr. Scaringe is a significant influence on and driver of our business plan. If Dr. Scaringe were to discontinue his service due to death, disability or any other reason, or if his reputation is adversely impacted by personal actions or omissions or other events within or outside his control, we would be significantly disadvantaged.

In addition, Dr. Scaringe is a director of Forever by Rivian, Inc., a 501(c)(4) social welfare organization ("Forever by Rivian"), and a trustee of the Rivian Foundation, a 501(c)(3) non-operating private foundation. Such positions with the Rivian Foundation and Forever by Rivian may give rise to fiduciary or other duties in conflict with the duties he owes to us. Furthermore, Dr. Scaringe may have significant duties, and may devote a substantial amount of time serving, as a member of the board of trustees of the Rivian Foundation and board of directors of Forever by Rivian which may compete with his ability to devote a sufficient amount of attention toward his obligations to us, or to day-to-day activities of our business.

33

Exhibit 8 - Page 521

**Our long-term results depend upon our ability to successfully introduce, integrate, and market new products and services, which may expose us to new and increased challenges and risks, and any inability to do so could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

Our growth strategy depends, in part, on our ability to successfully introduce and market new products and services, such as financing, insurance, vehicle services, charging solutions, vehicle resale, as well as membership and software services for consumer customers and fleet management for commercial customers. If we experience significant future growth, we may be required not only to make additional investments in our ecosystem and workforce, but also to expand our distribution infrastructure and customer support or expand our relationships with various partners and other third parties with whom we do business.

As we introduce new products and services or refine, improve, begin charging customers for, or upgrade versions of existing products and services, we cannot predict the level of market acceptance or the amount of market share these products or services will achieve, if any. There can be no assurance that we will not experience material delays in the introduction of new products and services in the future or that we will not experience higher costs than anticipated to launch new products and services. Consistent with our strategy of offering new products and product refinements, we expect to continue to use a substantial amount of capital for product refinement, research and development, and sales and marketing. We will need additional capital for product development and refinement, and this capital may not be available on terms favorable to us, if at all, which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

To date, we have little sustained experience servicing or repairing our vehicles in the field or providing financing or insurance services for our vehicles. Such lack of sustained experience as well as our lack of significant, relevant user data relating to these new offerings may make it more difficult for us to anticipate user demand and preferences. We may misjudge user demand and the potential profitability of a new product or service.

**If we fail to scale our business operations or otherwise manage our future growth effectively as we attempt to rapidly grow our company, we may not be able to produce, market, service and sell (or lease) our vehicles successfully.**

We intend to continue to expand our operations significantly, which will require hiring, retaining and training new personnel, controlling expenses, efficiently and effectively expanding operational capabilities, establishing more facilities and experience centers, and growing administrative infrastructure, systems, and processes. For example, in order to efficiently and effectively operate our manufacturing processes we must stand-up complex and integrated information technology ("IT") systems, and we plan to strategically expand infrastructure, including additional manufacturing capacity both domestically and internationally. Our future operating results depend largely on our ability to manage this expansion and growth successfully. Risks that we face in undertaking this expansion include, among others:

- attracting and retaining skilled and qualified personnel to support our expanded operations at existing facilities or operations at any facilities we may construct or acquire in the future;
- constructing and operationalizing our planned second manufacturing plant;
- implementing IT systems that allow for efficiently scalable manufacturing operations;
- managing a larger organization with a greater number of employees in different divisions and geographies;
- training and integrating new employees into our operations to meet the growing demands of our business;
- controlling expenses and investments in anticipation of expanded operations;
- establishing or expanding design, manufacturing, sales, charging and service facilities;
- managing regulatory requirements and permits, labor issues and controlling costs in connection with the construction of additional facilities or the expansion of existing facilities;
- implementing and enhancing administrative infrastructure, systems and processes;
- facing opposition from local anti-development groups or other special interest groups that are adverse to our business interests;
- failing to receive or maintain the support of local, state, federal or international politicians or other policymakers necessary to support expansion or new construction plans; and
- addressing any new markets and potentially unforeseen challenges as they arise.

As a newer entrant into the automotive industry, we cannot assure that we will be able to develop efficient, automated, cost-efficient manufacturing capabilities and processes, and reliable sources of component supply, that will enable us to meet the quality, price, engineering, design, and production standards, as well as the production volumes, required to successfully

34

Exhibit 8 - Page 522

market our vehicles as our operations expand. Any failure to effectively manage our growth could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**We may not succeed in maintaining and strengthening our brand, which would materially and adversely affect customer acceptance of our vehicles, products, and services and our business, prospects, financial condition, results of operations, or cash flows.**

Our business and prospects heavily depend on our ability to maintain and strengthen the Rivian brand. If we are not able to maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Our ability to maintain and strengthen the Rivian brand will depend heavily on our ability to provide high quality EVs and engage with our customers as intended, as well as the success of our customer development and marketing efforts.

The automobile industry is intensely competitive. Many of our current and potential competitors, particularly automobile manufacturers headquartered in the United States, Japan, the United Kingdom ("U.K."), the European Union ("EU"), and China, have greater name recognition, broader customer relationships, and substantially greater marketing resources than we do. If we do not maintain a strong brand, our business, prospects, financial condition, results of operations, and/or cash flows could be materially and adversely impacted.

In addition, if incidents occur or are perceived to have occurred, such as production delays and price increases, whether or not such incidents are our fault, we have in the past and could in the future be subject to adverse publicity. In particular, given the popularity of social media, any negative publicity, whether true or not, could quickly proliferate and harm consumer perceptions and confidence in the Rivian brand. Furthermore, there is the risk of potential adverse publicity related to our manufacturing, other partners (whether or not such publicity is related to their collaboration with us) or investors. Our ability to successfully position our brand could also be adversely affected by perceptions about the quality of our competitors' vehicles. In addition, from time to time, our vehicles are evaluated and reviewed by third parties. Any negative reviews or reviews which compare us unfavorably to competitors could adversely affect consumer perception about our vehicles.

**Our passion and focus on delivering a high-quality and engaging Rivian experience may not maximize short-term financial results, which may yield results that conflict with the market's expectations and could result in our stock price being negatively affected.**

We are passionate about continually enhancing the Rivian experience with a focus on driving long-term customer engagement through innovative, technologically advanced vehicles and services, which may not necessarily maximize short-term financial results. We frequently make business decisions that may reduce our short-term financial results if we believe that the decisions are consistent with our goals to improve the Rivian experience, which we believe will improve our financial results over the long-term. In the near-term, we will focus significant resources on research and development and sales and marketing to deliver the Rivian experience to our customers, which could impact our short-term financial results. These decisions may not be consistent with the short-term expectations of our stockholders and may not produce the long-term benefits that we expect, in which case our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely impacted.

**Our distribution model is different from the predominant current distribution model for automobile manufacturers and is subject to regulatory limitations on our ability to sell and service vehicles directly, which subjects us to substantial risk and makes evaluating our business, prospects, financial condition, results of operations, and cash flows difficult.**

We are selling and financing, and plan to lease, our vehicles directly to customers rather than through franchised dealerships. This model of vehicle distribution is relatively new, different from the predominant current distribution model for automobile manufacturers and, with limited exceptions, unproven, which subjects us to substantial risk. We have limited experience in selling and no experience in leasing vehicles and therefore this model may require significant expenditures and provide for slower expansion than the traditional dealer franchise system. For example, we will not be able to utilize long established sales channels developed through a franchise system to increase sales volume. Moreover, we will be competing with companies with well established distribution channels. Our success will depend in large part on our ability to effectively develop our own sales channels and marketing strategies. If our direct sales and leasing model does not develop as expected, develops more slowly than expected, or faces significant adversity from the established industry, we may be required to modify or abandon our sales and leasing model, which could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

35

Exhibit 8 - Page 523

As a manufacturer engaged in sales directly to consumers, we may also face regulatory limitations on our ability to sell and service vehicles directly, which could materially and adversely affect our ability to sell our vehicles. Many states have laws that may be interpreted to impose limitations on this direct-to-consumer sales model for manufacturers. The application of these state laws to our operations may be difficult to predict. Laws in some states may limit our ability to obtain dealer licenses from state motor vehicle regulators or to own or operate our own service centers. As a result, we may not be able to sell, finance or lease directly to customers in each state in the United States or provide service from a location in every state. In addition, decisions by regulators permitting us to sell vehicles may be challenged by dealer associations and others as to whether such decisions comply with applicable state motor vehicle industry laws. In some states, there have also been regulatory and legislative efforts by dealer associations to interpret laws or propose laws that, if enacted, would prevent us from obtaining dealer licenses in their states given our direct sales model. Dealer associations have also resorted to lawsuits in state courts to challenge our ability to obtain dealer licenses and operate directly even in states that have laws that would otherwise allow us to own and operate retail locations. We expect dealer associations to continue to mount continued legal and legislative challenges to our business model. For customers residing in states in which we will not be allowed to sell, lease, or deliver vehicles, we must generally conduct the sale out of the state over the internet or telephonically and may have to arrange alternate methods of delivery of vehicles. This could include delivering vehicles to adjacent or nearby states in which we are allowed to directly sell or lease and ship vehicles, and arranging for the customer to transport the vehicles to their home states. These workarounds could add significant complexity, and as a result, costs, to our business. States may also restrict our ability to service vehicles once sold and delivered to customers. Some states, for example, have laws that prohibit manufacturers from providing warranty service in state or restrict the ability for manufacturers to own or operate service operations. A few states have passed legislation that clarifies our ability to operate, but at the same time limits the number of dealer licenses we can obtain or dealerships that we can operate. The foregoing examples of state laws governing the sale and servicing of motor vehicles are just some of the legal hurdles we face as we sell and service our vehicles. In many states, there is limited historical application of motor vehicle laws to our sales model, particularly with respect to the sale of new vehicles over the internet. Internationally, there may be laws in jurisdictions that may restrict our sales or other business practices. While we have analyzed the principal laws in the United States, Canada, EU, China, Japan, U.K., and Australia relating to our distribution model and believe we comply with such laws, the laws in this area can be complex, difficult to interpret and may change over time, and thus require ongoing review. Further, we have not performed a complete analysis of all jurisdictions in which we may sell vehicles. These uncertainties and complexities subject us to substantial risk and could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**We rely on complex machinery for our operations, and production involves a significant degree of risk and uncertainty in terms of operational performance, safety, security, and costs.**

We rely heavily on complex machinery for our operations and our production involves a significant degree of uncertainty and risk in terms of operational performance, safety, security, and costs. Our manufacturing plant consists of large-scale machinery combining many components, including complex software to operate such machinery and to coordinate operating activities across the manufacturing plant. The manufacturing plant components are likely to suffer unexpected malfunctions from time to time, especially as we ramp up production on new products, and will depend on repairs, spare parts, and IT solutions to resume operations, which may not be available when needed. Unexpected malfunctions of the manufacturing plant machinery may significantly affect operational efficiency.

Operational performance and costs can be difficult to predict and are often influenced by factors outside of our control, such as, but not limited to, scarcity of natural resources, environmental hazards and remediation, costs associated with decommissioning of machines, labor disputes and strikes, difficulty or delays in obtaining governmental permits, damages or defects in electronic systems including the software used to control or operate them, industrial accidents, pandemics, fire, seismic activity, and natural disasters. For example, we have experienced several small fires in our Normal Factory. While these events were quickly contained and resulted in minimal damage and production delay, we cannot guarantee that similar events will not occur in the future, or that we will be able to contain such events without damage or delay.

Should operational risks materialize, it may result in the personal injury to or death of workers, the loss of production equipment, damage to manufacturing facilities, products, supplies, tools and materials, monetary losses, delays and unanticipated fluctuations in production, environmental damage, administrative fines, increased insurance costs, and potential legal liabilities, all of which could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows. We cannot be certain that our insurance coverage will be sufficient to cover potential costs and liabilities arising from operational risks or at reasonable rates. A loss that is uninsured or exceeds policy limits may require us to pay substantial amounts, which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

36

Exhibit 8 - Page 524

**Our vehicles rely on software and hardware that is highly technical, and if these systems contain errors, bugs, vulnerabilities, or design defects, or if we are unsuccessful in addressing or mitigating technical limitations in our systems, our business could be adversely affected.**

Our vehicles rely on software and hardware that is highly technical and complex and will require modification and updates over the life of the vehicles. In addition, our vehicles depend on the ability of such software and hardware to store, retrieve, process and manage immense amounts of data. There can be no assurance that our software and hardware will not contain errors, bugs, vulnerabilities or design defects, and our systems are subject to certain technical limitations that may compromise our ability to meet our objectives. Some errors, bugs, vulnerabilities, or design defects inherently may be difficult to detect and may only be discovered after the code has been released for external or internal use. Although we will attempt to remedy any issues we observe in our vehicles effectively and rapidly, such efforts may not be timely, may hamper production or may not be to the satisfaction of our customers.

Additionally, if we deploy updates to the software (whether to address issues, deliver new features or make desired modifications) and our over-the-air update procedures fail to properly update the software or otherwise have unintended consequences to the software, the software within our customers' vehicles will be subject to vulnerabilities or unintended consequences resulting from such failure of the over-the-air update until properly addressed.

If we are unable to prevent or effectively remedy errors, bugs, vulnerabilities or defects in our software and hardware, or fail to deploy updates to our software properly, we would suffer damage to our reputation, loss of customers, loss of revenue or liability for damages, any of which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**We must continue to develop complex software and technology systems in coordination with vendors and suppliers to reach mass production for our vehicles, and there can be no assurance such systems will be successfully developed or integrated.**

Our vehicles and operations use a substantial amount of complex in-house and third-party software and hardware. The continued development and integration of such advanced technologies are inherently complex, and requires us to coordinate with our vendors and suppliers to reach mass production for our vehicles. Defects and errors may be revealed over time and our control over the performance of third-party services and systems may be limited. Thus, our potential inability to develop and integrate the necessary software and technology systems may harm our competitive position.

We rely on third-party suppliers to develop a number of emerging technologies for use in our products, including battery technology and the use of different battery cell chemistries. Certain of these technologies and chemistries are not today, and may not ever be, commercially viable. There can be no assurances that our suppliers will be able to meet the technological requirements, production timing, and volume requirements to support our business plan. Furthermore, if we experience delays by our third-party suppliers, we could experience delays in delivering on our timelines. In addition, the technology may not comply with the cost, performance useful life, and warranty characteristics we anticipate in our business plan. As a result, our business plan could be significantly impacted and we may incur significant liabilities under warranty claims which could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**If there is inadequate access to charging stations, our business will be materially and adversely affected and we may not realize the benefits of our charging networks.**

Demand for our vehicles will depend in part upon the availability of a charging infrastructure. We continue to deploy our Rivian Adventure Network Direct Current fast charging sites ("Rivian Adventure Network") and Rivian Waypoints, which are networks of charging stations in the United States designed to provide charging capability to owners of our vehicles. We market our ability to provide our customers with comprehensive charging solutions, including our networks of charging stations, the Rivian Adventure Network and Rivian Waypoints, as well as the installation of home chargers for users where practicable, and provide other solutions including charging through publicly accessible charging infrastructure. We have limited experience in the actual provision of our charging solutions to customers and providing these services is subject to challenges, which include:

- charging station performance and reliability issues;

37

Exhibit 8 - Page 525

- the logistics, including any delays or disruptions, of rolling out and supporting our Rivian Adventure Network and Rivian Waypoints and teams in appropriate areas;
- successful integration with existing third-party charging networks;
- inadequate capacity or over capacity in certain areas, security risks or risk of damage to vehicles, charging equipment or real or personal property;
- access to sufficient charging infrastructure;
- obtaining any required permits, land use rights and filings;
- the potential for lack of customer acceptance of our charging solutions; and
- the risk that government support for EV and alternative fuel solutions and infrastructure may not continue.

While the prevalence of charging stations generally has been increasing, charging station locations are significantly less widespread than gas stations. Some potential customers may choose not to purchase our vehicles because of the lack of a more widespread charging infrastructure and concerns around reliability. Although we intend to expand our charging networks throughout the United States and eventually in other countries, with a focus on strategically deploying our charging stations in those regions with the highest concentration of customer preorders, major interstates as well as targeted destination areas, we may be unable to expand Rivian Adventure Network and Rivian Waypoints as fast as we intend or as the public expects, or to place the charging stations in places our customers believe to be optimal, and these networks may not result in increased preorders or sales of our vehicles. This could be due to a number of factors, including the inability to secure, or delays in securing, suitable locations and permits, problems negotiating leases with landowners, difficulties in interfacing with the infrastructures of various utility companies and greater than expected costs and difficulties of installing, maintaining, and operating the networks. If we do not realize the benefits of our charging networks, our brand and business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.

Further, to provide our customers with access to sufficient charging infrastructure, we will rely on the availability of, and successful integration of our vehicles with, third-party charging networks. In June 2023, we announced the adoption of the North American Charging Standard ("NACS") and planned incorporation of NACS charge ports and access to Tesla's Supercharger network. Any failure of third-party charging networks to meet customer expectations or needs, including quality of experience, reliability, safety, or security, any delays in implementation of NACS charge ports and access, or any limitation or cancellation of our customers' access to any third-party charging network, could impact the demand for our EVs. For example, where charging bays exist, the number of vehicles could oversaturate the available charging bays, leading to increased wait times and dissatisfaction for customers. In addition, given our limited experience in providing charging solutions, there could be unanticipated challenges, which may hinder our ability to provide our solutions or make the provision of our solutions costlier than anticipated. To the extent we are unable to meet user expectations or experience difficulties in providing our charging solutions, our reputation and business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.

**Our vehicles use lithium-ion battery cells, which, if not appropriately managed and controlled, have been observed to catch fire or vent smoke and flame.**

The battery packs within our vehicles use lithium-ion cells. If not properly managed or subject to environmental stresses, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the battery pack is designed to contain any single cell's release of energy without spreading to neighboring cells, a field or testing failure of battery packs in our vehicles could occur, which could result in bodily injury or death and could subject us to lawsuits, field actions (including product recalls), or redesign efforts, all of which would be time consuming and expensive and could harm our brand image. Also, negative public perceptions regarding the suitability of lithium-ion cells for automotive applications, the social and environmental impacts of mineral mining or procurement associated with the constituents of lithium-ion cells, or any future incident involving lithium-ion cells, such as a vehicle or other fire, could materially and adversely affect our reputation and business, prospects, financial condition, results of operations, and cash flows.

In addition, we store lithium-ion cells at our facilities and we have experienced, and may in the future experience, thermal events. Any mishandling of battery cells or safety issue or fire related to the cells could disrupt our operations and any prolonged or significant disruption would materially and adversely affect our business, prospects, financial condition, results of operations or cash flows. Such damage or injury could also lead to adverse publicity, regulatory action, and potentially a safety recall. In addition, the transportation and effective storage of lithium-ion batteries is also tightly regulated by the U.S. Department of Transportation and other regulatory bodies, and any failure to comply with such regulation could result in

38

Exhibit 8 - Page 526

fines, loss of permits and licenses or other regulatory consequences, which could limit our ability to manufacture and deliver our vehicles and negatively affect our business, prospects, financial condition, results of operations, and cash flows.

**We have limited experience servicing and repairing our vehicles. If we or our partners are unable to adequately service our vehicles, our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.**

We have limited experience servicing and repairing our vehicles. Servicing EVs is different than servicing vehicles with internal combustion engines and requires specialized skills, including high voltage training and servicing techniques. Although we plan to keep core areas of vehicle service internal over time, we continue to partner strategically with third parties to enable nationwide coverage of certain important services to our customers, such as emergency roadside and off-road assistance, third party collision repair support, and tire distribution needs. There can be no assurance that we will be able to enter into an acceptable arrangement with any such third-party providers. Although such servicing partners may have experience in servicing other vehicles, they will initially have limited experience in servicing our vehicles. We also have a limited network of locations to perform service and rely upon mobile service vehicles with technicians to provide service to our customers. There can be no assurance that our service arrangements will adequately address the service requirements of our customers to their satisfaction, or that we and our servicing partners will have sufficient resources, experience, or inventory to meet these service requirements in a timely manner as the volume of EVs we deliver increases. This risk is enhanced by our limited operating history and our limited data regarding our vehicles' real-world reliability and service requirements.

In addition, a number of states currently impose limitations on the ability of manufacturers to directly service vehicles. The application of these state laws to our operations would hinder or impede our ability to provide services for our vehicles from a location in every state. As a result, if we are unable to roll out and establish a widespread service network that complies with applicable laws, customer satisfaction could be adversely affected, which in turn could materially and adversely affect our reputation and our business, prospects, financial condition, results of operations, and cash flows.

As we continue to grow, additional pressure may be placed on our customer support team or partners, and we may be unable to respond quickly enough to accommodate short-term increases in customer demand for technical support. Customer behavior and usage may result in higher than expected maintenance and repair costs, which may materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows. We also could be unable to modify the future scope and delivery of our technical support to compete with changes in the technical support provided by our competitors. If we are unable to successfully address the service requirements of our customers or establish a market perception that we do not maintain high-quality support our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.

**The automotive industry and its technology are rapidly evolving and may be subject to unforeseen changes which could adversely affect the demand for our vehicles or increase our operating costs.**

We may be unable to keep up with changes in EV technology or alternatives to electricity as a fuel source and, as a result, our competitiveness may suffer. Developments in alternative technologies, such as advanced diesel, hydrogen, ethanol, fuel cells, or compressed natural gas, or other improvements in the fuel economy of the internal combustion engine ("ICE") or the cost of such fuels, may materially and adversely affect our business and prospects in ways we do not currently anticipate. Existing and other battery cell technologies, fuels or sources of energy may emerge as customers' preferred alternative to our vehicles. Any failure by us to develop new or enhanced technologies or processes, or to react to changes in existing technologies, could materially delay our development and introduction of new and enhanced alternative fuel and EVs, which could result in the loss of competitiveness of our vehicles, decreased revenue, and a loss of market share to competitors. Our research and development efforts may not be sufficient to adapt to changes in alternative fuel and EV technology.

As technologies change, we plan to upgrade or adapt our vehicles with the latest technology. However, our vehicles may not compete effectively with alternative systems if we are not able to source and integrate the latest technology into our vehicles. The introduction and integration of new technologies into our vehicles may increase our costs and capital expenditures required for the production and manufacture of our vehicles. In addition, upgrades and adaptations to our vehicles will also require, from time to time, planned and temporary manufacturing shutdowns. Plant shutdowns, whether associated with product changes or other factors, can have a negative impact on our revenues and a negative impact on our working capital. If we are unable to cost efficiently implement new technologies or adjust our manufacturing operations, or if we experience delays in achieving the foregoing, our business, prospects, financial condition, results of operations, or cash flows would be materially and adversely affected.

Exhibit 8 - Page 527

**We are subject to risks associated with advanced driver assistance technology.**

Our vehicles provide advanced driver assistance capabilities to our customers supported by hardware, software, and machine learning models. Errors in the design, implementation or execution of these components could lead to increased risk for our customers or third-party road users. Advanced driver assistance technologies are subject to risks and there have been accidents and fatalities associated with such technologies. The safety of such technologies depends in part on driver interactions, and drivers may not be accustomed to using or adapting to such technologies. To the extent accidents associated with our advanced driver assistance systems occur, we could be subject to liability, negative publicity, government scrutiny, and further regulation. Moreover, any incidents related to advanced driver assistance systems of our competitors could adversely affect the perceived safety and adoption of our vehicles and advanced driver assistance technology more broadly.

Advanced driver assistance technology is also subject to considerable regulatory uncertainty as the law evolves to catch up with the rapidly evolving nature of the technology itself. Our vehicles also may not achieve the requisite level of advanced driver assistance required for certification and rollout to consumers or satisfy changing regulatory requirements which would require us to redesign, modify, or update our advanced driver assistance hardware and related software systems. We may also fail to deliver the level of advanced driver assistance systems that customers expect from vehicles in our class. Any of the foregoing could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**Our future growth is dependent on the demand for, and upon consumers' willingness to adopt, EVs.**

Our future growth is dependent on the demand for, and upon consumers' willingness to adopt EVs, and even if EVs become more mainstream, consumers choosing us over other EV manufacturers is not assured. Demand for EVs may be affected by factors directly impacting automobile prices or the cost of purchasing and operating automobiles such as sales and financing incentives, prices of raw materials and components, cost of energy and governmental regulations, including tariffs, import regulation and other taxes. Volatility in demand may lead to lower vehicle unit sales, which may result in downward price pressure and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

The market for new alternative energy vehicles is still rapidly evolving, characterized by rapidly changing technologies, competitive pricing and competitive factors, evolving government regulation and industry standards, and changing consumer demands and behaviors. Other factors that may influence the adoption of alternative fuel vehicles, and specifically EVs, include:

- perceptions about EV quality, safety, design, performance and cost, especially if negative events or accidents occur that are linked to the quality or safety of EVs, whether or not such vehicles are produced by us or other manufacturers, resulting in adverse publicity and harm to consumer perceptions of EVs generally;
- perceptions about vehicle safety in general, in particular safety issues that may be attributed to the use of advanced technology, including EV systems;
- range anxiety, including the decline of an EV's range resulting from deterioration over time in the battery's usable capacity;
- the availability of new alternative energy vehicles;
- competition, including from other types of alternative fuel vehicles, plug-in hybrid EVs, and high fuel-economy ICE vehicles;
- the quality and availability of service and charging stations for EVs;
- the costs and challenges of installing home charging equipment, including for multi-family, rental, and densely populated urban housing;
- the environmental consciousness of consumers, and their adoption of EVs;
- the higher initial upfront purchase price of EVs, despite lower cost of ongoing operating and maintenance costs, compared to ICE vehicles;
- the availability of tax and other governmental incentives to purchase and operate EVs and future regulations requiring increased use of nonpolluting vehicles;
- perceptions about and the actual cost of alternative energy, including the capacity and reliability of the electric grid;
- volatility in the price of gasoline or other petroleum-based fuel, any extended periods of low gasoline or other petroleum-based fuel prices or an improved outlook for the long-term supply of oil to the United States;
- regulatory, legislative and political changes; and

40

Exhibit 8 - Page 528

- macroeconomic factors.

We will also depend upon the adoption of EVs by operators of commercial vehicle fleets for future growth, and on our ability to produce, sell and service vehicles that meet their needs. The entry of commercial EVs is a relatively new development, particularly in the United States, and is characterized by rapidly changing technologies and evolving government regulation, industry standards and customer views of the merits of using EVs in their businesses. This process has been slow to date. As part of our sales efforts, we must educate fleet managers as to the economical savings during the life of the vehicle and the lower TCO of our vehicles. As such, we believe that operators of commercial vehicle fleets will consider many factors when deciding whether to purchase our commercial EVs (or commercial EVs generally), including the factors set forth above, as well as corporate sustainability initiatives, government regulations and economic incentives applicable to commercial vehicles, and the availability of commercial fleet charging infrastructure.

**The unavailability, reduction or elimination of government and economic incentives could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.**

Any reduction, elimination, or discriminatory application of government subsidies and economic incentives because of policy changes, or the reduced need for such subsidies and incentives due to the perceived success of the EV or other reasons, may result in the diminished competitiveness of the alternative fuel and EV industry generally or our vehicles in particular. Additionally, federal, state and local laws may impose additional barriers to EV adoption, including additional costs. For example, many states have enacted or proposed laws imposing additional registration fees for certain hybrids and EVs to support transportation infrastructure, such as highway repairs and improvements, which have traditionally been funded through federal and state gasoline taxes. Any of the foregoing could materially and adversely affect the growth of the alternative fuel automobile markets and our business, prospects, financial condition, results of operations, and cash flows.

While certain tax credits and other incentives for alternative energy production, alternative fuel, and EVs have been available in the past, there is no guarantee these programs will be available in the future. For example, the IRA, which was enacted into law on August 16, 2022, modifies the Internal Revenue Code of 1986 (the "Code") Section 30D ("30D") tax credit by limiting the tax credit to electric trucks, SUVs and vans priced below $80,000 and imposing certain income restrictions for taxpayer eligibility to receive the 30D tax credit. Eligibility for the 30D tax credit is also contingent on (i) the vehicle's final assembly occurring in North America, (ii) the vehicle having a certain percentage of the battery's critical minerals originating from a United States free trade agreement partner or being recycled in North America, and (iii) the vehicle having a certain percentage of its battery's components being manufactured or assembled in North America. Moreover, if a vehicle battery's critical minerals were extracted, processed or recycled by a "foreign entity of concern," such as China or Russia, the 30D tax credit would not apply. If our vehicles do not meet the pricing caps or satisfy the additional sourcing and manufacturing requirements by the deadlines set forth in the IRA, or if our customers do not fall within the specified income limits, some or all of the 30D tax credit may no longer be available to our customers. Failure of our vehicles to meet the 30D tax credit eligibility requirements may place our vehicles at a price disadvantage to competing EV manufacturers that offer EVs meeting all of the requirements for eligibility under the 30D tax credit. In addition, the IRA eliminates the current phase-out for EV manufacturers that sell 200,000 vehicles, thereby reinstating the 30D tax credit for competitors of Rivian who had previously been phased out. These changes to the 30D tax credit and any future changes to tax incentives that make it less likely for our EVs to qualify could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

41

Exhibit 8 - Page 529

**We may not be able to obtain or agree on acceptable terms and conditions for all or a significant portion of the government grants, loans and other incentives, including regulatory credits, for which we apply or on which we rely. As a result, our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.**

From time to time we apply for federal and state grants, loans, and/or tax incentives under government programs designed to stimulate the economy and support the production of alternative fuel, and EVs and related technologies. We anticipate that there will be new opportunities for us to apply for grants, loans and other incentives from the United States, state and foreign governments. Our ability to obtain funds or incentives from government sources is subject to the availability of funds under applicable government programs and various levels of approval of our applications to participate in such programs. The application process for these funds and other incentives is often highly competitive. There can be no assurance that we will be successful in obtaining any of these additional grants, loans and other incentives. If we are not successful in obtaining any of these additional incentives and we are unable to find alternative sources of funding to meet our planned capital needs, our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.

In addition, we earn tradable credits in the operation of our business under various regulations related to zero-emission vehicle ("ZEVs"), greenhouse gas ("GHG"), fuel economy, renewable energy and clean fuel. For example, the Federal Corporate Average Fuel Economy ("CAFE"), GHG emissions standards and the state-level ZEV mandates create a credit-trading program to reduce compliance costs for vehicle manufacturers and to allow flexibility for meeting such requirements. These programs allow automakers the flexibility to earn GHG, CAFE and ZEV credits by exceeding the standard in a given model year, which credits can either be applied to shortfalls in future years or traded to other automakers. We have contracted to sell and intend to sell these credits to other regulated entities who can use the credits to comply with emission standards, renewable energy procurement standards and other regulatory requirements. Such regulatory credits may become more difficult to obtain or decrease in value over time. The future of such programs is uncertain at this time.

In 2020, the U.S. Environmental Protection Agency ("EPA") and the NHTSA enacted the Safer Affordable Fuel-Efficient ("SAFE") Vehicles rule that, among other things, established less stringent fuel economy and GHG standards for light duty vehicles model years 2021 through 2026, and sought to strip California of the ability to set its own fuel economy and vehicle emissions standards, which other states could then follow. In 2021, changes to the SAFE Vehicles rule were finalized that increased GHG standards stringency for model years 2023 through 2026, and in 2022, the fuel economy standards were made more stringent for model years 2024 through 2026. In addition, the rules reinstating California's and other states' authority were finalized in 2022, while California regulators extended the Advance Clean Cars rule for model years 2026 through 2035 and finalized the Advanced Clean Trucks (ACT) rule. Concurrently, California's petition for an EPA Clean Air Act ("CAA") preemption waiver for its new medium and heavy-duty standards (ACT) has not yet been approved. The waiver process could postpone or eliminate the medium and heavy-duty ZEV program and the respective credits. More recently, in 2023, EPA and NHTSA proposed new regulations for 2027 and later model year light and medium duty vehicles. While the recent proposals will not be final until next year or later, the current federal GHG and fuel economy standards as well as California's ability to set its own light-duty standards are still being challenged in several lawsuits. If the courts find against EPA and NHTSA or reverse the reinstatement of California and other states' authority, or if the California medium and heavy-duty programs are not granted a CAA waiver, the value of certain regulatory credits would likely decrease. In addition, there are efforts in Congress to limit or reverse new EPA GHG standard and inhibit California's ability to regulate vehicle emissions. As a result, uncertainty remains about the future of California and other states' ZEV and GHG programs and the value of credits earned under them. In addition, new entrants to the EV market could drive down relevant compliance credit valuations. While we cannot predict such outcomes at this time, any of the above developments could impede our ability to earn and sell such credits and could have a material and adverse effect on our business, prospects, financial condition, results of operations, and cash flows in the future.

**Vehicle retail sales depend heavily on affordable interest rates and availability of credit for vehicle financing and a substantial increase in interest rates could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

In certain regions, including North America and Europe, financing for new vehicle sales has been available at relatively low interest rates for several years due to, among other things, expansive government monetary policies. As interest rates have risen, market rates for new vehicle financing have also risen, which may make our vehicles less affordable to customers or steer customers to less expensive vehicles that would be less profitable for us, adversely affecting our business, prospects, financial condition, results of operations, and cash flows. Additionally, if consumer interest rates continue to increase substantially or if financial service providers tighten lending standards or restrict their lending to certain classes of credit,

42

Exhibit 8 - Page 530

customers may not desire or be able to obtain financing to purchase or lease our vehicles. As a result, a continuing substantial increase in customer interest rates or tightening of lending standards could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

**Insufficient warranty reserves to cover future warranty claims could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

As our vehicles are produced, we will need to maintain warranty reserves to cover warranty-related claims. If our warranty reserves are inadequate to cover future warranty claims on our vehicles, our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected. We record and adjust warranty reserves based on changes in estimated costs and actual warranty costs. Such estimates are inherently uncertain, particularly in light of our limited operating history and limited field data available to us, and changes to such estimates based on real-world observations may cause material changes to our warranty reserves. In the future, we may become subject to significant and unexpected warranty expenses. There can be no assurances that then-existing warranty reserves will be sufficient to cover all claims. In addition, if future laws or regulations impose additional warranty obligations on us that go beyond our manufacturer's warranty, we may be exposed to materially higher warranty expenses than we expect, and our reserves may be insufficient to cover such expenses.

**Future field actions, including product recalls, could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

Any field action, including a product recall, whether initiated by us or a supplier, and whether the field action involves our or a competitor's product, may result in adverse publicity, damage our reputation, and adversely affect our business, prospects, financial condition, results of operations, and cash flows. We and our suppliers have initiated recalls, and expect to initiate recalls in the future, voluntarily or involuntarily, if it is determined that a safety-related defect or noncompliance with applicable federal motor vehicle safety standards exist in any of our vehicles or components (including our battery cells). For example, in October 2022 we initiated a voluntary recall of approximately 12,000 vehicles after determining that on a small percentage of vehicles, the fastener connecting the front upper control arm and steering knuckle may not have been sufficiently torqued. Recalls, whether caused by systems or components engineered or manufactured by us or our suppliers, could involve significant expense, the possibility of lawsuits, and diversion of management's attention and other resources, which could adversely affect our brand and our business, prospects, financial condition, results of operations, and cash flows.

**We will become subject to product liability claims, which could harm our business, prospects, financial condition, results of operations, and cash flows if we are not able to successfully defend or insure against such claims.**

We will become subject to product liability claims, which could have a material and adverse effect on our business, prospects, financial condition, results of operations, and cash flows. The automobile industry experiences an abundance of product liability claims. We face the risk of significant monetary exposure to claims in the event our vehicles do not perform as expected or contain design, manufacturing, or warning defects, and to claims without merit, or in connection with malfunctions resulting in personal injury or death. Our risks in this area are particularly pronounced given the limited field experience of our vehicles. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim could generate substantial negative publicity about our vehicles and business and inhibit or prevent commercialization of other future vehicle candidates, which would have a material adverse effect on our brand, business, prospects, financial condition, results of operations, or cash flows. Any insurance coverage might not be sufficient to cover all potential product liability claims. Any lawsuit seeking significant monetary damages either in excess of our coverage, or outside of our coverage, could have a material adverse effect on our reputation and business, prospects, financial condition, results of operations, and cash flows. We may not be able to secure additional product liability insurance coverage on commercially acceptable terms or at reasonable costs when needed, particularly if we face liability for our products and are forced to make a claim under our policies.

**We face risks associated with establishing and maintaining international operations, including unfavorable regulatory, political, currency, tax, and labor conditions, which could harm our business, prospects, financial condition, results of operations, and cash flows.**

Our business plan includes operations in international markets, including initial manufacturing and supply activities, and sales, in select markets in Canada and Europe, and eventual expansion into other international markets. We face risks associated with our international operations, including possible unfavorable regulatory, political, tax, and labor conditions,

43

Exhibit 8 - Page 531

which could harm our business. We have established and expect to continue to establish international operations and subsidiaries that are subject to the legal, political, regulatory, and social requirements and economic conditions in these jurisdictions. Furthermore, conducting and launching operations on an international scale requires close coordination of activities across multiple jurisdictions and time zones and consumes significant management resources. We have very limited experience to date selling or leasing and servicing our vehicles internationally and international expansion requires us to make significant expenditures, including the hiring of local employees and establishing facilities and related systems and processes, in advance of generating any revenue. We are subject to a number of risks associated with international business activities that may increase our costs, impact our ability to sell or lease our vehicles and require significant management attention. These risks include:

- conforming our vehicles to various international regulatory requirements where our vehicles are sold and serviced, which requirements may change over time;
- difficulty in staffing and managing foreign operations;
- difficulties establishing relationships with, or disruption in the supply chain from, international suppliers;
- difficulties attracting customers in new jurisdictions;
- difficulties in adapting our advanced driver assistance system to new jurisdictions;
- foreign government taxes, regulations and permit requirements, including foreign taxes that we may not be able to offset against taxes imposed upon us in the United States, and foreign tax and other laws limiting our ability to repatriate funds to the United States;
- inflation and fluctuations in foreign currency exchange rates and interest rates, including risks related to any foreign currency swap or other hedging activities we undertake;
- United States and foreign government trade restrictions, tariffs and price or exchange controls;
- foreign labor laws, regulations, and restrictions, including in the areas of supply chain, labor, environmental, health and safety and related compliance costs;
- foreign data privacy and security laws, regulations and obligations;
- expenditures related to foreign lawsuits and liability;
- changes in diplomatic and trade relationships, including political risk and customer perceptions based on such changes and risks;
- concerns raised by foreign governments regarding U.S. policies that may be seen as unfair domestic subsidies contrary to World Trade Organization rules or other agreements to which the United States is a party;
- laws and business practices favoring local companies;
- difficulties protecting or procuring intellectual property rights;
- political instability, natural disasters, war (including the ongoing military conflict between Russia and Ukraine and in Israel and Gaza) or events of terrorism, and health epidemics, such as the COVID-19 pandemic; and
- the strength of international economies.

If we fail to successfully address these risks, our business, prospects, financial condition, results of operations, and cash flows could be materially and adversely affected.

**Our business depends substantially on the efforts of our key employees and qualified personnel, and if they are unable to devote a sufficient amount of time and resources to our business, or if we are unable to attract and retain key employees and hire qualified management, technical, electric vehicle and software engineering personnel, our ability to compete could be harmed.**

Our success depends substantially on the continued efforts of our executive officers, key employees, and qualified personnel. We believe the depth and quality of the experience of our management team in the automotive and technology industries generally, and EVs in particular, is key to our ability to be successful. The loss of any of these individuals could have a material adverse effect on our business operations. As we build our brand and become more well known, the risk that competitors or other companies may poach our talent increases. The failure to motivate and retain these personnel could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

In addition, Dr. Scaringe and Rose Marcario, current Rivian directors, are also directors of Forever by Rivian and trustees of the Rivian Foundation; and Rivian's Chief Financial Officer ("CFO"), Claire McDonough, serves as Treasurer of Forever by Rivian and the Rivian Foundation. The positions held by these directors and executive officers may give rise to fiduciary or other duties in conflict with the duties they owe to us. Furthermore, such directors and officers may have significant duties to, and may devote a substantial amount of time serving, Forever by Rivian and the Rivian Foundation, and accordingly may

44

Exhibit 8 - Page 532

limit their ability to devote a sufficient amount of attention toward their obligations to us, or to day-to-day activities of our business.

Our success also depends, in part, on our continuing ability to identify, hire, attract, train, and develop other highly qualified personnel. Rivian's rapid growth has required a focus on organizational design and ensuring we have the right leaders in place to manage the business. We have recruited and hired new leaders with the objective of identifying talent we believe will help scale our operations. Experienced and highly skilled employees are in high demand and competition for these employees can be intense, especially in California and for talent across product development and all engineering disciplines. In addition, we have hired and trained a significant number of employees from the area surrounding the Normal Factory. If there is not an adequate number of candidates in the local area to support our operations at full capacity, we may face higher costs to hire employees for the Normal Factory and our business, financial condition, results of operations, and cash flows could be adversely affected.

Our ability to hire, attract, and retain employees depends on our ability to provide competitive compensation and benefits. We issue equity awards to our employees as part of our hiring and retention efforts, and job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. If the actual or perceived value of our Class A common stock declines, it may adversely affect our ability to hire or retain employees. Any inability to attract, assimilate, develop, or retain qualified personnel in the future could adversely affect our business, including the execution of our business strategy.

**If we cannot maintain our culture as we grow, we could lose the innovation, teamwork, and passion that we believe contribute to our success and our business may be harmed.**

We have invested substantial time and resources into building our culture, and we believe it serves as a critical component of our success. As we continue to grow, including geographical expansion, and developing the infrastructure associated with being a public company, we will need to maintain our culture across a larger number of employees, disciplines and geographic regions. Any failure to preserve our culture could negatively affect our future success, including our ability to attract, engage, and retain the talent required to support our future success.

From time to time, we may need to streamline our organization and adjust the size and structure of our workforce to ensure we are focused, agile and efficient to achieve our priorities and objectives. For example, in 2022 and 2023, we implemented certain cost reduction efforts to reduce material spend, operating expenses, and capital expenditures and implemented a reduction in our workforce. Any reduction in force may yield unintended consequences and costs, such as attrition beyond the intended reduction in force, the distraction of employees and reduced employee morale, which could, in turn, adversely impact productivity, continuity, accumulated knowledge and efficiency during transitional periods. Any of these impacts could also adversely affect our brand and reputation as an employer, making it more difficult for us to attract new employees in the future and increasing the risk that we may not achieve the anticipated benefits from the restructuring.

**Our business may be adversely affected by labor and union activities.**

Although none of our employees are currently represented by a labor union, it is common throughout the automobile industry generally for employees to belong to a union, which can result in the loss of a direct relationship with our employees, higher employee costs, operational restrictions and an increased risk of disruption to operations. If any of our employees decide to join or seek recognition to form a labor union, or if we are required to become a union signatory, we could be subject to risks as we engage to finalize negotiations with any such union, including substantial distraction from our business, potential work slowdowns or stoppages, delays and increased costs. We may also directly and indirectly depend upon other companies with unionized work forces, such as component suppliers, construction contractors and trucking and freight companies, and work stoppages or strikes organized by such unions could delay the manufacture and sale of our products and could have a material adverse impact on our business, prospects, financial condition, results of operations, and cash flows.

**Our business, prospects, financial condition, results of operations, and cash flows may be materially and adversely affected by the risks related to health epidemics, pandemics, and other outbreaks.**

We face various risks related to public health issues, including epidemics, pandemics, and other outbreaks, including the COVID-19 pandemic. For example, the impact of COVID-19 and associated variants, including changes in consumer and business behavior, pandemic fears, market downturns, and restrictions on business and individual activities, created

45

Exhibit 8 - Page 533

significant volatility starting in early 2020 in the global economy and led to reduced economic activity. The spread of COVID-19 and associated variants also created a disruption in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers, and led to a global decrease in vehicle sales in markets around the world.

Epidemics, pandemics, and other outbreaks could result in government authorities implementing numerous measures to try to contain such outbreaks, such as travel bans and restrictions, quarantines, stay-at-home or shelter-in-place orders, and business shutdowns. These measures have in the past adversely impacted our employees and operations and the operations of our customers, suppliers, vendors and business partners, resulted in delays and shortages of certain parts and materials necessary to produce our vehicles, and negatively impacted our manufacturing plans, sales and marketing activities, business, prospects, financial condition, results of operations, and cash flows. In addition, if significant portions of our workforce are unable to work effectively, including due to illness, quarantines, social distancing, government actions, or other restrictions in connection with an epidemic, pandemic, or other outbreak, or if government authorities institute measures such as travel bans and restrictions, quarantines, stay-at-home or shelter-in-place orders, and business shutdowns, our operations will be adversely impacted.

**Our financial results may vary significantly from period to period due to fluctuations in our product demand, production levels, operating costs, working capital, capital expenditures and other factors.**

We expect our period-to-period financial results to vary based on our product demand and operating costs, which we anticipate will fluctuate as we continue to design, develop and manufacture new EVs, increase production capacity and establish or expand design, research and development, production, and sales and service facilities. Additionally, our revenue from period to period may fluctuate as we identify and investigate areas of demand, adjust volumes and add new product derivatives based on market demand and margin opportunities, and develop and introduce new EVs or introduce existing EVs to new markets for the first time. Our production levels also depend on our ability to obtain vehicle components from our suppliers, the effective operation of our manufacturing facilities, our ability to expand our production capacity, and our ability to timely deliver finished vehicles to customers. Additionally, our revenue from period to period may fluctuate due to seasonality. Our period-to-period results of operations may also fluctuate because of other factors, including labor availability and costs for hourly and management personnel, profitability of our vehicles, changes in interest rates, impairment of long-lived assets, macroeconomic conditions, both nationally and locally, negative publicity relating to our vehicles, changes in consumer preferences and competitive conditions or investment in expansion to new markets. As a result of these factors, we believe that quarter-to-quarter comparisons of our financial results, especially in the short term, are not necessarily meaningful and that these comparisons cannot be relied upon as indicators of future performance. Significant variation in our quarterly performance could significantly and adversely affect the trading price of our Class A common stock.

**We have incurred a significant amount of debt and may in the future incur additional indebtedness. Our payment obligations under such indebtedness may limit the funds available to us, and the terms of our current or future debt agreements, contain or may contain restrictive covenants that may limit our operating flexibility.**

As of September 30, 2023, our total principal amount of outstanding indebtedness was $2,750 million, which does not include the issuance of $1,725 million principal amount of the 2030 Green Convertible Notes in October 2023. As of September 30, 2023, we had no borrowings under our senior secured asset-based revolving credit facility ("ABL Facility") and $380 million of letters of credit outstanding. Subject to the limitations in the terms of our existing and future indebtedness, we and our subsidiaries may incur additional debt in the near-and long-term, secure existing or future debt, or refinance our debt.

We will be required to use a portion of our future cash flows from operations to pay interest and principal on our indebtedness. Such payments will reduce the funds available to use for working capital, operating expenditures, capital expenditures and other corporate purposes, and limit our ability to obtain additional financing for working capital, operating expenditures, capital expenditures, expansions plans and other investments, which may in turn limit our ability to execute against our business strategy, heighten our vulnerability to downturns in our business, the industry, or in the general economy, and prevent us from taking advantage of business opportunities as they arise.

In addition, the credit agreement governing the ABL Facility and the indenture governing the senior secured floating rate notes due October 2026 ("2026 Notes") contain, and future debt agreements may contain, restrictive covenants, that, among other things, limit our ability to transfer or dispose of assets, merge with other companies or consummate certain changes of control, acquire other companies, incur additional indebtedness and liens and enter into new businesses, and a minimum liquidity covenant. The indentures governing the 2029 Green Convertible Notes and the 2030 Green Convertible Notes also contain certain similar restrictive covenants, some of which, however, are less restrictive than the covenants under the ABL

46

Exhibit 8 - Page 534

Facility and the indenture governing the 2026 Notes. We therefore may not be able to engage in any of the foregoing transactions unless we obtain the consent of the lenders or noteholders or terminate the credit agreement governing the ABL Facility or future debt agreements, which may limit our operating flexibility. In addition, the ABL Facility and the 2026 Notes are secured by substantially all of the assets of Rivian Holdings, LLC and its subsidiaries (however if the Fixed Asset Release Date (as defined in the credit agreement governing the ABL Facility) occurs, the ABL Facility will be secured only by certain assets until we incur certain other indebtedness that would require the grant of certain security interests) and requires us to satisfy certain financial covenants. Noteholders of our 2029 Green Convertible Notes and 2030 Green Convertible Notes may, subject to a limited exception described in the governing indentures, require us to repurchase their notes following a fundamental change, as described in the governing indentures, at a cash repurchase price generally equal to the principal amount of the 2029 Green Convertible Notes or the 2030 Green Convertible Notes to be repurchased, as applicable, plus accrued and unpaid interest, if any. In addition, the 2029 Green Convertible Notes and the 2030 Green Convertible Notes each have conditional conversion features and if one or more noteholders elect to convert their 2029 Green Convertible Notes or their 2030 Green Convertible Notes, as applicable, unless we elect to satisfy our conversion obligation by delivering solely shares of Class A common stock (other than paying cash in lieu of fractional shares), we would be required to settle a portion or all of the conversion obligations in cash. There is no guarantee that we will be able to generate sufficient cash flow or sales to meet these various financial covenants, pay the principal and interest when due under our debt agreements or repurchase the 2029 Green Convertible Notes or the 2030 Green Convertible Notes, or pay any cash amounts due upon conversion of such notes. Furthermore, there is no guarantee that future working capital, borrowings or equity financing will be available to repay or refinance any such debt.

Any inability to comply with the terms of the credit agreement governing the ABL Facility, the indentures governing the 2026 Notes, the 2029 Green Convertible Notes and the 2030 Green Convertible Notes, or any future debt agreement, including failing to make scheduled payments or to meet the financial covenants, would adversely affect our business.

**If our vehicle owners customize our vehicles with aftermarket products, or attempt to modify our vehicles' charging systems, the vehicles may not operate properly, which may create negative publicity and could harm our brand and business.**

Automobile enthusiasts may seek to alter our vehicles to modify their performance which could compromise vehicle safety and security systems. Also, customers may customize their vehicles with aftermarket parts that can compromise driver safety. We do not test, nor do we endorse, such changes or products. In addition, customers may attempt to modify our vehicles' charging systems or use improper external cabling or unsafe charging outlets that can compromise the vehicle systems or expose our customers to injury from high voltage electricity. Such unauthorized modifications could reduce the safety and security of our vehicles and any injuries resulting from such modifications could result in adverse publicity, which would negatively affect our brand and could have a material and adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

**We rely on third-party vendors for certain product and service offerings, which exposes us to increased risks.**

We contract with third parties to provide certain products and services to our customers, including vehicle financing, insurance, collision repair, roadside assistance, service part processing, service visit alternative transportation, tires, windshields, and 12V battery replacement. Although we carefully select our third-party vendors, we cannot control their actions. If our vendors fail to perform as we expect, our operations and reputation could suffer if the failure harms the vendors' ability to serve us and our customers. One or more of these third-party vendors may experience financial distress, staffing shortages or liquidity challenges, file for bankruptcy protection, go out of business, or suffer disruptions in their business. The use of third-party vendors represents an inherent risk to us that could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**Certain of our principal stockholders or their affiliates are or may in the future engage in, and certain of our directors are affiliated with entities that may in the future engage in, commercial transactions with us, or business activities similar to those conducted by us which may compete directly or indirectly with us, causing such stockholders or persons to have conflicts of interest.**

Certain of our principal stockholders and their affiliates are engaged in similar business activities to those conducted by us, may engage in commercial transactions with us, and currently or in the future may invest in or otherwise hold securities of businesses that compete directly or indirectly with us. For example, an affiliate of Amazon.com, Inc., which through another affiliate is also one of our principal stockholders, has placed an order with us, subject to modification, for 100,000 vehicles.

47

Exhibit 8 - Page 535

Amazon will continue to be able to influence matters requiring stockholder approval, including any potential change of control transaction, regardless of whether or not other stockholders believe that a potential transaction is in our best interest. In turn this may deter third parties from seeking to acquire us. These relationships also may give rise to conflicts of interest or create the appearance thereof, and such stockholders may take action or vote their shares other ways which could adversely impact us or our other stockholders, and may impact other companies' perception of us as a potential partner, including the willingness of such other companies to order our future planned commercial vehicles. Our relationship with Amazon could influence our perceived ability, or create the appearance of such influence, to negotiate potential future commercial agreements with Amazon, to allocate our limited resources in how we prioritize the delivery of and support for Amazon vehicles relative to our other vehicle models, and to pursue other commercial customers who may be competitors to Amazon.

Further, employees of two of our stockholders and their affiliates serve on our board of directors and retain their positions with our principal stockholders or their affiliates. Given such relationships, and despite their fiduciary duties as directors and the rules applied by our board of directors to handle conflicts of interest, these individuals' positions may create, or create the appearance of, conflicts of interest when they are asked to make decisions that could have different implications for such principal stockholders or their affiliates than the decisions have for us or our other stockholders or customers.

**We are subject to risks associated with exchange rate fluctuations, interest rate changes, commodity and credit risk.**

We operate in numerous markets worldwide and are exposed to risks stemming from fluctuations in currency and interest rates. The exposure to currency risk will be mainly linked to differences in the geographic distribution of our manufacturing and commercial activities, resulting in cash flows from sales being denominated in currencies different from those of purchases or production activities. Although we may manage risks associated with fluctuations in currency and interest rates and commodity prices through financial hedging instruments, significant changes in currency or interest rates or commodity prices could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows. In addition, we may use various forms of financing to cover future funding requirements for our activities and changes in interest rates can affect our net revenues, finance costs, and margins. Borrowings under the ABL Facility and the 2026 Notes accrue interest at variable rates, which exposes us to interest rate risk.

**Risks Related to Information Technology, Intellectual Property, Data Security, and Privacy**

**Breaches in data security, failure of information security systems, cyber attacks or other security or privacy-related incidents could have a material adverse effect on our reputation and brand, harm our business, prospects, financial condition, results of operations, and cash flows and subject us to legal or regulatory fines or damages.**

Threats to networks and information technology infrastructure are increasingly diverse and sophisticated. Traditional computer "hackers," malicious code (such as viruses and worms), phishing attempts, employee theft or misuse, denial of service attacks, ransomware attacks, and sophisticated nation-state and nation-state supported actors engage in intrusions and attacks that create risks for our (and our suppliers') internal networks, vehicles, infrastructure, and cloud deployed products and the information they store and process, including personal information of our employees and customers, including names, accounts, user IDs and passwords, vehicle information, and payment or transaction related information. Although we have implemented security measures designed to prevent such attacks, our networks and systems may be breached due to the actions of outside parties, employee error, malfeasance, a combination of these, or otherwise, and as a result, an unauthorized party may obtain access to our systems, networks, or data, resulting in data being publicly disclosed, altered, lost, or stolen, which could subject us to liability and adversely impact our financial condition. Further, any breach in our data security could allow malicious parties to access sensitive systems, such as our product lines and the vehicles themselves. Such access could adversely impact the safety of our employees and customers. We and our suppliers have in the past been subject to ransomware and phishing attacks. Though we do not believe we experienced any material losses or that any material sensitive information was compromised, we were unable to determine conclusively that this was the case. While we have implemented remedial measures in response to such incidents, we cannot guarantee that such measures will prevent all incidents in the future.

Any actual, alleged or perceived failure to prevent a security breach or to comply with our privacy policies or privacy-related legal obligations, failure in our systems or networks, or any other actual, alleged or perceived data security incident we or our suppliers suffer, could result in damage to our reputation, negative publicity, loss of customers and sales, loss of competitive advantages over our competitors, increased costs to remedy any problems and provide any required notifications, including to regulators and individuals, and otherwise respond to any incident, regulatory investigations and enforcement actions,

48

Exhibit 8 - Page 536

costly litigation, and other liabilities. In addition, we may incur significant financial and operational costs to investigate, remediate and implement additional tools, devices and systems designed to prevent actual or perceived security breaches, and other security or privacy-related incidents, as well as costs to comply with any notification obligations resulting from any such incidents. Further, we could also be exposed to a risk of loss or litigation and potential liability under laws, regulations and, contracts that protect the privacy and security of personal information. Any of these negative outcomes could adversely impact the market perception of our products and customer and investor confidence in our company, and would materially and adversely affect our business, prospects, financial condition, results of operations, or cash flows.

While we maintain cyber insurance that may help provide coverage for security breaches or other incidents, such insurance may not be adequate to cover the costs and liabilities related to them, which in some cases could impact our operating results and financial condition. In addition, our insurance policy may change as a result of such incidents or for other reasons, which may result in premium increases or the imposition of large deductible or co-insurance requirements.

**If we fail to comply with federal, state, and foreign laws relating to privacy and data security, we may face potentially significant liability, negative publicity, and an erosion of trust, and increased regulation could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

We receive, store, handle, transmit, use and otherwise process business information and information related to individuals from and about actual and prospective customers, as well as our employees and service providers. As a result, we and our handling of data are subject to a variety of laws, rules and regulations relating to privacy and data security, as well as contractual obligations and industry standards. In the United States, a violation of consumers' privacy rights or failure to take appropriate steps to keep consumers information secure may constitute unfair or deceptive acts or practices in or affecting commerce in violation of the Federal Trade Commission Act or similar state consumer laws enforced by state attorneys general. We may also be subject to various generally applicable federal and state privacy laws that are specific to certain industries, sectors, contexts, or locations. For example, we may be subject to state privacy laws such as the California Consumer Privacy Act of 2018 ("CCPA"), as amended by the California Privacy Rights Act ("CPRA"), as well as other privacy statutes that share similarities to the CPRA that have been enacted in certain other states. As we continue to expand our foreign operations, we may also become subject to international privacy laws such as the European Union's General Data Protection Regulation (EU) 2016/679 ("GDPR"), the U.K. Data Protection Act of 2018, and other international data protection, privacy, data security, data localization and similar national, state, provincial, and local laws.

These laws, rules and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could harm our current or future business and operations and may result in ever increasing regulatory and public scrutiny and escalating levels of enforcement and sanctions. Any significant changes to applicable laws, regulations or industry practices regarding the use or disclosure of our users' data, or regarding the manner in which the express or implied consent of users for the use and disclosure of such data is obtained - or in how these applicable laws, regulations or industry practices are interpreted and enforced by state, federal and international privacy regulators - could require us to modify our services and features, possibly in a material and costly manner, may subject us to legal claims, regulatory enforcement actions and fines, and may limit our ability to develop new services and features that make use of the data that our users voluntarily share with us.

Although we make reasonable efforts to comply with all applicable data protection laws and regulations, our interpretations and efforts may have been or may prove to be insufficient or incorrect. We also generally seek to comply with industry standards and are subject to the terms of our privacy policies and privacy-related obligations to third parties. We strive to comply with all of these obligations. However, it is possible that these obligations may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another or that may conflict with other rules or our practices. We may also incur significant expenses to comply with privacy and security standards and controls imposed by laws, regulations, industry standards, or contractual obligations. Our failure to comply with applicable laws, directives, and regulations (e.g., the GDPR and CCPA) may result in private claims or enforcement actions against us, including liabilities, fines, and damage to our reputation, any of which could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

**Any unauthorized control or manipulation of our vehicles' systems could result in a loss of confidence in us and our vehicles and harm our business.**

Our vehicles contain complex technology systems. For example, our vehicles are outfitted with built-in data connectivity to install periodic remote updates to improve or update the functionality of our vehicles. We have implemented cryptographic

Exhibit 8 - Page 537

technologies to deliver updates securely from Rivian including a hardware security module to verify the integrity of vehicle software by using cryptographic hashes. We have designed, implemented, and tested security measures intended to prevent cybersecurity breaches or unauthorized access to our information technology networks, our vehicles and their systems, and intend to implement additional security measures as necessary. However, hackers and other malicious actors may attempt in the future to gain unauthorized access to modify, alter, and use networks, vehicle software and our systems to gain control of, or to change, our vehicles' software or to gain access to data stored in or generated by the vehicle. Errors and vulnerabilities, including zero days, in our information technology systems will be probed by third parties and could be identified and exploited in the future, and our remediation efforts may not be timely or successful. Any unauthorized access to or control of our vehicles or their systems or any unauthorized access to or loss of data could result in risks to our customers, unsafe driving conditions, or failure of our systems, any of which could result in interruptions in our business, legal claims or proceedings which may or may not result in our favor and could subject us to significant liability. In addition, regardless of their veracity, reports of unauthorized access to our vehicles, their systems or data, as well as other factors that may result in the perception that our vehicles, their systems or data are capable of being "hacked" and lack appropriate safety controls, could negatively affect our brand and harm our business, prospects, financial condition, results of operations, and cash flows.

**We utilize third-party service providers to support our service and business operations and any errors, disruption, performance problems, delays or failure in their or our operational infrastructure could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

Our brand, reputation and ability to attract customers depends on the reliable performance of our vehicles and the supporting systems, technology, and infrastructure. For example, we outfit our vehicles with in-vehicle services and functionality that use data connectivity to monitor performance and capture opportunities for cost-saving preventative maintenance. The availability and effectiveness of these services depend on the continued operation of information technology and communication systems. We primarily rely on Amazon Web Services in the United States to host our cloud computing and storage needs. We do not own, control, or operate our cloud computing physical infrastructure or their data center providers. If any of these third-party services experience errors, disruptions, security issues, or other performance deficiencies, if they are updated such that our platforms become incompatible, if these services, software, or hardware fail or become unavailable due to extended outages, interruptions, defects, or otherwise, or if they are no longer available on commercially reasonable terms or prices (or at all), these issues could result in errors or defects in our platforms, cause our platforms to fail, or could adversely affect the experience of our customers, our reputation and brand could be damaged, we could be exposed to legal or contractual liability, our expenses could increase, and our ability to manage our operations could be interrupted, all of which may take significant time and resources, increase our costs, and could adversely affect our business. We may also have additional liability to our customers which may not be fully compensated by third-party service providers or insurance.

**We are, and may in the future become, subject to patent, trademark and/or other intellectual property infringement claims, which may be time-consuming, cause us to incur significant liability, and increase our costs of doing business.**

We are involved in, and may in the future become party to additional, intellectual property infringement proceedings. Companies, organizations, or individuals, including our competitors, may hold or obtain patents, trademarks or other proprietary or intellectual property rights that would prevent, limit or interfere with our ability to make, use, develop, sell, lease or market our vehicles or components, which could make it more difficult for us to operate our business. From time to time, we may receive communications from holders of patents, trademarks, trade secrets or other intellectual property or proprietary rights alleging that we are infringing, misappropriating, diluting or otherwise violating such rights. Such parties have brought and may in the future bring suits against us alleging infringement or other violation of such rights, or otherwise assert their rights and urge us to take licenses to their intellectual property. Our applications for and uses of trademarks relating to our products, services, or designs, could be found to infringe upon existing trademark rights owned by third parties. We may not be aware of existing patents or patent applications that could be pertinent to our business as many patent applications are filed confidentially in the United States and are not published until 18 months following the applicable filing date. In the event that a claim relating to intellectual property is asserted against us, our suppliers or our third-party licensors, or if third parties not affiliated with us hold pending or issued patents that relate to our products or technology, we may need to seek licenses to such intellectual property or seek to challenge those patents. Even if we are able to obtain a license, it could be non-exclusive, thereby giving our competitors and other third parties access to the same technologies licensed to us. In addition, we may be unable to obtain these licenses on commercially reasonable terms, if at all, and our challenge of third-party patents may be unsuccessful. Litigation or other legal proceedings relating to intellectual property claims, regardless of merit, may cause us to incur significant expenses, could distract our technical and management

Exhibit 8 - Page 538

personnel from their normal responsibilities and result in negative publicity. Further, if we are determined to have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:

- cease selling or leasing, incorporating certain components into, or using vehicles or offering goods or services that incorporate or use the intellectual property that we allegedly infringe, misappropriate, dilute, or otherwise violate;
- pay substantial royalty or license fees or other damages;
- seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms, or at all;
- redesign or reengineer our vehicles or other technology, goods or services, which may be costly, time-consuming, or impossible; or
- establish and maintain alternative branding for our products and services.

Furthermore, many of our employees were previously employed by other automotive companies, by suppliers to automotive companies or companies with similar or related technology, products or services. We are, and may in the future become, subject to claims that we or these employees have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of former employers. Litigation may be necessary to defend against these claims. If we fail in defending such claims, we may be forced to pay monetary damages or fines and be enjoined from using certain technology, products, services, or knowledge. Even if we are successful in defending against these claims, litigation could result in substantial costs and demand on management resources.

**We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.**

We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position. We rely on a combination of patent, trade secret (including those in our know-how), and other intellectual property laws, as well as employee and third-party nondisclosure agreements, intellectual property licenses, and other contractual rights to establish and protect our rights in our technology and intellectual property. Our patent or trademark applications may not be granted, any patents or trademark registrations that may be issued to us may not sufficiently protect our intellectual property and any of our issued patents, trademark registrations or other intellectual property rights may be challenged by third parties. Any of these scenarios may result in limitations in the scope of our intellectual property or restrictions on our use of our intellectual property or may adversely affect the conduct of our business. Despite our efforts to protect our intellectual property rights, there can be no assurance that these protections will be available in all cases or will be adequate to prevent our competitors or other third parties from attempting to copy, reverse engineer or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe, misappropriate or otherwise violate our intellectual property. Monitoring unauthorized use of our intellectual property is difficult and costly, and the steps we have taken or will take to prevent misappropriation may not be successful. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

In addition, patent, trademark, and trade secret laws vary significantly throughout the world. A number of foreign countries do not protect intellectual property rights to the same extent as do the laws of the United States. Therefore, our intellectual property rights may not be as strong or as easily enforced outside of the United States. Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of some of our competitive advantage and a decrease in our revenue which would adversely affect our business, prospects, financial condition, results of operations, or cash flows.

**Our patent applications may not issue as patents, which may have a material adverse effect on our ability to prevent others from commercially exploiting products similar to ours. If our patents expire or are not maintained, our patent applications are not granted or our patent rights are contested, circumvented, invalidated or limited in scope, we may not be able to prevent others from selling, developing or exploiting competing technologies or products, which could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.**

We cannot be certain that we are the first inventor of the subject matter to which we have filed a particular patent application, or that we are the first party to file such a patent application. If another party has filed a patent application for the same subject matter as we have, we may not be entitled to the protection sought by the patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, we cannot be certain that the patent applications that we file will issue, or that our issued patents will afford protection against competitors with similar

51

Exhibit 8 - Page 539

technology. In addition, our competitors may design around our issued patents, which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

There can be no assurance that our pending applications will issue as patents. Even if our patent applications result in issued patents, these patents may be contested, circumvented or invalidated in the future. In addition, the rights granted under any issued patents may not provide us with adequate protection or competitive advantages. The claims under any patents that issue from our patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ours. The intellectual property rights of others could also bar us from licensing and exploiting any patents that issue from our pending applications. Numerous patents and pending patent applications owned by others exist in the fields in which we have developed and are developing our technology. Many of these existing patents and patent applications might have priority over our patent applications and could subject our patents to invalidation or our patent applications to rejection. Finally, in addition to patents with an earlier priority date and patent applications that were filed before our patent applications that may affect the likelihood of issuance of patents we are seeking, any of our existing or future patents may also be challenged by others on grounds that may render our patent applications or issued patents invalid or unenforceable.

**Our use of open source software in our applications could subject our proprietary software to general release, adversely affect our ability to sell our services and subject us to possible litigation, claims or proceedings.**

We use open source software in connection with the development and deployment of our products and services, and we expect to continue to use open source software in the future. Companies that use open source software in connection with their products have, from time to time, faced claims challenging the use of open source software and/or compliance with open source license terms. As a result, we could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms, and we may be required to purchase a costly license or cease offering the implicated products or services unless and until we can reengineer them to avoid infringement, which may be a costly and time-consuming process, and we may not be able to complete the reengineering process successfully. Some open source software licenses may require users who distribute proprietary software containing or linked to open source software to publicly disclose all or part of the source code to such proprietary software and/or make available any derivative works of the open source code under the same open source license, which could include proprietary source code. In such cases, the open source software license may also restrict us from charging fees to licensees for their use of our software. While we monitor the use of open source software and try to ensure that open source software is not used in a manner that would subject our proprietary source code to these requirements and restrictions, such use could inadvertently occur or could be claimed to have occurred, in part because open source license terms are often ambiguous and have generally not been interpreted by United States or foreign courts. Any actual or claimed requirement to disclose our proprietary source code or pay damages for breach of contract could harm our business and could help third parties, including our competitors, develop products and services that are similar to or better than ours.

Further, in addition to risks related to license requirements, use of certain open source software carries greater technical and legal risks than does the use of third-party commercial software. For example, open source software is generally provided as-is without any support or warranties or other contractual protections regarding infringement or the quality of the code, including the existence of security vulnerabilities. To the extent that our platform depends upon the successful operation of open source software, any undetected errors or defects in open source software that we use could prevent the deployment or impair the functionality of our systems and injure our reputation. In addition, the public availability of such software may make it easier for attackers to target and compromise our platform through cyber-attacks. Any of the foregoing risks could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**Risks Related to Other Legal, Regulatory, and Tax Matters**

**Our vehicles are subject to motor vehicle safety standards and the failure to satisfy such mandated safety standards would have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.**

All vehicles sold must comply with international, federal, and state motor vehicle safety standards. In the United States, vehicles that meet or exceed all federally mandated safety standards are self-certified by the manufacturer under the federal regulations. Rigorous testing and the use of approved materials and equipment are among the requirements for achieving federal certification. Other jurisdictions outside the United States, such as Europe, require us to meet Type Approval, the process for meeting the EU certification requirements, proving to regulators that our vehicles meet those relevant safety standards in effect in those countries. Failure by us to maintain compliance of the R1T, R1S, EDV, or obtain certification of

52

Exhibit 8 - Page 540

compliance for any future EV model with motor vehicle safety standards in the United States, Canada, the EU or other jurisdictions would have a material adverse effect on our business, prospects, financial condition, results of operations, or cash flows.

**We may be exposed to delays, limitations, and risks related to the environmental permits and other permits and approvals required to operate or expand operations at our manufacturing facility and any future facilities.**

Operation of an automobile manufacturing facility requires proper land use, environmental permits and other operating permits from federal, state and local government entities. While we currently have all permits necessary to carry out and perform our current plans and operations at our Normal Factory, expansion of operations at our facility, and the construction or operation of our planned facility in Georgia, may require land use changes, and environmental and operating permits. See Part II, Item 1 "Legal Proceedings" for additional information on matters related to our planned facility in Georgia. Delays, denials, or restrictions on any of the applications for or assignment of the permits to operate our facility or any future facility we may acquire or construct, including service centers and parts distribution centers, could adversely affect our ability to execute on our business plans and objectives.

**We are subject to various environmental, health, and safety laws and regulations that could impose substantial costs upon us and cause delays in building our manufacturing facilities.**

As an automobile manufacturer, we and our operations, both in the United States and abroad, are subject to national, state, provincial and/or local environmental, health and safety laws and regulations, including laws relating to the use, handling, storage, and disposal of, and human exposure to, hazardous materials. Environmental, health and safety laws, and regulations can be complex, and we expect that our business and operations will be affected by future amendments to such laws or other new environmental, health and safety laws which may require us to change our operations, potentially resulting in a material adverse effect on our business. These laws can give rise to liability for administrative oversight costs, cleanup costs, property damage, bodily injury, and fines and penalties. Compliance with environmental, health and safety laws and regulations could also lead to increased costs of compliance, including remediation of any discovered issues, and changes to our operations, which may be significant, and failures to comply could result in significant expenses, delays, substantial fines and penalties, third-party damages, suspension of production or a cessation of our operations.

Contamination at properties currently or formerly owned or operated by us, as well as at properties we will own and operate, and properties to which hazardous substances were sent by us, may result in liability for us under environmental laws and regulations, including, but not limited to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), which can impose liability for the full amount of contamination response-related costs without regard to fault, for the investigation and cleanup of contaminated soil and ground water, for building contamination and impacts to human health, and for damages to natural resources. The costs of complying with environmental laws, including CERCLA, and regulations and any claims concerning noncompliance, or liability with respect to contamination in the future, could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.

Our operations are also subject to federal, state, provincial, and local workplace safety laws and regulations, including the U.S. Occupational Health and Safety Act, and equivalent international laws and regulations, which require compliance with various workplace safety requirements, including requirements related to environmental safety. These laws and regulations can give rise to liability for oversight costs, compliance costs, bodily injury (including workers' compensation), fines, and penalties. Additionally, non-compliance could result in delay or suspension of production or cessation of operations. The costs required to comply with workplace safety laws can be significant, and non-compliance could adversely affect our production or other operations, which could have a material adverse effect on our business, brand, prospects and results of operations.

**We are subject to substantial and evolving regulation and unfavorable changes to, or our failure to comply with, these regulations could substantially harm our business, prospects, financial condition, results of operations, and cash flows.**

Our vehicles, and the sale of motor vehicles in general, are subject to substantial regulation under international, federal, state, and local laws. We expect to incur significant costs in complying with these regulations. Regulations related to the electric vehicle industry and alternative energy are currently evolving and we face risks associated with changes to these regulations, such as:

53

Exhibit 8 - Page 541

- the imposition of a carbon tax or the introduction of a cap-and-trade system on electric utilities, either of which could increase the cost of electricity and thereby the cost of operating an electric vehicle;
- new state regulations of electric vehicle fees could discourage consumer demand for EVs;
- the increase of subsidies for alternative fuels such as corn and ethanol could reduce the operating cost of vehicles that use such alternative fuels and gasoline, and thereby reduce the appeal of EVs;
- changes to the regulations governing the assembly and transportation of battery cells could increase the cost of battery cells or make such commodities more difficult to obtain;
- new regulations regarding the content of battery cells or packs, including mineral composition, mandatory recycling, or take back programs that require us to comply with new sets of laws and regulations;
- changes in regulation that affect vehicle design or engineering, for example relating to the noise required to be emitted by EVs, may impact the design or function of EVs, and thereby lead to decreased consumer appeal;
- changes in regulations governing the range and miles per gallon of gasoline-equivalent calculations could lower our vehicles' ratings, making EVs less appealing to consumers; and
- future rulemaking governing GHG and CAFE standards could reduce new business opportunities for our business.

To the extent the laws change, our vehicles may not comply with applicable international, federal, state or local laws, which would have an adverse effect on our business. Compliance with changing regulations could be burdensome, time consuming, and expensive. To the extent compliance with new regulations is cost prohibitive, our business, prospects, financial condition, results of operations, or cash flows would be materially and adversely affected.

Internationally, there may be laws in jurisdictions we have not yet entered or laws we are unaware of in jurisdictions we have entered that may restrict our sales or other business practices. Even for those jurisdictions we have analyzed, the laws in this area can be complex, difficult to interpret and may change over time. Continued regulatory limitations and other obstacles interfering with our ability to sell or lease vehicles directly to consumers could have a negative and material impact on our business, prospects, financial condition, results of operations, and cash flows.

**We are or may be subject to risks associated with strategic alliances or acquisitions.**

We may from time to time consider entering into strategic alliances, including joint ventures, minority equity investments or other transactions, with various third parties to further our business purpose. However, there are no assurances that we will be able to identify or secure suitable alliances in the future or that we will be able to maintain such alliances, which could impair our overall growth. In addition, these alliances could subject us to a number of risks, including risks associated with sharing proprietary information, with non-performance by the third party and with increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows. We may have limited ability to monitor or control the actions of these third parties and, to the extent any of these strategic third parties suffer negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with any such third party.

When appropriate opportunities arise, we may acquire additional assets, products, technologies, or businesses that are complementary to our existing business. In addition to possible stockholder approval, we may need approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable laws and regulations, which could result in increased delay and costs, and may disrupt our business strategy if we fail to do so. Furthermore, acquisitions and the subsequent integration of new assets and businesses into our own require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our operations. Acquired assets or businesses may not generate the financial results we expect. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets, and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

**Our business could be adversely affected by trade tariffs or other trade barriers.**

Our business is subject to the imposition of tariffs and other trade barriers, which may make it more costly for us to export our vehicles to the imposing country. For example, in recent years the United States government has renegotiated or terminated certain existing bilateral or multi-lateral trade agreements. It has also imposed tariffs on certain foreign goods which resulted in increased costs for goods imported into the United States. In response to these tariffs, a number of United

Exhibit 8 - Page 542

States trading partners have imposed retaliatory tariffs on a wide range of United States products, making it more costly for companies to export products to those countries. If we experience cost increases as a result of existing or future tariffs, and are unable to pass on such additional costs to our customers, or otherwise mitigate the costs, or if demand for our exported vehicles decreases due to the higher cost, our results of operations could be materially and adversely affected. In addition, China and the United States have each imposed tariffs, indicating the potential for further trade barriers which may escalate a nascent trade war between China and the United States. The resulting environment of retaliatory trade or other practices or additional trade restrictions or barriers, if implemented on a broader range of products or raw materials, could harm our ability to obtain necessary inputs or sell our vehicles at prices customers are willing to pay, which could have a material adverse effect on our business, prospects, results of operations, and cash flows.

**We are subject to export and import control laws, and non-compliance with such laws can subject us to criminal liability and other serious consequences, which can harm our business.**

We are subject to export control laws, import and economic sanctions laws and regulations, including the United States Export Administration Regulations, United States Customs regulations, and various economic and trade sanctions regulations administered by the United States Treasury Department's Office of Foreign Assets Control. United States export controls apply to (1) items that are produced in the United States, wherever they are geographically located; (2) all items located in the United States, even if only moving in transit through the United States; and (3) certain foreign-produced items, including those that incorporate more than de minimis levels of controlled United States-origin content. A violation of applicable laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal penalties, collateral consequences, remedial measures and legal expenses. In addition, we may in the future establish international operations for the reassembly or manufacture of our vehicles, which could subject us to additional constraints under applicable export and import controls and laws.

In addition, changes to our vehicles, or changes in applicable export control, import or economic sanctions laws and regulations, may create delays in the introduction and sale of our vehicles and solutions or, in some cases, prevent the export or import of our vehicles to certain countries, governments or persons altogether. Any change in export, import, or economic sanctions laws and regulations, shift in the enforcement or scope of existing laws and regulations or change in the countries, governments, persons or technologies targeted by such laws and regulations could also result in decreased use of our vehicles, as well decreasing our ability to export or market our vehicles to potential customers. Any decreased use of our vehicles or limitation on our ability to export or market our vehicles could adversely affect our business, prospects, results of operations and financial condition.

**We are subject to anti-corruption, anti-bribery, anti-money laundering, and similar laws, and non-compliance with such laws can subject us to administrative, civil and criminal fines and penalties, collateral consequences, remedial measures and legal expenses, all of which could adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations in various jurisdictions in which we conduct or in the future may conduct activities, including the United States Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act 2010, and other anti-corruption laws and regulations. Anti-corruption laws are interpreted broadly and prohibit companies and their officers, directors, employees, agents, contractors and other business partners from corruptly offering, promising, authorizing or providing anything of value to recipients in the public or private sector for the purposes of influencing decisions or obtaining or retaining business or otherwise obtaining favorable treatment. Our policies and procedures designed to ensure compliance with these regulations may not be sufficient and our directors, officers, employees, representatives, consultants, agents, and business partners could engage in improper conduct for which we may be held responsible, even if we do not explicitly authorize or have actual knowledge of such conduct.

Non-compliance with anti-corruption, anti-bribery or anti-money laundering laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal sanctions, collateral consequences, remedial measures and legal expenses, all of which could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**We are subject to legal proceedings in the ordinary course of our business. If the outcomes of these proceedings are adverse to us, it could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.**

55

Exhibit 8 - Page 543

We are subject to various litigation matters from time to time, the outcome of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows. Claims arising out of actual or alleged violations of law could be asserted against us by individuals, either individually or through class actions, by governmental entities in civil or criminal investigations and proceedings or by other entities. These claims could be asserted under a variety of laws, including but not limited to consumer finance laws, consumer protection laws, contract laws, tort laws, environmental laws, intellectual property laws, privacy laws, labor and employment laws, employee benefit laws, and securities laws. For example, in March and April 2022 three separate stockholder class action lawsuits were filed against the Company, its directors, certain officers and its initial public offering ("IPO") underwriters alleging violations of United States securities laws, including the Securities Act and the Exchange Act. Securities litigation, and other related matters such as governmental or regulatory investigations, could have a material adverse effect on our business, results of operations, financial condition, reputation and cash flows, as well as on the market price of our Class A common stock. We have also been subject to, and may become subject to, allegations of discrimination or other similar misconduct, as well as allegations of breach of contract or other acts or omissions by or on behalf of us. These actions could expose us to adverse publicity that could harm our brand, reputation, and operations and to substantial monetary damages and legal defense costs, injunctive relief and criminal and civil fines and penalties, including but not limited to suspension or revocation of licenses to conduct business. Although the results of lawsuits and claims cannot be predicted with certainty, defending these claims is costly and can impose a significant burden on management and employees. Any litigation to which we are a party may result in an onerous or unfavorable judgment that may not be reversed on appeal, or we may decide to settle lawsuits on similarly unfavorable terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our business practices, and accordingly our business could be seriously harmed. See Part II, Item 1 "Legal Proceedings."

**Changes in tax laws and the application of such laws may materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.**

New income, sales, use or other tax laws, statutes, rules, regulation, or ordinances could be enacted at any time, or interpreted, changed, modified, or applied adversely to us, any of which could adversely affect our business, prospects, financial condition, results of operations, and cash flows. In particular, presidential, congressional, state, and local elections in the United States could result in significant changes in, and uncertainty with respect to, tax legislation, regulation and government policy directly affecting our business or indirectly affecting us because of impacts on our customers, suppliers and manufacturers. For example, the United States government may enact significant changes to the taxation of business entities including, among others, an increase in the corporate income tax rate and the imposition of minimum taxes or surtaxes on certain types of income. To the extent that such changes occur and have a negative impact on us, our suppliers, manufacturers or our customers, including as a result of related uncertainty, these changes could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

**Our ability to use net operating loss carryforwards and other tax attributes is limited due to certain provisions of the Internal Revenue Code.**

We have incurred substantial losses during our history and do not expect to become profitable in the foreseeable future, and we may never achieve profitability. Under the Tax Cuts and Jobs Act, federal net operating losses ("NOLs") we generated in tax years through December 31, 2017 may be carried forward for 20 years and may fully offset taxable income in the year utilized, and federal NOLs we generated in tax years beginning after December 31, 2017 may be carried forward indefinitely but may only be used to offset 80% of our taxable income annually. Under Sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change federal NOLs and other tax attributes (such as research and development tax credits) to offset its post-change income and taxes may be limited. In general, an "ownership change" occurs if there is a greater than 50 percentage point change (by value) in a corporation's equity ownership by certain stockholders over a rolling three-year period. We have experienced ownership changes in the past and may experience ownership changes in the future as a result of subsequent shifts in our stock ownership (some of which shifts are outside our control). As a result, our ability to use our pre-change federal NOLs and other tax attributes to offset future taxable income and taxes could be subject to limitations. Similar provisions of state tax law may also apply and future regulatory changes could also limit our ability to utilize NOL carryforwards. For these reasons, even if we achieve profitability, we may be unable to use a material portion of our NOLs and other tax attributes, which could potentially result in increased future income tax liability to us and materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

56

Exhibit 8 - Page 544

**Increasing scrutiny and changing expectations from global regulations, our investors, consumers and employees with respect to our environmental, social, and governance ("ESG") practices may impose additional costs on us or expose us to new or additional risks.**

Companies across many industries are facing increasing scrutiny related to their ESG practices and reporting. Investors, consumers, employees and other stakeholders have focused increasingly on ESG practices and placed increasing importance on the implications and social cost of their investments, purchases and other interactions with companies. With this increased focus, public reporting regarding ESG practices is becoming more broadly expected. Any failure or perceived failure to accomplish or accurately track and report on our ESG initiatives on a timely basis or to meet investor, consumer or employee expectations on ESG matters, particularly because our mission is to create products and services that help our planet transition to carbon neutral energy and transportation, could adversely affect our brand and reputation, our employees' engagement and retention and the willingness of our customers and partners to do business with us.

We may at times engage in voluntary initiatives (such as voluntary disclosures, certifications, or goals, among others) or commitments to improve our ESG profile, and any such initiatives or achievements of such commitments may be costly. For example, our commitment to The Climate Pledge, pursuant to which signatories pledge to reach net-zero emissions by 2040, and subsequent reporting and emissions reductions and offsets would require considerable investments, and our commitment, with all of their contingencies, dependencies, and in certain cases, reliance on third-party verification and/or performance, is complex and ambitious, and we cannot guarantee that we will meet our commitment. Our ability to achieve this commitment is subject to numerous risks, many of which are outside of our control. Such risks include the availability and cost of low or non-carbon based energy sources, the evolving regulatory requirements affecting ESG standards or disclosures, the availability of suppliers that can meet our sustainability, diversity and other ESG standards, our ability to recruit, develop and retain a diverse range of talent, and other items discussed in these risk factors. Additionally, certain disclosures or targets may be based on assumptions, estimates, hypothetical expectations, or third-party information, which are necessarily uncertain and may be prone to errors or subject to misinterpretation given the long timelines involved and the lack of an established single approach to identifying, measuring, and reporting on many ESG matters. Our processes and controls to identify, measure, and report on ESG metrics may change to reflect evolving methodologies, standards, internal control, and data availability and quality. This may require us to incur significant costs and may impact our ESG initiatives, including reported progress on, and ability to achieve, any of our goals, either on an initial timeline or at all. Implementing and achieving our commitment may also result in increased costs in our supply chain and business operations. Furthermore, if our competitors' corporate responsibility performance is perceived to be greater than ours, including performance on third-party benchmarks and scores used by certain market participants, potential or current investors or customers may elect to invest or do business with our competitors instead. Even if this is not the case, our current actions may subsequently be determined to be insufficient by various stakeholders, and we may be subject to various adverse consequences or investor or regulator engagement on our ESG initiatives and disclosures, even if such initiatives are currently voluntary.

In addition, we expect there will likely be increasing levels of regulation, disclosure-related and otherwise, with respect to ESG matters. For example, the Securities and Exchange Commission ("SEC") has published proposed rules that require companies to provide significantly expanded climate-related disclosures in their periodic reporting, which may require us to incur significant additional costs to comply, including the implementation of significant additional internal controls processes and procedures regarding matters that have not been subject to such controls in the past, and impose increased oversight obligations on our management and board of directors. In addition, California has recently enacted climate disclosure laws that may require us to report on our greenhouse gas emissions, climate-related financial risks and other climate-related matters. Furthermore, industry and market practices may further develop to become even more robust than what is required under any new laws and regulations, and we may have to expend significant efforts and resources to keep up with market trends and stay competitive among our peers, which could result in higher associated compliance costs and penalties for failure to comply with such laws and regulations. Additionally, many of our customers and suppliers may be subject to similar expectations, which may augment or create additional risks.

**Risks Related to the Ownership of Our Class A Common Stock**

**The price of our Class A common stock has been, and may continue to be, volatile or may decline regardless of our operating performance.**

The market price of our Class A common stock has fluctuated and may continue to fluctuate significantly in response to numerous factors, many of which are beyond our control, including:

57

Exhibit 8 - Page 545

- actual or anticipated fluctuations in our financial condition and results of operations;
- the projections and any other guidance we may provide to the public, and any changes in, or failure to meet, such projections or guidance;
- failure of securities analysts to maintain coverage of Rivian, changes in financial estimates or ratings by any securities analysts who follow Rivian or our failure to meet these estimates or the expectations of investors;
- announcements by us or our competitors of significant technical innovations, acquisitions, strategic partnerships, joint ventures, results of operations, or capital commitments;
- changes in stock market valuations and operating performance of other EV companies generally, or those in our industry in particular;
- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;
- significant changes in our board of directors or management;
- sales of large blocks of our common stock, including sales by our Founder, our executive officers and directors or investors;
- lawsuits threatened or filed against us;
- actual or anticipated changes in laws, regulations or government policies applicable to our business;
- changes in our capital structure, such as future issuances of debt or equity securities;
- short sales, hedging and other derivative transactions involving our capital stock, including by holders of our 2029 Green Convertible Notes or 2030 Green Convertible Notes that employ a convertible arbitrage strategy with respect to such notes;
- anticipated conversions of the 2029 Green Convertible Notes and 2030 Green Convertible Notes into shares of Class A common stock;
- general economic conditions, such as recessions, changes in inflation or interest rates and slow or negative growth of our markets;
- other events or factors, including those resulting from war, geopolitical tensions such as the ongoing military conflict between Russia and Ukraine and in Israel and Gaza and related economic sanctions, pandemics (including COVID-19 and associated variants), incidents of terrorism or responses to these events; and
- the other factors described in this Part II Item 1A "Risk Factors."

The stock market in general, and the market for technology companies and EV companies in particular, has experienced extreme price and volume fluctuations, which in many cases have been unrelated or disproportionate to the results of operations of those companies. Market fluctuations could result in extreme volatility in the price of shares of our Class A common stock, which could cause a decline in the value of a stockholder's investment. Price volatility may be greater if the public float and trading volume of shares of our Class A common stock is low. Following periods of such volatility in the market price of a company's securities, securities class action litigation has often been brought against that company. Such litigation could result in substantial costs and divert management's attention and resources from our business.

**Our executive officers, directors, and principal stockholders, if they choose to act together, maintain significant voting power.**

Our executive officers, directors, and stockholders who owned more than 5% of our outstanding common stock before our IPO and their respective affiliates, in the aggregate, hold shares representing approximately 52.0% of the voting power of our outstanding capital stock and could significantly influence all matters submitted to our stockholders for approval, as well as our management and affairs, particularly if they were to choose to act together. For example, these persons, if they choose to act together, would control or significantly influence the election of directors and approval of any merger, consolidation, or sale of substantially all of our assets, regardless of whether or not other stockholders believe that such action is in their best interest. This concentration of ownership control may:

- delay or prevent a change in control;
- entrench our management and our board of directors; or
- impede a merger, consolidation, takeover, or other business combination involving us that other stockholders may desire.

In addition, each share of our Class B common stock is entitled to ten votes, while each share of our Class A common stock entitles its holder to one vote. An affiliate of our Founder and CEO, Robert J. Scaringe, holds all outstanding shares of our Class B common stock. Due to our dual class structure, affiliates of Dr. Scaringe hold shares of our common stock representing, in the aggregate, approximately 9.0% of the voting power of our outstanding capital stock but 2.4% of the total shares of common stock outstanding.

58

Exhibit 8 - Page 546

In addition, while we do not expect to issue any additional shares of Class B common stock, any future issuances of Class B common stock would be dilutive to holders of Class A common stock.

**We cannot predict the impact our dual class structure may have on the market price of our Class A common stock.**

We cannot predict whether our dual class structure will result in a lower or more volatile market price of our Class A common stock, in adverse publicity, or in other adverse consequences. Certain index providers exclude companies with multiple class share structures in certain of their indices. As a result, our dual class capital structure makes us ineligible for inclusion in any of these indices. Given the sustained flow of investment funds into passive strategies that seek to track certain indices, exclusion from stock indices would likely preclude investment by many of these funds and could make our Class A common stock less attractive to other investors. As a result, the market price of our Class A common stock could be materially adversely affected.

**Sales, directly or indirectly, of a substantial amount of our Class A common stock in the public markets by our existing security holders may cause the price of our Class A common stock to decline.**

Sales of a substantial number of shares of our Class A common stock into the public market, particularly sales by our directors, executive officers and principal stockholders, or the perception that these sales might occur, could cause the market price of our Class A common stock to decline. Many of our pre-IPO security holders have substantial unrecognized gains on the value of the equity they hold, and may take steps to sell their shares or otherwise secure or limit their risk exposure to the value of their unrecognized gains on those shares. We are unable to predict the timing or effect of such sales on the market price of our Class A common stock.

We and all of our directors and executive officers and certain other record holders are able to sell our shares freely in the public market, except that any shares held by our affiliates, as defined in Rule 144 under the Securities Act, would only be able to be sold in compliance with Rule 144. In addition, as of September 30, 2023, we had stock options and restricted stock units ("RSUs") outstanding, as well as other stock-based awards and shares underlying our 2021 Employee Stock Purchase Plan ("ESPP") that, if fully exercised, vested, or settled, would result in the issuance of approximately 132 million shares of Class A common stock. All of the shares of Class A common stock issuable upon the exercise of stock options, and the shares reserved for future issuance under our equity incentive plans, are registered for public resale under the Securities Act. Accordingly, these shares can be freely sold in the public market upon issuance subject to applicable vesting requirements, compliance by affiliates with Rule 144, and other restrictions provided under the terms of the applicable plan and/or the award agreements entered into with participants and any such sales could adversely affect the market price of our Class A common stock.

Further, in September 2022, we approved the payment of 2022 bonus awards to be made under the 2021 Incentive Award Plan in the form of RSUs, which vested immediately upon grant in the first quarter of 2023. The 2022 bonus objectives were subject to certain performance conditions related to production and other targets. These grants were made in March 2023 in an aggregate amount of $137 million in the form of RSUs. Our issuance of additional shares of common stock will dilute the ownership interests of our existing common stockholders, which may depress the trading price of our Class A common stock. In addition, the conversion of some or all of the 2029 Green Convertible Notes and the 2030 Green Convertible Notes will dilute the ownership interests of existing stockholders to the extent the Company delivers shares of Class A common stock upon such conversion.

In addition, certain holders of shares of our common stock have rights after the completion of our IPO, subject to certain conditions, to require us to file registration statements for the public resale of shares of our Class A common stock or to include such shares in registration statements that we may file for us or other stockholders.

**If securities or industry analysts do not publish research, or publish inaccurate or unfavorable research, about our business, the price of our Class A common stock and trading volume could decline.**

The trading market for our Class A common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business, our market and our competitors. We do not have any control over these analysts. If one or more of the analysts who cover us downgrade our Class A common stock or publish inaccurate or unfavorable research about our business, or if our results fall short of the projected results published by one or more of the analysts, our Class A common stock price would likely decline. If one or more of these analysts cease coverage of us or fail to publish

Exhibit 8 - Page 547

reports on us regularly, we could lose visibility in the financial markets and demand for our Class A common stock could decrease, which might cause our Class A common stock price and trading volume to decline.

**We do not intend to pay dividends for the foreseeable future. Consequently, any gains from an investment in our common stock will likely depend on whether the price of our Class A common stock increases.**

We currently intend to retain any future earnings to finance the operation and expansion of our business and we do not expect to declare or pay any dividends in the foreseeable future. Any determination to pay dividends in the future will be at the discretion of the board of directors. As a result, stockholders must rely on sales of their Class A common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment. Moreover, the terms of our ABL Facility and the indenture governing the 2026 Notes restrict the ability of certain of our subsidiaries to pay dividends to us, and any additional debt we may incur in the future may restrict our ability to declare or pay cash dividends or make distributions. In addition, Delaware law may impose requirements that may restrict our ability to pay dividends to holders of our Class A common stock.

**Anti-takeover provisions contained in our amended and restated certificate of incorporation and amended and restated bylaws, as well as provisions of Delaware law, could impair a takeover attempt.**

Our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law contain provisions which could have the effect of rendering more difficult, delaying, or preventing an acquisition. These provisions include:

- a dual class structure;
- a classified board of directors with three-year staggered terms, who can only be removed for cause, which may delay the ability of stockholders to change the membership of a majority of our board of directors;
- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;
- the exclusive right of our board of directors to set the size of the board of directors and to elect a director to fill a vacancy, however occurring, including by an expansion of the board of directors, which prevents stockholders from being able to fill vacancies on our board of directors;
- the ability of our board of directors to authorize the issuance of shares of preferred stock and to determine the price and other terms of those shares, including voting or other rights or preferences, without stockholder approval, which could be used to significantly dilute the ownership of a hostile acquiror;
- the ability of our board of directors to alter our amended and restated bylaws without obtaining stockholder approval;
- in addition to our board of director's ability to adopt, amend, or repeal our amended and restated bylaws, our stockholders may adopt, amend, or repeal our amended and restated bylaws only with the affirmative vote of the holders of at least 66 2/3% of the voting power of all our then outstanding shares of capital stock;
- the required approval of (i) at least 66 2/3% of the voting power of the outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class, to adopt, amend, or repeal certain provisions of our amended and restated certificate of incorporation and (ii) for so long as any shares of Class B common stock are outstanding, the holders of at least 80% of the shares of Class B common stock outstanding at the time of such vote, voting as a separate series, to adopt, amend, or repeal certain provisions of our amended and restated certificate of incorporation;
- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of stockholders;
- the requirement that a special meeting of stockholders may be called only by an officer of the Company pursuant to a resolution adopted by a majority of our board of directors then in office or the chairperson of our board of directors; and
- advance notice procedures that stockholders must comply with in order to nominate candidates to our board of directors or to propose matters to be acted upon at a stockholders' meeting, which may discourage or deter a potential acquiror from conducting a solicitation of proxies to elect the acquiror's own slate of directors or otherwise attempting to obtain control of us.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management. These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors of their choosing and to cause us to take other corporate actions they desire, any of which, under certain

Exhibit 8 - Page 548

circumstances, could limit the opportunity for our stockholders to receive a premium for their shares of our Class A common stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

As a Delaware corporation, we are also subject to provisions of Delaware law, including Section 203 of the Delaware General Corporation Law (the "DGCL"), which prevents some stockholders holding more than 15% of our outstanding common stock from engaging in certain business combinations without approval of the holders of substantially all of our outstanding common stock.

In addition, certain provisions in the 2029 Green Convertible Notes and the 2030 Green Convertible Notes and the governing indentures could make a third-party attempt to acquire us more difficult or expensive. For example, if a takeover constitutes a fundamental change, then noteholders will have the right to require us to repurchase their 2029 Green Convertible Notes and the 2030 Green Convertible Notes for cash. In addition, if a takeover constitutes a make-whole fundamental change, then we may be required to temporarily increase the conversion rate. In either case, and in other cases, our obligations under the 2029 Green Convertible Notes and the 2030 Green Convertible Notes and the governing indentures could increase the cost of acquiring us or otherwise discourage a third party from acquiring us or removing incumbent management, including in a transaction that holders of our common stock may view as favorable.

**Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware will be the sole and exclusive forum for certain stockholder litigation matters and the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.**

Our amended and restated certificate of incorporation provides that, unless we otherwise consent in writing, the Court of Chancery of the State of Delaware is the exclusive forum (or if such court does not have subject matter jurisdiction, the federal district court of the State of Delaware) for any derivative action or proceeding brought on our behalf, any action asserting a claim of breach of a fiduciary duty, any action asserting a claim arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws or as to which the DGCL confers exclusive jurisdiction on the Court of Chancery of the State of Delaware or any action asserting a claim governed by the internal affairs doctrine of the law of the State of Delaware. This provision would not apply to claims seeking to enforce any liability or duty created by the Exchange Act. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. Accordingly, both state and federal courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our amended and restated certificate of incorporation provides that the federal district courts of the United States will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act. While the Delaware courts have determined that such choice of forum provisions are facially valid, a stockholder may nevertheless seek to bring a claim in a venue other than those designated in the exclusive forum provisions. In such instances, we would expect to vigorously assert the validity and enforceability of our exclusive forum provisions.

The choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits against us and our directors, officers, and other employees. Alternatively, if a court were to find the choice of forum provision contained in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with litigating such action in another jurisdiction, which could harm our business, prospects, financial condition, results of operations, and cash flows.

**General Risk Factors**

**Our business is subject to the risk of earthquakes, fire, power outages, floods, other natural disasters, the physical effects of climate change and other catastrophic events, and to interruption by man-made events such as terrorism.**

Our business is vulnerable to damage or interruption from power losses, telecommunications failures, terrorist attacks, acts of war, electronic and physical break-ins, natural disasters and the acute physical effects of climate change, which may include more frequent or severe storms, hurricanes, floods, droughts and wildfires, and other similar events. Climate change may also result in chronic changes in physical conditions such as sea-level rise or changes in temperature or precipitation patterns, which may also result in adverse impacts on our business. The third-party systems and operations and suppliers and

Exhibit 8 - Page 549

service providers we rely on are subject to similar risks. If a significant natural disaster, such as an earthquake, fire, or flood occurs, or our information technology systems or communications networks break down or operate improperly, our facilities may be seriously damaged or we may have to stop or delay production and delivery of our vehicles, which could have an adverse effect on our business, prospects, financial condition, results of operations, and cash flows, and our insurance coverage may be insufficient to compensate us for losses that may occur. Acts of terrorism, which may be targeted at metropolitan areas that have higher population density than rural areas, could also cause disruptions in our or our suppliers' and service providers' businesses or the economy as a whole. We may not have sufficient protection or recovery plans in some circumstances, such as natural disasters affecting locations that store significant inventory of our products, and in certain situations market responses to climate change and other catastrophic events may impair our ability to acquire insurance on terms that we find acceptable, which may augment the impact of any such events. Because we depend on single or limited source suppliers in some instances, any damage or interruption to our or our suppliers' facilities could have a significant impact on our business or financial condition. Any prolonged disruption of operations at our manufacturing facility or our suppliers' facilities, whether due to technical, information systems, communication networks, strikes, accidents, weather conditions or other natural disasters, including due to climate change, a health epidemic, pandemic or similar outbreak, whether short- or long-term, would materially and adversely affect our business, prospects, financial condition, results of operations, or cash flows.

**Our insurance strategy may not be adequate to protect us from all business risks.**

Our insurance strategy is to maintain insurance coverage for various types of risks, including property, products liability, casualty, management liability, cyber liability, and other risks similar to other companies with our risk profile that are normal and customary and available in the current insurance market. We place our insurance coverage with various carriers in numerous jurisdictions. The types and amounts of insurance we carry may vary from time to time and limits and retentions vary depending on availability, cost, and our decisions with respect to risk retention. These insurance policies are subject to various deductibles, policy limits, and exclusions that may impact our ability to recover for a specific risk. We may only insure to meet contractual requirements and/or choose to retain a level of risk where we believe we can adequately self-insure against the anticipated exposure. Losses that are not covered by insurance may be substantial and/or unpredictable and could adversely affect our financial condition and results of operations. Further, insurance coverage may not continue to be available to us or, if available, may be at a significantly higher cost, based on insurance market conditions or a change in our risk profile. This may require a change in our insurance purchasing philosophy and strategy which can result in the assumption of greater risks to offset insurance market fluctuations.

**General business and economic conditions could reduce our orders and sales, which could have a material adverse effect on our business, prospects, financial condition, results of operations, and cash flows.**

Our business and results of operations may be subject to global economic conditions and their impact on customer discretionary spending. Some factors that may negatively influence customer spending include high levels of unemployment, higher customer debt levels, declines in asset values and related market uncertainty, sustained inflation, fluctuating interest rates and credit availability, availability of vehicle financing, fluctuating fuel and other energy costs, and national and global geo-political and economic uncertainty, including in connection with tariffs or trade laws. Economic conditions in certain regions may also be affected by natural disasters, such as earthquakes, hurricanes, tropical storms and wildfires, public health crises, political crises, such as terrorist attacks, war or other political instability or other unexpected events, and such events could also disrupt our operations, internet or mobile networks or the operations of one or more of our third-party suppliers or providers. Specifically, difficult macroeconomic conditions, such as decreases in per capita income and level of disposable income, increased and prolonged unemployment, or a decline in consumer confidence could have a material adverse effect on the demand for our vehicles and more broadly on the automotive industry. Recently, certain automobile manufacturers have announced delays in EV production plans as a result of these and other factors impacting the demand for EVs. Under difficult economic conditions, potential customers may seek to reduce spending by forgoing our vehicles for other traditional options, increase use of public and mass transportation options or may choose to keep their existing vehicles, and cancel preorders.

**We have identified material weaknesses in our internal control over financial reporting. If our remediation of such material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to develop and maintain effective internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired, which could adversely affect investor confidence in the accuracy and completeness of our financial statements and adversely affect our business and operating results and the market price for our Class A common stock.**

Exhibit 8 - Page 550

As a public company, we are required to establish and periodically evaluate procedures with respect to our disclosure controls and procedures and our internal control over financial reporting. In the course of preparing our financial statements for fiscal year 2021, we identified material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in our internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements would not be prevented or detected on a timely basis. The material weaknesses previously identified pertained to controls to address access and segregation of duties across financially relevant functions and IT general controls over our Enterprise Resource Planning systems, applications, and tools used in financial reporting. During the preparation of our financial statements for fiscal year 2022, we concluded that the material weaknesses previously identified had not been remediated as of December 31, 2022 and they continued to exist as of September 30, 2023 as disclosed in Part I, Item 4 "Controls and Procedures".

While the control deficiencies described above did not result in a material misstatement to our financial statements, the control deficiencies created a reasonable possibility that a material misstatement to our consolidated financial statements would not be prevented or detected on a timely basis. Therefore, we concluded that the deficiencies represent material weaknesses in our internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2022. In addition, our independent registered public accounting firm issued an adverse opinion indicating that our internal control over financial reporting was not effective as of December 31, 2022. We have taken and will continue to take action to remediate these material weaknesses, as described in Part I, Item 4 "Controls and Procedures." However, we will not be able to fully remediate these material weaknesses until these steps have been completed and have been operating effectively for a sufficient period of time.

Furthermore, we cannot assure you that the measures we have taken to date, and actions we may take in the future, will be sufficient to remediate the control deficiencies that led to our material weaknesses in our internal control over financial reporting or that they will be effective in preventing or mitigating potential future material weaknesses. Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. Further, additional weaknesses in our disclosure controls and procedures and internal control over financial reporting may be discovered in the future. If we are unable to remediate the material weaknesses in a timely manner and further implement and maintain effective internal control over financial reporting or disclosure controls and procedures, our ability to record, process, and report financial information accurately, and to prepare financial statements within required time periods could be adversely affected, which could result in material misstatements in our financial statements that may continue undetected or a restatement of our financial statements for prior periods. This may negatively impact the public perception of the Company and cause investors to lose confidence in the accuracy and completeness of our financial reports, which could negatively affect the market price of our Class A common stock, harm our ability to raise capital on favorable terms, or at all, in the future, and subject us to litigation or investigations by regulatory authorities, which could require additional financial and management resources or otherwise have a negative impact on our financial condition.

In addition, we have incurred and expect to continue to incur significant expenses and devote substantial management effort toward our efforts to achieve and maintain effective internal control over financial reporting. As a result of the complexity involved in complying with the rules and regulations applicable to public companies, our management's attention may be diverted from other business concerns, which could harm our business, operating results, and financial condition. Although we have already hired additional employees to assist us in complying with these requirements, we may not have adequate personnel with the appropriate level of knowledge, experience and training in the accounting policies, practices, or internal control over financial reporting required of public companies and may need to hire more employees in the future, or engage outside consultants, which will increase our operating expenses. As a result, the development and implementation of the standards and controls necessary to achieve the level of accounting standards required of a public company may require costs greater than expected or take longer to achieve.

**We will continue to incur significant additional costs as a public company, and our management will be required to devote substantial time to compliance with our public company responsibilities and corporate governance practices.**

We have incurred and will continue to incur increased costs associated with reporting and corporate governance rules and regulations for public companies. These rules and regulations have increased and may continue to evolve and are expected to significantly increase our accounting, legal and financial compliance costs and have made and will continue to make some activities more time consuming, including due to increased training of our current employees, additional hiring of new employees, and increased assistance from consultants. In addition, our executive officers have limited experience in the management of a publicly traded company and will need to devote substantial attention to complying with the increasingly complex laws pertaining to public companies and interacting with public company analysts and investors, which may divert

Exhibit 8 - Page 551

attention away from the day-to-day management and growth of our business, including operational, research and development and sales and marketing activities, which may adversely affect our business, prospects, financial condition, results of operations, and cash flows. We also expect public company rules, regulations and oversight to make it more expensive for us to maintain directors' and officers' liability insurance and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to maintain the same or similar coverage. As a result, it may be more difficult for us to attract and retain qualified persons to serve on our board of directors or as executive officers.

**If our estimates or judgments relating to our critical accounting policies are based on assumptions that change or prove to be incorrect, our results of operations could fall below the expectations of our investors and securities analysts, resulting in a decline in the trading price of our Class A common stock.**

The preparation of financial statements in conformity with generally accepted accounting principles in the United States ("U.S. GAAP") requires management to make estimates and assumptions that affect the amounts reported in our consolidated financial statements and accompanying notes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, as discussed in Part I, Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Form 10-Q, the results of which form the basis for making judgments about the carrying values of assets, liabilities, equity and expenses that are not readily apparent from other sources. Our results of operations may be adversely affected if our assumptions change or if actual circumstances differ from those in our assumptions, which could cause our results of operations to fall below our publicly announced guidance or the expectations of securities analysts and investors, resulting in a decline in the market price of our Class A common stock.

**Item 2. Unregistered Sales of Equity Securities, Use of Proceeds, and Issuer Purchases of Equity Securities**

On November 15, 2021, we completed our IPO. The net proceeds to us from the IPO were $13.5 billion, after deducting the underwriting discount and commissions of approximately $185 million. All shares sold were registered pursuant to a registration statement on Form S-1 (File No. 333-259992), as amended (the "Registration Statement"), which was declared effective by the SEC on November 9, 2021.

The net proceeds from our IPO have been invested in investment grade instruments. There has been no material change in the use of proceeds from our IPO as described in our final prospectus, as filed with the SEC in connection with our IPO.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

(a) Amendment to EDV Agreement

On November 7, 2023, our wholly-owned subsidiary, Rivian Automotive, LLC, and Amazon Logistics, Inc., or Logistics, entered into Amendment No. 3 (the "Amendment") to the Framework Agreement, dated September 16, 2019, as amended. The Amendment amends the various agreements comprising the EDV Agreement among Rivian Automotive, LLC, Rivian Automotive, Inc., Logistics, and Logistics' parent company, Amazon.com, Inc. Amazon.com, Inc. is also the parent company of Amazon.com NV Investment Holdings LLC, which beneficially owns shares of our capital stock representing 15.7% of our voting power as of September 30, 2023.

Under the EDV Agreement, we and Logistics agreed to collaborate to design and develop EDVs and/or certain component parts for use in Amazon's last mile delivery operations. The EDV Agreement included exclusivity provisions pursuant to which we agreed to exclusively provide last mile delivery vehicles to Amazon for a period of four years from when Amazon first receives EDVs, and Amazon would have a right of first refusal to purchase last mile delivery vehicles from us for a period of two years thereafter.

Exhibit 8 - Page 552

The Amendment changes the foregoing exclusivity provisions and allows us to sell commercial vans, which contain jointly-owned intellectual property, to third-parties, subject to distribution fees and certain limitations related to customer type and vehicle volume. The distribution fees will be effective beginning on January 1, 2024 and are comprised of a base fee, a fee for last mile distribution vehicles, and a skateboard distribution fee, such fees to be in effect for ten years, five years and five years, respectively, from their effective date. Sales to certain last-mile delivery customers will require Amazon's approval for five years and sales to certain customers in the retail industry will require approval for ten years. We are not limited in or require approval to sell commercial vans to customers that are not last mile delivery customers or not retailers.

In addition, under the Amendment, we have agreed to make certain investments towards internal and external non-recurring engineering work, tooling and other research and development expenses directly related to investment projects that are dedicated to vehicle line product improvements. The investment projects are comprised of shared projects, Amazon-directed projects and Rivian-directed projects (as defined in the Amendment). We will have until December 31, 2026 to satisfy the investment commitment.

The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the text of the Amendment, which is filed as Exhibit 10.6 to this Form 10-Q and incorporated herein by reference.

(b) Not applicable

(c) During the three months ended September 30, 2023, no director or "officer" (as defined in Rule 16a-1(f) under the Exchange Act) of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," each as defined in Item 408(a) of Regulation S-K.

Exhibit 8 - Page 553

**Item 6. Exhibits**

Exhibit Index

| Exhibit Number | Exhibit Title | Incorporated by Reference | | | | Filed / Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 3.1 | Amended and Restated Certificate of Incorporation of Rivian Automotive, Inc. | 8-K | 001-41042 | 3.1 | 11/16/2021 | |
| 3.2 | Amended and Restated Bylaws of Rivian Automotive, Inc. | 8-K | 001-41042 | 3.2 | 11/16/2021 | |
| 4.1 | Specimen Stock Certificate evidencing the shares of Class A common stock | S-1/A | 333-259992 | 4.1 | 11/01/2021 | |
| 4.2 | Fifth Amended and Restated Investors' Rights Agreement, dated as of January 19, 2021, by and among the Registrant and certain holders of its capital stock, as amended | S-1/A | 333-259992 | 4.2 | 10/22/2021 | |
| 4.3 | Indenture, dated as of October 11, 2023, between Rivian Automotive, Inc. and U.S. Bank Trust Company, National Association, as trustee | 8-K | 001-41042 | 4.1 | 10/11/2023 | |
| 4.4 | Form of certificate representing the 3.625% Green Convertible Senior Notes due 2030 (included as Exhibit A to Exhibit 4.3) | 8-K | 001-41042 | 4.2 | 10/11/2023 | |
| 10.1# | Employment Agreement by and between Rivian Automotive, LLC and Kjell Gruner | | | | | * |
| 10.2# | Consulting Agreement by and between Rivian Automotive, LLC and Jiten Behl | | | | | * |
| 10.3‡ | First Amendment to Economic Development Agreement, dated as of September 26, 2023, by and among Rivian Horizon, LLC, the State of Georgia acting by and through the Georgia Department of Economic Development, the Joint Development Authority of Jasper County, Morgan County, Newton County and Walton County | 8-K | 001-41042 | 10.1 | 9/29/2023 | |
| 10.4 | Form of Capped Call Confirmations | 8-K | 001-41042 | 10.1 | 10/11/2023 | |
| 10.5 | Form of Additional Capped Call Confirmations | 8-K | 001-41042 | 10.2 | 10/11/2023 | |
| 10.6† | Amendment No. 3 to the Framework Agreement, dated as of November 7, 2023, by and between Rivian Automotive, LLC and Amazon Logistics, Inc. | | | | | * |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) | | | | | * |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) | | | | | * |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 | | | | | ** |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 | | | | | ** |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | | | | | * |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | * |

66

Exhibit 8 - Page 554

| | | |
|---|---|---|
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | * |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | * |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document | * |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | * |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) | * |

* Filed herewith.
** Furnished herewith.
‡ Schedules and exhibits have been omitted pursuant to Item 601(a)(5) of Regulation S-K. The registrant undertakes to provide copies of any of the omitted schedules and exhibits upon request by the Securities and Exchange Commission.
# Indicates management contract or compensatory plan.
† Portions of this exhibit (indicated by asterisks) have been redacted in compliance with Regulation S-K Item 601(b)(10)(iv).

Exhibit 8 - Page 555

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**RIVIAN AUTOMOTIVE, INC.**

|  | By: | */s/* Robert J. Scaringe |
|---|---|---|
|  |  | Robert J. Scaringe |
|  |  | Chief Executive Officer |
| Dated: November 7, 2023 |  | *(Principal Executive Officer)* |

|  | By: | */s/* Claire McDonough |
|---|---|---|
|  |  | Claire McDonough |
|  |  | Chief Financial Officer |
| Dated: November 7, 2023 |  | *(Principal Financial Officer)* |

68

Exhibit 8 - Page 556

**Exhibit 10.1**

### RIVIAN AUTOMOTIVE, LLC EMPLOYMENT AGREEMENT

This Employment Agreement (the "***Agreement***"), entered into as between Rivian Automotive, LLC (the "***Company***") and Kjell Gruner ("***Executive***" and, together with the Company, the "***Parties***") shall be effective as of the first day of Executive's employment with Company on September 1, 2023 (the "***Effective Date***").

**WHEREAS**, the Company desires to employ Executive to perform services as an employee of the Company under the terms hereof;

**WHEREAS**, the Parties mutually desire to execute this Agreement to supersede any verbal offer or any other preceding document that may contain the terms of Executive's employment with the Company effective as of the Effective Date.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, including the respective covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      **Employment.**

(a)      General. The Company shall employ Executive upon the terms and conditions provided herein effective as of the Effective Date.

(b)      Position and Duties. Effective as of the Effective Date, Executive shall serve as the Company's Chief Commercial Officer and President, Business Growth (***"CCO"***) with responsibilities, duties, and authority usual and customary for such position, reporting to and subject to direction by the Chief Executive Officer of the Company (the "***CEO***"), and Executive agrees promptly and faithfully to comply with all present and future policies, requirements, rules and regulations, and reasonable directions and requests, of the Company in connection with the Company's business. At the Company's request, Executive shall serve the Company and/or its subsidiaries and affiliates in such other capacities in addition to the foregoing as the Company shall designate, *provided* that such additional capacities are consistent with Executive's position as the Company's CCO. In the event that Executive serves in any one or more of such additional capacities, Executive's compensation shall not automatically be increased on account of such additional service.

(c)      Principal Office. Executive will be based in Irvine, California, with required travel in connection with the fulfillment of Executive's role with the Company, subject to travel restrictions imposed by state and federal government agencies related to the COVID-19 pandemic.

(d)      Exclusivity. Except with the prior written approval of the CEO (which the CEO may grant or withhold in his sole and absolute discretion), Executive shall devote Executive's best efforts and full working time, attention, and energies to the business of the Company, except during any paid vacation or other excused absence periods.  Notwithstanding the foregoing, Executive may, without violating this Section 1(d), (i) as a passive investment, own publicly traded securities in such form or manner as will not require any services by Executive in the operation of the entities in which such securities are owned; (ii) engage in charitable and civic activities; (iii) serve as an officer or director of a professional organization or committee as approved by the CEO; (iv) serve on the boards of directors of any Affiliate (as defined below) as approved by the CEO; or (v) engage in other personal passive investment activities (including on behalf of Executive's family or any trust controlled by Executive or any member of Executive's family), in each case, so long and to the extent as such interests or activities do not materially interfere, individually or in the aggregate, with or otherwise prevent the performance of Executive's duties and responsibilities hereunder. Executive may also serve as a member of the board of directors or board of advisors of other organizations provided (i) such organization is not a competitor of the Company; (ii) Executive receives prior written approval from the CEO; and (iii) such activities do not individually or in the aggregate interfere with the performance of Executive's duties under this Agreement, violate the Company's standards of conduct then in effect, or raise a conflict under the Company's conflict of interest policies. For the avoidance of doubt, the CEO has approved Executive's continued service with those organizations set forth on <u>Exhibit A</u>, such approval to continue until the earlier to occur of (a) the CEO's revocation of such approval in the CEO's sole and absolute discretion, or (b) such time as such service interferes with the performance of Executive's duties under this Agreement, violates the Company's standards of conflict or raises a conflict under the Company's conflict of interest policies. For purposes hereof, "***Affiliate***" shall mean any person controlling, controlled by, or under common control with the Company. For purposes of this Agreement, "***control***" (including the terms "controlling" and "controlled") with respect to a person means the right to direct or cause the direction of the management and policies of such person, whether through the ownership of securities, by contract, or otherwise.

Exhibit 8 - Page 557

**Exhibit 10.1**

**2.**     **Term**. The period of Executive's employment under this Agreement shall commence on the Effective Date and shall continue until Executive's employment with the Company is terminated pursuant to Section 5. The phrase "**Term**" as used in this Agreement shall refer to the entire period of employment of Executive by the Company.

**3.**     **Compensation and Related Matters**.

**(a)**     One-Time Sign-On Bonus. The Company shall pay Executive a one-time lump sum cash signing bonus of One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "**Signing Bonus**") within forty-five (45) days following the Effective Date.

**(b)**     Repayment Obligations. Should Executive terminate employment without Good Reason (defined below) or the Company terminates Executive's employment for Cause (as defined below) prior to the first anniversary of the Effective Date, Executive's repayment obligations will be prorated for each full month of service completed with Rivian at the end of Executive's employment. Moreover, the Signing Bonus shall be subject to any policy (whether in existence as of the Effective Date or later adopted) established by the Company providing for clawback or recovery of the Signing Bonus paid to the Executive. The Company will make any determination for clawback or recovery in its sole discretion and in accordance with any applicable law or regulation.

**(c)**     One-Time Inducement Equity Grants. Following the Effective Date and subject to the approval of the Compensation Committee of the Board of Directors of Rivian Automotive, Inc. (the "**Board**"), Executive shall be granted the following one-time inducement equity awards, in each case, subject to the terms of and governed under the Rivian Automotive, Inc. 2021 Incentive Award Plan (as it may be amended from time to time, the "**Plan**") and an award agreement:

(i)     RSU Award: An award of Restricted Stock Units ("**RSUs**") with an initial value, as determined in accordance with Company policy, of Ten Million Dollars ($10,000,000.00). The actual number of RSUs granted will be calculated in a manner consistent with the Company's granting policy, as determined by the Board as of the date of award approval in accordance with Company policy. Company policy as of the date of this letter provides for the actual number of RSUs granted to be determined by dividing the initial value by the value of an RSU to be determined based on the average closing trading price of a share of Company common stock during the month of hire. The RSUs will be subject to the Plan and an award agreement that will be provided following the date of grant. The vesting of the RSU award will be subject to a time-based condition (vest as to 1/16th of the RSUs will time-vest quarterly for a total time-vesting over a four-year period from the vest start date) as determined by the Compensation Committee.

(ii)     Stock Option Award: An award of non-qualified stock options (the "**Options**") to purchase shares of Class A common stock of Rivian Automotive, Inc. with an initial value, as determined in accordance with Company policy, of Three Million Dollars ($3,000,000.00). The Options will be subject to the Plan and an award agreement. The Options will be subject to annual vesting (vest as to 1/4th annually on the anniversary of the grant date) for a total time-vesting over a four-year period). The actual number of Options granted will be calculated in a manner consistent with the Company's granting policy, as determined by the Board as of the date of award approval in accordance with Company policy. Company policy as of the date of this letter provides for the actual number of Options granted to be determined by (A) dividing the initial value by the value of an Option to be determined based on the average closing trading price of a share of Company common stock during the month of hire rounded up to the nearest whole share of common stock, and (B) multiplying that number by two.

**(d)**     Annual Base Salary. During the Term, Executive shall receive a base salary at the rate of Four Hundred Fifty Thousand Dollars ($450,000.00) per year (as may be increased from time to time, the "**Annual Base Salary**"). The Annual Base Salary shall be subject to withholdings and deductions and paid to Executive in accordance with the customary payroll practices and procedures of the Company. Such Annual Base Salary shall be reviewed by the CEO and/or the Compensation Committee (the "**Compensation Committee**") of the Board of Directors of Rivian Automotive, Inc. ("**Parent**"), not less than annually.

**(e)**     Annual Bonus. Executive shall be eligible to receive an annual bonus based on Executive's achievement of performance objectives established by the CEO and/or the Compensation Committee, such bonus to be targeted at 50% of the Annual Base Salary (the "**Annual Bonus**"). Any Annual Bonus approved by the CEO and/or the Compensation Committee shall be paid at the same time annual bonuses are paid to other executives of the Company generally and, in any event, by March 15 of the year following the year to which such Annual Bonus relates.

Exhibit 8 - Page 558

Exhibit 10.1

**(f)** <u>Benefits</u>. Executive shall be entitled to participate in such employee and executive benefit plans and programs as the Company may from time to time offer to provide to its executives, subject to the terms and conditions of such plans. Notwithstanding the foregoing, nothing herein is intended, or shall be construed, to require the Company to institute or continue any particular plan or benefit.

**(g)** <u>Business Expenses</u>. The Company shall reimburse Executive for all reasonable, documented, out-of-pocket travel and other business expenses incurred by Executive in the performance of Executive's duties to the Company in accordance with the Company's applicable expense reimbursement policies and procedures as are in effect from time to time. In accordance with the then-current Company budget, the Company shall acquire and/or provide to Executive for business use: a multimedia portable computer and subscriptions to various trade publications and various trade books and any other supplies reasonably appropriate for the performance of Executive's duties. Such items shall remain the exclusive property of the Company, are to be used solely for Executive's benefit, and shall be returned promptly to the Company upon request at the termination of Executive's employment for whatever reason.

**(h)** <u>Vacation</u>. Executive will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

**4. Ongoing Equity Awards.**

**(a)** Executive shall be eligible for a discretionary grant(s) of stock options, restricted stock units and other equity awards following the Effective Date as may be determined by the CEO or the Compensation Committee.

**5. Termination.**

**(a)** <u>At-Will Employment</u>. The Company and Executive acknowledge that Executive's employment is and shall continue to be at-will, as defined under applicable law. This means that it is not for any specified period of time and, subject to any ramifications under Section 6 of this Agreement, can be terminated by Executive or by the Company at any time, with or without advance notice, and for any or no particular reason or cause. It also means that Executive's job duties, title, and responsibility and reporting level, work schedule, compensation, and benefits, as well as the Company's personnel policies and procedures, may be changed with prospective effect, with or without notice, at any time in the sole discretion of the Company (subject to any ramification such changes may have under Section 6 of this Agreement). This "at-will" nature of Executive's employment shall remain unchanged during Executive's tenure as an employee and may not be changed, except in an express writing signed by Executive and a duly-authorized officer of the Company. If Executive's employment terminates for any lawful reason, Executive shall not be entitled to any payments, benefits, damages, award, or compensation other than as provided in this Agreement.

**(b)** <u>Notice of Termination</u>. During the Term, any termination of Executive's employment by the Company or by Executive (other than by reason of death) shall be communicated by written notice (a "***Notice of Termination***") from one Party hereto to the other Party hereto (i) indicating the specific termination provision in this Agreement relied upon, if any, (ii) setting forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated, and (iii) specifying the Date of Termination (as defined below). Written Notice by Executive must be made to the CEO to be considered effective Notice. The failure by the Company to set forth in the Notice of Termination all of the facts and circumstances which contribute to a showing of Cause (as defined below) shall not waive any right of the Company hereunder or preclude the Company from asserting such fact or circumstance in enforcing its rights hereunder.

**(c)** <u>Date of Termination</u>. For purposes of this Agreement, "***Date of Termination***" shall mean the date of the termination of Executive's employment with the Company specified in a Notice of Termination.

**(d)** <u>Deemed Resignation</u>. Upon termination of Executive's employment for any reason, Executive shall be deemed to have resigned from all offices and board memberships, if any, then held with the Company or any of its affiliates, and, at the Company's request, Executive shall execute such documents as are necessary or desirable to effectuate such resignations.

**6. Consequences of Termination**.

**(a)** <u>Payments of Accrued Obligations upon all Terminations of Employment</u>. Upon a termination of Executive's employment for any reason, Executive (or Executive's estate or legal representative, as applicable) shall be entitled to receive, within thirty (30) days after Executive's Date of Termination (or such earlier date as may be required by applicable law): (i) any portion of Executive's Annual Base Salary earned

Exhibit 8 - Page 559

Exhibit 10.1

through Executive's Date of Termination not theretofore paid, (ii) any business expense reimbursements owed to Executive under Section 3, (iii) any accrued but unused paid time-off owed to Executive, (iv) any Annual Bonus earned but unpaid as of the Date of Termination, and (v) any amount arising from Executive's participation in, or benefits under, any employee benefit plans, programs, or arrangements under Section 3, which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs, or arrangements. Except as otherwise set forth in Sections 6(b) and (c), the payments and benefits described in this Section 6(a) shall be the only payments and benefits payable in the event of Executive's termination of employment for any reason.

       **(b)**    Severance Payments upon Covered Termination Outside a Change of Control Period. If, during the Term, Executive experiences a Covered Termination outside of a Change of Control Period (each as defined below), then in addition to the payments and benefits described in Section 6(a), the Company shall, subject to Executive's delivery to the Company of a waiver and release of claims agreement substantially in the form of Exhibit B hereto (but updated to the extent deemed by the Company to be necessary to reflect any changes in applicable law) (the "***Release***") that becomes effective and irrevocable in accordance with Section 10(d), and Executive's continued compliance with the restrictive covenants and confidentiality provisions of this Agreement, provide Executive with the following:

       **(i)**    During the period of time commencing on the Termination Date and ending on the twelve (12) month anniversary of the Termination Date (the "***Severance Period***"), the Company shall continue to pay Executive's Annual Base Salary at the rate in effect immediately prior to the Date of Termination. Such payments shall be made in accordance with the Company's standard payroll practices, less applicable withholdings, beginning on the first payroll date following the date the Release of Claims becomes effective and irrevocable in accordance with Section 10(d) below, and with the first installment including any amounts that would have been paid had the Release been effective and irrevocable on the Date of Termination.

       **(ii)**    Executive shall be entitled to receive a pro-rated portion (based on the number of days Executive was employed by the Company during the calendar year in which the Date of Termination occurs) of the Annual Bonus that Executive would have earned had Executive remained employed through the end of the calendar year in which the Date of Termination occurs, as determined by the Company in good faith. If and to the extent earned, such earned pro-rated annual bonus shall be paid out at the same time annual bonuses are paid generally to other executives of the Company for the relevant year, less applicable withholdings and deductions, but in no event later than March 15th of the year immediately following that in which the Date of Termination occurs.

       **(iii)**    Subject to Executive's eligibility to elect continued healthcare coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("***COBRA***") as of the Date of Termination, the Company shall pay a lump sum payment to Executive equal to the amount the Company would have otherwise contributed toward Executive's group health, prescription, vision and dental coverage premium as an active employee ("***Company COBRA Premium***") for a period of time equal to the Severance Period. The Company COBRA Premium payment shall be paid in a cash lump sum on the first payroll date following the date the Release becomes effective and irrevocable in accordance with Section 10(d) below, less applicable withholdings and deductions. Executive will receive a separate COBRA election notice describing any rights to subsidized COBRA coverage and the terms and conditions of such subsidy.

       **(c)**    Severance Payments upon Covered Termination During a Change of Control Period. If, during the Term, Executive experiences a Covered Termination during a Change of Control Period, then, in addition to the payments and benefits described in Section 6(a), the Company shall, subject to Executive's delivery to the Company of the Release that becomes effective and irrevocable in accordance with Section 10(d), and Executive's continued compliance with the restrictive covenants and confidentiality provisions of this Agreement, provide Executive with the following:

       **(i)**    The Company shall pay to Executive an amount equal to twelve (12) months of Executive's Annual Base Salary. Such amount will be subject to applicable withholdings and payable in a single lump sum cash payment on the first regular payroll date following the date the Release becomes effective and irrevocable in accordance with Section 10(d).

       **(ii)**    Executive shall be entitled to receive a pro-rated portion (based on the number of days Executive was employed by the Company during the calendar year in which the Date of Termination occurs) of the Annual Bonus that Executive would have earned had Executive remained employed through the end of the calendar year in which the Date of Termination occurs, as determined by the Company in good faith. If and to the extent earned, such earned pro-rated annual bonus shall be

Exhibit 8 - Page 560

Exhibit 10.1

paid out at the same time annual bonuses are paid generally to other executives of the Company for the relevant year, less applicable withholdings and deductions, but in no event later than March 15th of the year immediately following that in which the Date of Termination occurs.

(iii)     Subject to Executive's eligibility to elect continued healthcare coverage under COBRA as of the Date of Termination, the Company shall pay a lump sum payment to Executive equal to the Company COBRA Premium for a period of time equal to the Severance Period. The Company COBRA Premium payment shall be paid in a cash lump sum on the first payroll date following the date the Release becomes effective and irrevocable in accordance with Section 10(d) below, less applicable withholdings and deductions. Executive will receive a separate COBRA election notice describing any rights to subsidized COBRA coverage and the terms and conditions of such subsidy.

(iv)     Each outstanding and unvested equity award with Parent (excluding any such awards that vest in whole or in part based on the attainment of performance- vesting conditions, which shall be governed by the terms of the applicable award agreement), including, without limitation, each restricted stock, stock option, restricted stock unit and stock appreciation right, held by Executive shall automatically become vested and, if applicable, exercisable and any forfeiture restrictions or rights of repurchase thereon shall immediately lapse with respect to one hundred percent (100%) of the shares subject thereto (excluding any such awards that vest in whole or in part based on the attainment of performance-vesting conditions, which shall be governed by the terms of the applicable award agreement), as of immediately prior to the Termination Date. To give effect to the foregoing, upon the Termination Date if it occurs prior to the closing of a Change of Control, (i) the vested portion of such equity awards shall be remain outstanding and/or be exercisable for the period(s) of time set forth in the applicable equity award agreements, (ii) Executive's outstanding equity awards shall cease vesting, and (iii) the unvested shares subject to Executive's outstanding equity awards shall remain outstanding (but unvested) until the earlier to occur of (A) the original expiration date of the equity award and (B) three (3) month anniversary of the Termination Date (the "**Equity Award Period**"). In the event a Change of Control has not been consummated by end of the Equity Award Period, then the unvested portion of Executive's equity awards shall terminate immediately without further action as of such date. Notwithstanding the foregoing, in the event the award agreement, the Prior Plan (as defined in the Plan) or the Plan pursuant to which the equity awards were granted or the agreement governing the Change in Control provides for more favorable treatment of Executive's equity awards upon a Change of Control or a Covered Termination during a Change of Control Period, nothing in this Agreement is intended to limit Executive's right to such more favorable treatment as provided in such award agreement, the Prior Plan (as defined in the Plan), the Plan or the agreement governing the Change in Control. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall amend an outstanding equity award to the extent such amendment would cause adverse tax consequences under Section 409A of the Code to Executive.

(d)     No Other Severance. Except as otherwise approved by the CEO (in his sole discretion and authority), the provisions of this Section 6 shall supersede in their entirety any severance payment provisions in any severance plan, policy, program, or other arrangement maintained by the Company.

(e)     No Requirement to Mitigate; Survival. Executive shall not be required to mitigate the amount of any payment provided for under this Agreement by seeking other employment or in any other manner. Notwithstanding anything to the contrary in this Agreement, the termination of Executive's employment shall not impair the rights or obligations of any Party.

(f)     Return of Severance Payments. Executive shall return to the Company any severance pay or other benefits, or portion thereof, made by a mistake of fact or law, or paid contrary to the terms of this Agreement. The Company has all remedies available at law for the recovery of such amounts. In addition, in the event Executive is receiving or has received severance pay or other benefits under this Agreement and has breached or subsequently breaches Sections 8(a) or 8(b), any portion of the Release, or any non-competition, non-solicitation, non- disparagement or confidentiality or other restrictions contained or referenced therein, (i) the payment of severance pay and benefits to Executive shall cease, (ii) the Company shall have no further obligation at any time to make available any severance pay and benefits under this Agreement, and (iii) Executive shall be required to return to the Company any severance pay and benefits, or portion thereof, paid to Executive, less five hundred dollars ($500), and the Company shall have all remedies available at law for the recovery of such amounts.

(g)     Definition of Cause. For purposes hereof, "**Cause**" means, subject to certain cure rights: (i) Executive's breach of any provision of this Agreement or the Release of Claims in any material respect; (ii) Executive's theft, material dishonesty, willful misconduct, breach of fiduciary duty, or falsification of any documents or records of the Company or any affiliate thereof; (iii) Executive's failure to abide, in a material

Exhibit 8 - Page 561

Exhibit 10.1

manner, with a written code of conduct or other written policies (including, without limitation, policies relating to confidentiality and reasonable workplace conduct) of the Company; (iv) Executive's unauthorized use, misappropriation, destruction or diversion of any tangible or intangible asset or corporate opportunity of the Company or any affiliate thereof, including, without limitation, Executive's improper use or disclosure of confidential or proprietary information of the Company or any affiliate thereof; *provided*, that the foregoing shall not apply to any particular corporate opportunity with respect to which the Company and/or any affiliate thereof, as applicable, has renounced any expectancy and/or waived any claims in writing and *provided further* that Executive's taking of copies of documents, or electronic sending of documents to Executive's personal electronic mail address, solely for Company use, and in compliance with the confidentiality and use restrictions set forth in the applicable Company agreement, shall not constitute unauthorized use, misappropriation, destruction or diversion of a tangible or intangible asset or corporate opportunity of the company or any affiliate thereof; (v) any act by Executive (other than his good faith execution of his duties to the Company or an affiliate thereof) which has a material detrimental effect on the reputation or business of the Company or any affiliate thereof; or (vi) Executive's gross or intentional failure to perform any reasonable assigned duties. For purposes of this Cause definition, the "Company" shall be deemed to refer to the Company, Parent and/or any of their respective subsidiaries.

(h)    Definition of Change of Control. For purposes hereof, "**Change of Control**" has the meaning ascribed to such term under the Company's 2021 Incentive Award Plan, as amended from time to time (the "**Plan**"); *provided*, that such transaction must also constitute a "change in control event" within the meaning of Treasury Regulation Section 1.409A-3(i)(5).

(i)    Definition of Change of Control Period. For purposes hereof, "**Change of Control Period**" means the period of time commencing three (3) months prior to the closing of a Change of Control and ending on the twelve (12) month anniversary of the closing such Change of Control.

(j)    Definition of Covered Termination. For purposes hereof, "**Covered Termination**" shall mean the termination of Executive's employment by the Company without Cause or by Executive for Good Reason and shall not include a termination due to Executive's death or disability.

(k)    Definition of Good Reason. For purposes hereof, "**Good Reason**" means Executive's termination of employment (no later than ten (10) days following the Company's failure to cure by the end of the cure period set forth below) in direct response to the Company (i) materially and adversely diminishing or altering Executive's title or duties (as determined reasonably and in good faith, based solely upon the duties specifically and directly assigned to Executive by the Company and upon which Executive's performance bonus is based, both prior to and following such diminishment or alteration), provided, however; that for the avoidance of doubt, the parties agree that the consummation of a Change of Control shall by itself constitute a material and adverse diminishment or alteration of Executive's duties if, following such Change of Control, Executive does not serve as the most senior legal officer of the ultimate parent of the acquirer in such Change of Control, (ii) reducing Executive's base salary by greater than ten percent (10%), or (iii) requiring that Executive permanently relocate his primary work location by more than fifty (50) miles from those primary work locations set forth in Section 1(c), unless such relocation results in a shorter (by distance) commute for Executive from his home; *provided*, *however*, that, prior to such termination, Executive shall provide the Company with written notice, within thirty (30) days of his discovery of the facts allegedly constituting Good Reason (or within thirty (30) days of the occurrence of an event described in clauses (i)-(iii) above, if later), and a reasonable opportunity to cure (which does not in any event have to be longer than thirty (30) days).

7.    **Assignment and Successors**. The Company shall assign its rights and obligations under this Agreement to any successor to all or substantially all of the business or the assets of the Company (by merger or otherwise). This Agreement shall be binding upon and inure to the benefit of the Company, Executive, and their respective successors, assigns, personnel, and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable. None of Executive's rights or obligations may be assigned or transferred by Executive, other than Executive's rights to payments hereunder, which may be transferred only by will, operation of law, or as otherwise provided herein.

8.    **Miscellaneous Provisions**.
(a)    Confidentiality.

(i)    Except as authorized or directed by the Company and subject to Section 8(j), Executive shall not, at any time during which Executive is receiving any compensation from the Company, and at any time thereafter, directly or indirectly publish or disclose any Confidential Information (as defined below) of the Company or of any of its Affiliates, or Confidential Information of others that has come into the possession of the Company or of any of its Affiliates, or into Executive's possession in the course of his employment with the Company or of his services and duties hereunder,

Exhibit 8 - Page 562

**Exhibit 10.1**

to any other person or entity, and Executive shall not use any such Confidential Information for Executive's own personal use or advantage or make it available to others for use. All Confidential Information, whether oral or written, regarding the business or affairs of the Company or any of its Affiliates, including, without limitation, information as to their products, services, systems, designs, inventions, software, finances (including prices, costs and revenues), marketing plans, programs, methods of operation, prospective and existing contracts, customers and other business arrangements or business plans, procedures, and strategies, shall all be deemed Confidential Information, except to the extent the same shall have been lawfully and without breach of the Executive's confidentiality obligation made available to the general public by the Company. Except as provided in Section 8(a) of this Agreement, upon expiration or termination of this Agreement for any reason, Executive shall promptly return to the Company all Confidential Information, including all copies thereof in Executive's possession, whether prepared by him or others.

(ii)     Executive understands that nothing contained in this Agreement limits Executive's ability to file a charge or complaint with the Securities and Exchange Commission, or any other federal, state or local governmental regulatory or law enforcement agency ("Government Agencies"). Executive further understands that nothing in this Agreement limits Executive's ability to communicate with any Governmental Agencies or otherwise participate in or fully cooperate with any investigation or proceeding that may be conducted by any Governmental Agency, including providing documents or other information, without notice to or approval from the Company. Executive can provide confidential information to Government Agencies without risk of being held liable or incurring liquidated damages or other financial penalties. This Agreement does not limit Executive's right to receive an award for information provided to any Government Agencies.

(iii)     Executive shall assign and transfer to the Company, and does hereby assign and transfer, to the Company all right title and interest in and to all the Company IP (as defined below). All the Company IP is and shall be the sole property of the Company. Upon request of the Company, Executive shall promptly execute a written assignment of title to the Company for all the Company IP, and Executive will preserve all such the Company IP as Confidential Information. As used herein "***Company IP***" means all inventions and intellectual property rights (including, but not limited to, designs, discoveries, inventions, improvements, ideas, devices, techniques, processes, writings, trade secrets, trademarks, patents, copyrights and all plans, memoranda and other tangible information relating to such intellectual property, whether or not subject to protection under applicable laws) that Executive solely or jointly with others conceives, makes, acquires, develops, suggests or participates in at any time during Executive's employment with the Company, or which are developed with the use of time, material, employees, private or Confidential Information or facilities of the Company and that relate to the actual, past or prospective business, products, processes, work, operations, research and development or other activities of the Company. The Company IP shall also include any intellectual property that was not disclosed or assigned to any predecessor or parent company of the Company prior to the effective date of this Agreement. It is understood that the Company may, in its sole discretion, designate another entity as the designated recipient and beneficiary of the disclosure and assignment provisions set forth above.

(b)     Restrictive Covenants.

(i)     *Non-Solicitation*. For a period of one year following Executive's Date of Termination, Executive shall not, either directly or indirectly (i) solicit for employment by any individual, corporation, firm, or other business, any employees, consultants, independent contractors, or other service providers of the Company or any of its Affiliates, (ii) solicit any employee or consultant of the Company or any of its Affiliates to leave the employment or consulting of or cease providing services to the Company or any of its Affiliates, or (iii) recruit or otherwise solicit or induce any customer, subscriber, vendor, business affiliate, or supplier of the Company or its Affiliates to (a) terminate its arrangement with the Company or its Affiliates, or (b) otherwise change its relationship with the Company or its Affiliates; *provided*, *however*, that the foregoing clauses (i) and (ii) shall not apply to a general advertisement or solicitation (or any hiring pursuant to such advertisement or solicitation) that is not specifically targeted to such employees or consultants.

(ii)     *Non-Disparagement*. Executive agrees that Executive shall not (in writing or otherwise) disparage, criticize or defame the Company, its affiliates and their respective affiliates, directors, officers, agents, partners, stockholders or employees, either publicly or privately. Similarly, the Company shall not disparage, criticize or defame Executive, either publicly or privately and whether in writing or not. Nothing in this Section 8(b) shall apply to any evidence or testimony required by any court, arbitrator or government agency. Moreover, nothing in this Agreement prevents you from

Exhibit 8 - Page 563

Exhibit 10.1

discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that you have reason to believe is unlawful.

(iii)       *Injunctive Relief; Survival*. Executive acknowledges that a breach of the covenants contained in Sections 8(a) or 8(b) will cause irreparable damage to the Company and its goodwill, the exact amount of which will be difficult or impossible to ascertain, and that the remedies at law for any such breach will be inadequate. Accordingly, Executive agrees that in the event a court of competent jurisdiction determines that Executive has engaged in a material breach of any of the covenants contained in Sections 8(a) or 8(b), in addition to any other remedy which may be available at law or in equity, the Company will be entitled to specific performance and injunctive relief notwithstanding any dispute resolution procedure set forth in this Agreement or in any document governing the Company or the Company's shareholders that applies to Executive's employment with the Company as set forth herein. The provisions of Sections 8(a) and 8(b) shall survive any termination or expiration of the term of this Agreement.

(b) Governing Law. This Agreement shall be governed, construed, interpreted, and enforced in accordance with its express terms, and otherwise in accordance with the substantive laws of the State of Delaware, without giving effect to any principles of conflicts of law, whether of the State of Delaware or any other jurisdiction, and where applicable, the laws of the United States, that would result in the application of the laws of any other jurisdiction.

(c) Validity. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

(d) Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement. Signatures delivered by facsimile or DocuSign shall be deemed effective for all purposes.

(e) Entire Agreement. The terms of this Agreement, together with the Exhibits, are intended by the Parties to be the final expression of their agreement with respect to the employment of Executive by the Company and supersede all prior understandings and agreements, whether written or oral, regarding Executive's service to the Company. The Parties further intend that this Agreement, together with the Exhibits, shall constitute the complete and exclusive statement of their terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

(f) Amendments; Waivers. This Agreement may not be modified, amended, or terminated except by an instrument in writing signed by Executive and a duly authorized representative of the Company. By an instrument in writing similarly executed, Executive or a duly authorized officer of the Company, as applicable, may waive compliance by the other Party with any specifically identified provision of this Agreement that such other Party was or is obligated to comply with or perform; *provided*, *however*, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

(g) Dispute Resolution. To ensure the timely and economical resolution of disputes that arise in connection with this Agreement, Executive and the Company agree that, except as excluded herein, any and all controversies, claims and disputes arising out of or relating to this Agreement, including without limitation any alleged violation of its terms or otherwise arising out of the Parties' relationship, shall be resolved solely and exclusively by final and binding arbitration held in California through JAMS in conformity with Delaware law and the then-existing JAMS employment arbitration rules, which can be found at https://www.jamsadr.com/rules-employment-arbitration/. The Parties reserve the right to hold any resulting arbitration at another location that is mutually agreed to by the Parties. The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. shall govern the interpretation and enforcement of this arbitration clause. All remedies available from a court of competent jurisdiction shall be available in the arbitration; *provided*, *however*, in the event of a breach of Sections 8(a) or 8(b), the Company may request relief from a court of competent jurisdiction if such relief is not available or not available in a timely fashion through arbitration as determined by the Company. The arbitrator shall: (a) provide adequate discovery for the resolution of the dispute; and (b) issue a written arbitration decision, to include the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator shall award the prevailing Party attorneys' fees and expert fees, if any, in accordance with applicable

Exhibit 8 - Page 564

Exhibit 10.1

law. Notwithstanding the foregoing, it is acknowledged that it will be impossible to measure in money the damages that would be suffered if the Parties fail to comply with any of the obligations imposed on them under Sections 8(a) and 8(b), and that in the event of any such failure, an aggrieved person will be irreparably damaged and will not have an adequate remedy at law. Any such person shall, therefore, be entitled to seek injunctive relief, including specific performance, to enforce such obligations, and if any action shall be brought in equity to enforce any of the provisions of Sections 8(a) and 8(b), none of the Parties shall raise the defense, without a good faith basis for raising such defense, that there is an adequate remedy at law. Executive and the Company understand that by agreement to arbitrate any claim pursuant to this Section 8(h), they will not have the right to have any claim decided by a jury or a court but shall instead have any claim decided through arbitration. Executive and the Company waive any constitutional or other right to bring claims covered by this Agreement other than in their individual capacities. Except as may be prohibited by applicable law, the foregoing waiver includes the ability to assert claims as a plaintiff or class member in any purported class or collective action or representative proceeding. Nothing herein shall limit Executive's ability to pursue claims for workers compensation or unemployment benefits or pursue other claims which by law cannot be subject to mandatory arbitration.

(h) Enforcement. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a portion of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

(i) Withholding. The Company shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local, or foreign withholding or other taxes or charges which the Company is required to withhold. The Company shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

(j) Whistleblower Protections and Trade Secrets. Notwithstanding anything to the contrary contained herein, nothing in this Agreement prohibits Executive from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such government agencies). Furthermore, in accordance with 18 U.S.C. § 1833, notwithstanding anything to the contrary in this Agreement: (i) Executive shall not be in breach of this Agreement, and shall not be held criminally or civilly liable under any federal or state trade secret law (x) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (y) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (ii) if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney, and may use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

(k) Notices. For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when hand-delivered, sent by overnight courier, or mailed by first-class registered, certified mail (return receipt requested), or transmitted by email (with receipt requested) as follows:

If to the Company:
Rivian Automotive, LLC Attention: Chief People Officer 14600
Myford Road
Irvine, California 92606

If to Executive:
Most recent address on file for the Executive. The Executive is responsible for ensuring that their address is up to date at all times.

9.      **Golden Parachute Excise Tax**.

Exhibit 8 - Page 565

Exhibit 10.1

(a)       Best Pay. Any provision of this Agreement to the contrary notwithstanding, if any payment or benefit Executive would receive from the Company pursuant to this Agreement or otherwise ("*Payment*") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "*Excise Tax*"), then such Payment will be equal to the Reduced Amount (as defined below). The "*Reduced Amount*" will be either (A) the largest portion of the Payment that would result in no portion of the Payment (after reduction) being subject to the Excise Tax or (B) the entire Payment, whichever amount after taking into account all applicable federal, state, and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate, net of the maximum reduction in federal income taxes which could be obtained from a deduction of such state and local taxes), results in Executive' s receipt, on an after- tax basis, of the greater economic benefit notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in a Payment is required pursuant to the preceding sentence and the Reduced Amount is determined pursuant to clause (A) of the preceding sentence, the reduction shall occur in the manner (the "*Reduction Method*") that results in the greatest economic benefit for Executive. If more than one method of reduction will result in the same economic benefit, the items so reduced will be reduced pro rata (the "*Pro Rata Reduction Method*"). Notwithstanding the foregoing, if the Reduction Method or the Pro Rata Reduction Method would result in any portion of the Payment being subject to taxes pursuant to Section 409A (as defined below) that would not otherwise be subject to taxes pursuant to Section 409A, then the Reduction Method and/or the Pro Rata Reduction Method, as the case may be, shall be modified so as to avoid the imposition of taxes pursuant to Section 409A as follows: (1) as a first priority, the modification shall preserve to the greatest extent possible, the greatest economic benefit for Executive as determined on an after-tax basis; (2) as a second priority, Payments that are contingent on future events (*e.g.*, being terminated without cause), shall be reduced (or eliminated) before Payments that are not contingent on future events; and (3) as a third priority, Payments that are "deferred compensation" within the meaning of Section 409A shall be reduced (or eliminated) before Payments that are not deferred compensation within the meaning of Section 409A.

(b)       Accounting Firm. The accounting firm engaged by the Company for general tax purposes as of the day prior to the Change of Control will perform the calculations set forth in Section 9(a). If the firm so engaged by the Company is serving as the accountant or auditor for the acquiring company, the Company will appoint a nationally recognized accounting firm to make the determinations required hereunder. The Company will bear all expenses with respect to the determinations by such firm required to be made hereunder. The accounting firm engaged to make the determinations hereunder will provide its calculations, together with detailed supporting documentation, to the Company within thirty (30) days before the consummation of a Change of Control (if requested at that time by the Company) or such other time as requested by the Company. If the accounting firm determines that no Excise Tax is payable with respect to a Payment, either before or after the application of the Reduced Amount, it will furnish the Company with documentation reasonably acceptable to the Company that no Excise Tax will be imposed with respect to such Payment. Any good faith determinations of the accounting firm made hereunder will be final, binding and conclusive upon the Company and Executive.

10.       Section 409A.

(a)       General. The intent of the Parties is that the payments and benefits under this Agreement comply with or be exempt from Section 409A of the Code and the Department of Treasury Regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date, ("*Section 409A*") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. Notwithstanding any provision of this Agreement to the contrary, if the Company determines that any compensation or benefits payable under this Agreement may be subject to Section 409A, the Company shall work in good faith with Executive to adopt such amendments to this Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Company determines are necessary or appropriate to avoid the imposition of taxes under Section 409A, including, without limitation, actions intended to (i) exempt the compensation and benefits payable under this Agreement from Section 409A, and/or (ii) comply with the requirements of Section 409A; however, this Section shall not create an obligation on the part of the Company to adopt any such amendment, policy or procedure or take any such other action, nor shall the Company (A) have any liability for failing to do so, or (B) incur or indemnify Executive for any taxes, interest or other liabilities arising under or by operation of Section 409A.

(b)       Separation from Service, Installments and Reimbursements. Notwithstanding any provision to the contrary in this Agreement: (i) no amount that constitutes "deferred compensation" under Section 409A shall be payable pursuant to Section 6 unless the termination of Executive's employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations ("*Separation from Service*");

Exhibit 8 - Page 566

Exhibit 10.1

(ii) for purposes of Section 409A, Executive's right to receive installment payments shall be treated as a right to receive a series of separate and distinct payments; and (iii) to the extent that any reimbursement of expenses or in-kind benefits constitutes "deferred compensation" under Section 409A, such reimbursement or benefit shall be provided no later than December 31st of the year following the year in which the expense was incurred. The amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year. The amount of any in-kind benefits provided in one year shall not affect the amount of in-kind benefits provided in any other year.

(c)    Specified Employee. Notwithstanding anything in this Agreement to the contrary, if Executive is deemed by the Company at the time of Executive's Separation from Service to be a "specified employee" for purposes of Section 409A, to the extent delayed commencement of any portion of the benefits to which Executive is entitled under this Agreement is required in order to avoid a prohibited distribution under Section 409A, such portion of Executive's benefits shall not be provided to Executive prior to the earlier of (i) the expiration of the six (6) month period measured from the date of Executive's Separation from Service with the Company or (ii) the date of Executive's death. Upon the first business day following the expiration of the applicable Section 409A period, all payments deferred pursuant to the preceding sentence shall be paid in a lump sum to Executive (or Executive's estate or beneficiaries), and any remaining payments due to Executive under this Agreement shall be paid as otherwise provided herein.

(d)    Release. Notwithstanding anything to the contrary in this Agreement, to the extent that any payments due under this Agreement as a result of Executive's termination of employment are subject to Executive's execution and delivery of the Release, (i) if Executive fails to execute the Release on or prior to the Release Expiration Date (as defined below) or timely revokes Executive's acceptance of the Release thereafter, Executive shall not be entitled to any payments or benefits otherwise conditioned on the Release, and (ii) in any case where Executive's Date of Termination and the Release Expiration Date fall in two separate taxable years, any payments required to be made to Executive that are conditioned on the Release and are treated as nonqualified deferred compensation for purposes of Section 409A shall be made in the later taxable year. For purposes of this Section 10(d), "***Release Expiration Date***" shall mean the date that is twenty-one (21) days following the date upon which the Company timely delivers the Release to Executive, or, in the event that Executive's termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date. To the extent that any payments of nonqualified deferred compensation (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are delayed pursuant to this Section 10(d), such amounts shall be paid in a lump sum on the first payroll date following the date that Executive executes and does not revoke the Release (and the applicable revocation period has expired) or, in the case of any payments subject to Section 10(d)(ii), on the first payroll period to occur in the subsequent taxable year, if later.

11.    **Employee Acknowledgement**. Executive acknowledges that Executive has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company other than those contained in writing herein, and has entered into this Agreement freely based on Executive's own judgment.

[*Signature Page Follows*]

Exhibit 8 - Page 567

The Parties have executed this Agreement as of the date first set forth above.

**RIVIAN AUTOMOTIVE, LLC**

By: /s/ RJ Scaringe

Name: RJ Scaringe

Title: CEO

**EXECUTIVE**

By: /s/ Kjell Gruner

Name: Kjell Gruner

[Executive Employment Agreement - Signature Page]

Exhibit 8 - Page 568

**EXHIBIT A**

**PERMITTED OUTSIDE ACTIVITIES**

- LiveWire
- Member of the German American Chamber of Commerce
- Member of the Metro Atlanta Chamber of Commerce
- Member of the Board of Trustees of the Woodruff Foundation

Exhibit 8 - Page 569

**EXHIBIT B**

**RELEASE OF CLAIMS**

This Release of Claims ("**Release**") is entered into as of _____ between Kjell Gruner ("**Executive**") and Rivian Automotive, LLC (the "**Company**" and, together with Executive, the "**Parties**"), effective eight (8) days after Executive's signature hereto (the "**Effective Date**"), unless Executive revokes Executive's acceptance of this Release as provided in Paragraph 1(c), below.

1. <u>Executive's Release of the Company</u>. Executive understands that by agreeing to this Release, Executive is agreeing not to sue, or otherwise file any claim against, the Company or any of its employees or other agents for any reason whatsoever based on anything that has occurred as of the date Executive signs this Release.

(a)    On behalf of Executive and Executive's heirs and assigns, Executive hereby releases and forever discharges the "**Releasees**" hereunder, consisting of the Company, and each of its owners, affiliates, divisions, predecessors, successors, assigns, agents, directors, officers, partners, employees, and insurers, and all persons acting by, through, under or in concert with them, or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "**Claims**"), which Executive now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date Executive executes this Release, including, without limiting the generality of the foregoing, any Claims arising out of, based upon, or relating to Executive's hire, employment, remuneration or resignation by the Releasees, or any of them, including Claims arising under federal, state, or local laws relating to employment, Claims of any kind that may be brought in any court or administrative agency, any Claims arising under the Age Discrimination in Employment Act ("**ADEA**"), 29 U.S.C. § 621, et seq.; Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000 et seq.; the Equal Pay Act, 29 U.S.C. § 206(d); the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq.; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff et seq.; the False Claims Act , 31 U.S.C. § 3729 et seq.; the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. the Fair Labor Standards Act, 29 U.S.C. § 215 et seq., the Sarbanes- Oxley Act of 2002; the California Labor Code; the employment and civil rights laws of California; Claims for breach of contract; Claims arising in tort, including, without limitation, Claims of wrongful dismissal or discharge, discrimination, harassment, retaliation, fraud, misrepresentation, defamation, libel, infliction of emotional distress, violation of public policy, and/or breach of the implied covenant of good faith and fair dealing; and Claims for damages or other remedies of any sort, including, without limitation, compensatory damages, punitive damages, injunctive relief and attorney's fees.

(b)    Notwithstanding the generality of the foregoing, Executive does not release the following claims:

(i)    Claims for unemployment compensation or any state disability insurance benefits pursuant to the terms of applicable state law;

(ii)    Claims for workers' compensation insurance benefits under the terms of any worker's compensation insurance policy or fund of the Company;

(iii)    Claims to continued participation in certain of the Company's group benefit plans pursuant to the terms and conditions of COBRA;

(iv)    Claims for insurance coverage under Directors' and Officer Liability insurance policies or any similar policies;

(v)    Claims to any benefit entitlements vested as the date of Executive's employment termination, pursuant to written terms of any Company employee benefit plan;

Exhibit 8 - Page 570

(vi)    Claims for indemnification under any indemnification agreement with the Company, the Company's Bylaws, California Labor Code Section 2802 or any other applicable law; and

(vii)    Executive's right to bring to the attention of the Equal Employment Opportunity Commission claims of discrimination; provided, however, that Executive does release Executive's right to secure any damages for alleged discriminatory treatment.

(c)    In accordance with the Older Workers Benefit Protection Act of 1990, Executive has been advised of the following:

(i)    Executive has the right to consult with an attorney before signing this Release;

(ii)    Executive has been given at least twenty-one (21) days to consider this Release;

(iii)    Executive has seven (7) days after signing this Release to revoke it, and Executive will not receive the severance benefits provided by the Employment Agreement between the Parties (the "***Employment Agreement***") unless and until such seven (7) day period has expired. If Executive wishes to revoke this Release, Executive must deliver notice of Executive's revocation in writing, no later than 5:00 p.m. on the seventh (7th) day following Executive's execution of this Release to Christine Cannella, Chief Labor and Employment Counsel, via email at ccannella@rivian.com.

(d)    To the extent California law applies to this Release: EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS BEEN ADVISED OF AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM, WOULD HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

BEING AWARE OF SAID CODE SECTION, EXECUTIVE HEREBY EXPRESSLY WAIVES ANY RIGHTS EXECUTIVE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

2.    Executive Representations. Executive represents and warrants that:

(a)    Executive has returned to the Company all Company property in Executive's possession;

(b)    Executive is not owed wages, commissions, bonuses or other compensation, other than wages through the date of the termination of Executive's employment and any accrued, unused vacation earned through such date, and any payments that become due under the Employment Agreement;

(c)    During the course of Executive's employment Executive did not sustain any injuries for which Executive might be entitled to compensation pursuant to worker's compensation law or Executive has disclosed any injuries of which Executive is currently, reasonably aware for which Executive might be entitled to compensation pursuant to worker's compensation law; and

(d)    Executive has not initiated any adversarial proceedings of any kind against the Company or against any other person or entity released herein, nor will Executive do so in the future, except as specifically allowed by this Release.

3.    Severability. The provisions of this Release are severable. If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.

4.    Choice of Law. This Release shall in all respects be governed and construed in accordance with the laws of the State of Delaware, including all matters of construction, validity and performance, without regard to conflicts of law principles.

Exhibit 8 - Page 571

5.    <u>Integration Clause</u>. This Release and the Employment Agreement contain the Parties' entire agreement with regard to the separation of Executive's employment, and supersede and replace any prior agreements as to those matters, whether oral or written. This Release may not be changed or modified, in whole or in part, except by an instrument in writing signed by Executive and a duly authorized officer or director of the Company.

6.    <u>Execution in Counterparts</u>. This Release may be executed in counterparts with the same force and effectiveness as though executed in a single document. Facsimile signatures shall have the same force and effectiveness as original signatures.

7.    <u>Intent to be Bound</u>. The Parties have carefully read this Release in its entirety; fully understand and agree to its terms and provisions; and intend and agree that it is final and binding on all Parties.

IN WITNESS WHEREOF, and intending to be legally bound, the Parties have executed the foregoing on the dates shown below.

**EXECUTIVE RIVIAN AUTOMOTIVE, LLC**

_____  _____

**Date:** _____  **Date:** _____

Exhibit 8 - Page 572

Exhibit 10.2

**INDEPENDENT CONSULTANT AGREEMENT**

This Independent Consultant Agreement ("**Consulting Agreement**") is between **Rivian Automotive, LLC,** a Delaware limited liability company ("**Rivian**") and **Jiten Behl** ("**Consultant**") (collectively, the "**Parties**") and is effective on the date as of which it is executed by both Parties ("**Effective Date**").

WHEREAS, Rivian desires to contract with Consultant to perform certain business consulting and advisory services for Rivian utilizing Consultant's independent skill and expertise as an independent contractor, and Consultant desires to accept such engagement, pursuant to the terms and conditions of this Consulting Agreement; and

WHEREAS, both Rivian and Consultant desire to reduce to writing their agreement for Consultant to provide such services; and

WHEREAS, Rivian and Consultant are parties to that certain Separation Agreement and General Release Agreement to be executed concurrently herewith (the "**Separation Agreement**"); and

WHEREAS, Rivian and Consultant are parties to certain agreements related to Consultant's awards under the Rivian Automotive, Inc. 2015 Long-Term Incentive Plan, as amended (the "**Plan**"),

NOW THEREFORE, in consideration of the mutual covenants and promises each Party has made to the other as set forth in this Consulting Agreement, the Parties agree as follows:

1.    *Engagement*. Subject to the terms and conditions set forth in this Consulting Agreement, Rivian hereby engages Consultant, and Consultant hereby accepts engagement with Rivian, to perform the services set forth in **Attachment A** (the "**Services**").

2.    *Independent Contractor Relationship*. The Parties agree that Consultant is an independent contractor and that neither Consultant nor Consultant's employees or agents are or shall be employees of Rivian. Neither Rivian nor Consultant shall represent directly or indirectly that Consultant or Consultant's employees or agents are agents, employees, or legal representatives of Rivian. As an independent contractor, the mode, manner, method, and means used by Consultant in the performance of the Services shall be of Consultant's selection and under the sole control and direction of Consultant. Consultant shall be responsible for all risks incurred in the operation of Consultant's business and shall enjoy all the benefits thereof.

3.    *Standard of Conduct; Performance of the Services*. At the request of Rivian, Consultant shall comply with all policies and guidelines published by Rivian from time to time. Consultant further represents and warrants that: (i) the Services shall be provided in a diligent, trustworthy, professional, ethical, and efficient manner; (ii) the Services shall be provided in compliance with all applicable laws, rules, and regulations; and (iii) Consultant is not (and will not be) limited by other agreements or arrangements in Consultant's ability to provide the Services.

4.    *Term*. Consultant's Performance of the Services shall commence on September 1, 2023 and shall continue until November 30, 2025 or such earlier date that this Consulting Agreement is terminated by either Party pursuant to Section 9 ("**Agreement Term**").

5.    *Compensation*. Rivian shall compensate Consultant on a monthly basis for all Services performed during the Agreement Term (as defined in Section 4) with consulting fees in the amount of One Hundred Dollars ($100.00) per hour ("**Consulting Fees**"). Payments will be made based on time submitted by Consultant and shall be paid within sixty (60) days of Consultant's submission of Consultant's time. The Consultant will submit his time worked entries on a monthly basis describing the actual services performed, the date the services were performed, and number of hours worked on each date. The Parties agree that nothing in this Consulting Agreement shall obligate Rivian to provide Consultant with any minimum amount of work during any month of the Agreement Term or obligate Consultant to perform any work requested by Rivian except that
(a) Consultant shall be available during normal business hours for consultation from time to time as may be requested by Rivian and (b) Consultant shall, at a minimum, perform the Services for at least one (1) full eight (8)-hour work day per quarter. Consultant shall be entitled to Consulting Fees only for work actually performed by Consultant as requested by Rivian from time to time during the Agreement Term. In addition, as further consideration for the Services provided by Consultant under this Consulting Agreement, the Parties agree that the "**Separation Date**" as that term is defined in the Separation Agreement shall not constitute a "Termination of Employment," as such term is defined in the Plan because Consultant will continue to provide services to Rivian under the terms of this Consulting Agreement as a "Contractor," as such term is defined in the Plan. Because Consultant's Separation Date does not constitute a "Termination of Employment" for purposes of grants under the Plan, Consultant shall continue to vest shares under the terms of any and all awards

Exhibit 8 - Page 573

**Exhibit 10.2**

Consultant has received under the Plan for so long as Consultant continues to provide Service to Rivian pursuant to this Consulting Agreement through any applicable vesting date. In the event of a Change in Control event as described in the Plan, any outstanding and unvested equity award held by Consultant shall automatically become vested and, if applicable, exercisable and any forfeiture restrictions or rights of repurchase thereon shall immediately lapse. For avoidance of doubt, the Parties agree that Consultant's awards that are unvested as of the Separation Date are set forth in **Attachment B**.

6.      *Costs and Expenses*. During the Agreement Term (as defined in <u>Section 4</u>), Rivian shall reimburse Consultant for all reasonable, out-of-pocket travel and entertainment costs and expenses that are pre-approved by Rivian and incurred by Consultant in connection with the Services provided by Consultant under this Consulting Agreement.

7.      *Tax Treatment*. Consultant and Rivian agree that Rivian will treat Consultant as an independent contractor for purposes of all applicable tax laws and file forms consistent with that status. Consultant agrees, as an independent contractor, that neither Consultant nor any of Consultant's employees or agents shall be entitled to unemployment compensation benefits from Rivian in the event this Consulting Agreement terminates, or workers' compensation benefits from Rivian in the event that any of any of Consultant's employees or agents are injured in any manner while performing consulting services under this Consulting Agreement. Consultant will be solely responsible to pay any and all local, state, and federal income, Social Security, and unemployment taxes for Consultant's employees, as well as any applicable taxes for Consultant's employees in any jurisdictions outside the United States of America in which Consultant provides the Services. Rivian will not withhold any taxes or prepare an IRS Form W-2 for Consultant but will provide Consultant with an IRS Form 1099.

8.      *No Employee Benefits*. Consultant acknowledges and agrees that neither Consultant nor any of Consultant's employees or agents shall receive any employee benefits of any kind from Rivian as a result of providing consulting services under this Consulting Agreement. Consultant and Consultant's employees are excluded from participating in any fringe benefit plans or programs as a result of the performance of the Services under this Consulting Agreement. In addition, Consultant waives any and all rights, if any, to participation in any employee benefit or welfare plans or programs that Rivian might provide to its employees from time to time, including, but not limited to, medical insurance, dental insurance, vision insurance, group life and AD&D insurance, short-term and long-term disability insurance, severance pay, unemployment compensation coverage, workers' compensation coverage, and 401(k) savings plans.

9.      *Expiration and Termination of the Agreement*. This Consulting Agreement shall expire or terminate in accordance with <u>Section 4</u> of this Consulting Agreement, unless sooner terminated pursuant to the provisions of this <u>Section 9</u>. Subject to the provisions below, either Party shall have the right and option, exercisable by giving prior written notice to the other Party, to terminate the Agreement at any time for any reason with or without cause in accordance with <u>Section 21</u> of this Consulting Agreement. In the event that this Consulting Agreement is terminated by either Party prior to the expiration of the Term as defined in <u>Section 4</u> of this Consulting Agreement, Consultant's right to receive any further Compensation under this Consulting Agreement shall forthwith cease and terminate and Rivian shall provide to Consultant payment of Consulting Fees (as defined in <u>Section 5</u>) for work performed through the date of termination by Consultant to Rivian in accordance with <u>Section 5</u> and payment of any outstanding costs or expenses reimbursable pursuant to <u>Section 6</u>. In the event that this Consulting Agreement is terminated by Rivian prior to the expiration of the Term as defined in <u>Section 4</u> of this Consulting Agreement, any outstanding and unvested equity award held by Consultant shall automatically become vested and, if applicable, exercisable and any forfeiture restrictions or rights of repurchase thereon shall immediately lapse.

10.     *Protection of Rivian's Business Interests*. In consideration of Consultant's performance of Services under this Consulting Agreement, during the Agreement Term Rivian will provide Consultant with access to Confidential Information (defined below) of Rivian and its Affiliates (defined below) and to Rivian's and its Affiliates' substantial relationships and goodwill with employees, contractors, vendors, suppliers and other business relations. Consultant agrees that each of the foregoing constitutes a legitimate business interest of Rivian and its Affiliates, and that Rivian and its Affiliates are entitled to the protection of those interests in the form of reasonable restrictions on Executive's ability and right to engage in certain competitive activities following the Separation Date. Accordingly, in exchange for the benefits provided to Consultant under this Agreement, Consultant agrees to the following restrictions to protect Rivian's and its Affiliates' legitimate business interests:

        A.      *Protection of Confidential Information.* Except as permitted by <u>Section 12</u>, during the Agreement Term Consultant shall not, directly or indirectly, use or disclose Confidential Information without Rivian's prior written consent for any purpose other than performance of

Exhibit 8 - Page 574

Exhibit 10.2

the Services, and Consultant shall use the utmost diligence to guard and protect the Confidential Information from disclosure to any other person or entity. Consultant understands that this restriction on use or disclosure of Confidential Information applies for as long as the information in question remains Confidential Information as defined below. Consultant further understands that the Confidential Information is, and at all times shall remain, the sole and exclusive property of Rivian and its Affiliates (excepting Confidential Information that belongs to third parties that Rivian is obligated to keep confidential, which shall remain the exclusive property of the disclosing third party).

B. *Ensuring Fair Competition.* During the Agreement Term, Consultant shall not, directly or indirectly, (i) own, operate, finance, or control any Competitive Business in the Restricted Territory other than as a passive owner of not more than five percent (5%) of the outstanding stock of a Competitive Business in which Consultant has no active participation; or (b) render services to, give advice to, consult with, or be employed by a Competitive Business. Notwithstanding the foregoing, nothing in this Agreement shall prevent Consultant from requesting an exception from Rivian with respect to specific services for a particular Competitive Business, which Rivian shall consider on a case-by-case basis in its sole discretion. In the event that Consultant desires an exception with respect to any Competitive Business, Consultant shall request the waiver from the CEO of Rivian.

C. *Protection of Employee and Contractor Relationships.* During the Agreement Term, Consultant shall not, directly or indirectly, (i) solicit or recruit any Restricted Person to obtain employment with or provide services to a Competitive Business;
(ii) interfere with the performance by any such persons of their duties for Rivian or an Affiliate; or (iii) communicate with any Restricted Person for the purposes described in clauses (i), (ii), or (iii) of this Section 10(c).

D. *Protection of Business Relationships.* During the Agreement Term, Consultant shall not, directly or indirectly, (i) solicit or induce any Restricted Business Relation to terminate or limit its business with Rivian or an Affiliate, (ii) solicit or induce any Restricted Business Relation to provide services to a Competitive Business in connection with or related to the research, development, production, marketing, or sale of a Competing Product, or (iii) communicate with any Restricted Business Relation for the purposes described in clauses (i), (ii), or (iii) of this Section 10(d).

E. *Definitions*. For purposes of this Consulting Agreement, the following capitalized terms are defined as follows:

    i. "**Affiliates**" means Rivian's parents and subsidiaries and any entity that is directly or indirectly controlled by Rivian Automotive, Inc. For purposes of this definition, "controlled" means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract, or otherwise.

    ii. "**Competitive Business**" means (A) a business engaged in or planning to be engaged in the development, marketing, production, or sale of electric vehicles or products and services related to electric vehicles, including, but not limited to, batteries, battery modules, software, electronic control modules (ECMs), motors, advanced driver-assistance systems (ADAS), vehicle charging products, and vehicle charging technology, and (B) a business otherwise engaged in or planning to be engaged in the development, marketing, production or sale of a Competing Product.

    iii. "**Competing Product**" means a product or service of any person other than Rivian or its Affiliates that (A) is substantially similar to or otherwise competes with a product or service that is produced, provided, marketed, sold, or under active research or development by Rivian or an Affiliate during the Agreement Term, and (B) for which Consultant had any responsibility or about which Consultant had access to Confidential Information during the Agreement Term.

    iv. "**Confidential Information**" means any information belonging to, or otherwise relating to, Rivian or an Affiliate which is not generally known outside Rivian or an Affiliate, regardless of the manner in which it was stored or conveyed to Consultant. Without limiting the foregoing, Confidential Information includes trade secrets as well as other proprietary knowledge, information, know-how, and non-public intellectual property rights, including, without limitation, memoranda, and other materials or

Exhibit 8 - Page 575

**Exhibit 10.2**

records of a proprietary nature; technical information regarding the operations of Rivian; records and policy matters relating to market research, research and development projects, accounting information or practices, advertising, marketing, financial results, projections, and other financial information, finance methods, acquisition opportunities, and/or strategic planning; and records related to actual or prospective employees, service providers, and other business relations. Confidential Information does not include knowledge or information known to Consultant prior to Consultant's employment with Rivian, in the public domain, or generally available to the public (except by Consultant's fault or negligence).

**v.** "**Restricted Business Relation**" means a vendor, supplier, or other business relation of Rivian or an Affiliate (other than an employee or contractor) (A) with whom Consultant had business-related contact during the Agreement Term, or (B) about whom Consultant had access to Confidential Information during the Agreement Term.

**vi.** "**Restricted Person**" means any person who, as of the Separation Date, is employed or engaged by Rivian or an Affiliates as an employee or contractor and (A) with whom Consultant had business-related contact during the Agreement Term, or (B) about whom Consultant had access to Confidential Information during the Agreement Term.

**11.** *Exceptions to Non-Disclosure of Confidential Information*. Notwithstanding anything to the contrary, nothing in any part of this Consulting Agreement prevents Consultant from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination, or any other conduct that Consultant has reason to believe is unlawful, or from otherwise reporting possible violations of law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any Inspector General, or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation. Consultant further acknowledges and agrees that Rivian has provided Consultant with written notice that the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), provides an immunity for the disclosure of a trade secret to report suspected violations of law and/or in an anti-retaliation lawsuit, as set forth in **Attachment C**.

**12.** *Return of Property*. Consultant agrees that immediately upon termination of this Consulting Agreement, or at any other time that Rivian may request in writing, Consultant shall return all property of Rivian in Consultant's possession, custody, or control, including but not limited to all Confidential Information, documents, copies, recordings of any kind, papers, computers and computer equipment, mobile devices, external storage devices, USB devices, computer records or programs, drawings, manuals, letters, notes, notebooks, reports, formulae, memoranda, client lists, keys, passwords, login credentials, and other materials that relate to Rivian or any Affiliate and that Consultant obtained in connection with this Consulting Agreement or the Services provided under this Consulting Agreement.

**13.** *Intellectual Property*. Consultant acknowledges that Rivian is the sole owner of all the products and proceeds of Consultant's Services under this Consulting Agreement free and clear of any claims by Consultant (or anyone acting or claiming on the Consultant's behalf) of any kind or character whatsoever (other than the Consultant's right to receive payment as set forth in Section 5). Without limiting the foregoing, Consultant acknowledges and agrees that Rivian is the sole owner of all software programs, source or object code, improvements, formulas, developments, ideas, concepts, developments, arrangements, processes, techniques, know-how, technical and non-technical data, inventions, designs, drawings, methods, devices, works of authorship, trade secrets, copyrights, trademarks, service marks, trademark registrations, applications for trademark registration, patents and patent applications, discoveries, and other intellectual property, whether patentable or unpatentable, that Consultant may acquire, obtain, develop, or create in connection with the Services provided under this Consulting Agreement or with use of Rivian's property or Confidential Information (collectively, the **"IP"**). Consultant hereby assigns and transfers all right, title, and interest in and to the IP to Rivian, and shall, at the request of Rivian, execute such assignments, certificates or other instruments as Rivian may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title or interest in or to any such IP.

**14.** *Injunctive Relief and Remedies*. In the event of the breach or an anticipated breach by Consultant of any of the provisions of the Sections 9, 12, or 13 of this Consulting Agreement, Rivian would suffer irreparable harm, and in addition and supplementary to other rights and remedies existing in its favor, Rivian shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

Exhibit 8 - Page 576

**Exhibit 10.2**

**15.    *Indemnification*.** Consultant, at its sole expense, shall indemnify and hold harmless Rivian, the Affiliates, and their directors, shareholders, officers, and employees ("**Rivian Indemnified Parties**") from and against any and all claims, allegations, actions, demands, or investigations ("**Claims**") and shall pay all losses, damages, expenses (including reasonable attorneys' fees and other costs, including the costs of defending or settling the claim), and any other liabilities (collectively, "**Losses**") sustained by any of Rivian Indemnified Parties that arise out of, relate to, or are in connection with: (i) Consultant's acts or omissions in connection with the performance of the Services; (ii) Consultant's failure to perform any of its obligations under this Consulting Agreement; and (iii) the inaccuracy of any representation or breach of any warranty made or given by Consultant in this Consulting Agreement. Consultant's indemnification obligations set forth in this Section shall not in any way limit, reduce, or alter Consultant's other obligations, whether at law or under this Consulting Agreement.

**16.    *Transfer and Assignment.*** This Consulting Agreement is personal to Consultant and shall not be assigned or transferred by Consultant without the prior written consent of Rivian. However, this Consulting Agreement will be binding upon and inure to the benefit of Rivian and any successor to Rivian, including without limitation any persons acquiring directly or indirectly all or substantially all of the business or assets of Rivian whether by purchase, merger, consolidation, reorganization or otherwise.

**17.    *No Waiver*.** The failure of either Party to execute a right or to require performance by the other Party of any part of this Consulting Agreement shall not affect the full right to exercise such right or to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Consulting Agreement constitute a waiver of any later breach of the same or any other provision.

**18.    *Entire Agreement*.** This Consulting Agreement sets forth the entire agreement between the Parties and supersedes any other written or oral statements, representations, communications, understandings and agreements relating to the subject matters of this Consulting Agreement. Consultant affirmatively states that Consultant has not, will not, and cannot rely on any representations not expressly made herein. For avoidance of doubt, this Consulting Agreement does not supersede the terms and conditions set forth in the Plan or the covenants set forth in the Separation Agreement, which shall remain in full force and effect. No amendment or modification of the terms of this Consulting Agreement shall be binding upon the Parties unless reduced to writing and signed by Rivian and Consultant.

**19.    *Severability*.** In the event any phrase, clause or provision of this Consulting Agreement is declared to be illegal, invalid or unenforceable by a court of competent jurisdiction, such phrase, clause or provision shall be deemed severed from this Consulting Agreement but will not affect the other provisions of this Consulting Agreement, which shall otherwise remain in full force and effect. If any phrase, clause or provision in this Consulting Agreement is deemed to be unreasonable, onerous or unduly restrictive by a court of competent jurisdiction, it shall not be stricken in its entirety and held totally void and unenforceable but shall remain effective to the maximum extent permissible within reasonable bounds. In the event Rivian is entitled to damages for a breach of this Consulting Agreement or any other agreement between Rivian and Consultant, or with respect to any other matter arising out of the engagement of Consultant by Rivian, Rivian shall be entitled to offset such damages or claims against amounts due and owing from Rivian to Consultant.

**20.    *Governing Law; Jurisdiction*.** This Consulting Agreement, and the application or interpretation of this Consulting Agreement, shall be governed by the laws of the State of Delaware, without regard to any conflict of laws principles. Any dispute, controversy or claim arising out of, in connection with, or relating to this Consulting Agreement or Consultant's engagement by Rivian shall be brought exclusively in a federal or state court in the State of Delaware. The Parties consent to the exclusive jurisdiction of these courts and specifically waive any defenses to personal jurisdiction or venue that may be raised in such an action.

**21.    *Notice*.** Notices required under this Consulting Agreement shall be in writing and sent by overnight courier or registered mail, return receipt requested, to the Party's last known address or to such other address that the Party being notified may subsequently furnish to the other by written notice.

**22.    *Construction*.** Rivian and Consultant acknowledge that this Consulting Agreement was the result of arms-length negotiations between sophisticated Parties, each with the opportunity to be represented by legal counsel. The terms of this Consulting Agreement shall be construed as though both Parties participated equally in the drafting of such terms, and any rule of construction that a document shall be construed against the drafting Party shall not apply to this Consulting Agreement.

**23.    *Counterparts*.** This Consulting Agreement may be executed in counterparts, each of which shall be deemed an original.

Exhibit 8 - Page 577

Exhibit 10.2

IN WITNESS WHEREOF, the Parties hereto have executed, or have caused to be executed, this Consulting Agreement on the day and date written below.

Rivian Automotive, LLC

/s/ Jiten Behl /s/ Helen Russell
Jiten Behl Helen Russell
Date: 8/29/2023 Date: 8/30/2023

Exhibit 8 - Page 578

**ATTACHMENT A: Services to be Performed by Consultant**

During the term of this Agreement, Consultant is expected to perform the following services on behalf of Rivian:

- Provide advice to the Chief Executive Officer in several areas, including, but not limited to:

    ◦ Strategic partnerships between Rivian and third-party entities

    ◦ Large scale commercial agreements

    ◦ Business development

    ◦ Mergers and acquisitions

Exhibit 8 - Page 579

**ATTACHMENT B: Unvested Awards**

Consultant was previously granted the following equity awards which are wholly or partially unvested as of August 31, 2023:

| Grant Date | Grant Type | Granted Shares | Unvested Shares | Full Vesting Date |
|---|---|---|---|---|
| 12/16/2020 | 2015/NQ | 125,000 | 62,500 | 12/16/2024 |
| 8/23/2021 | 2015/NQ | 240,000 | 120,000 | 8/23/2025 |
| 10/30/2021 | 2015/RSU | 20,000 | 11,250 | 11/15/2025 |

Exhibit 8 - Page 580

**ATTACHMENT C: Notice under the Defend Trade Secrets Act**

(1)      IMMUNITY. - An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that-

(A)   is made-

i.       in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

ii.      solely for the purpose of reporting or investigating a suspected violation of law; or

(B)      is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)    USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION
LAWSUIT. - An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual-

(A)   files any document containing the trade secret under seal; and

(B)   does not disclose the trade secret, except pursuant to court order.

Exhibit 8 - Page 581

**Exhibit 10.6**
[***] Certain information in this document has been excluded pursuant to Regulation S-K, Item (601)(b)(10). Such excluded information is not material and would likely cause competitive harm to the registrant if publicly disclosed.

**AMENDMENT NO. 3 TO THE FRAMEWORK AGREEMENT**

This Amendment No. 3 to the Framework Agreement (this "Amendment"), between Amazon Logistics, Inc., a Delaware corporation ("Amazon") and Rivian Automotive, LLC, a Delaware limited liability company ("Rivian"), is dated as of November 7, 2023 (the "Amendment Effective Date"). Amazon and Rivian are referred to herein individually as a "Party" and collectively as the "Parties." The Parties entered into a Framework Agreement, dated September 16, 2019 (the "Framework Agreement"), including an initial Work Order thereunder ("Work Order #1"), in each case as amended, modified or supplemented from time to time. Additionally, Amazon's affiliate, Amazon.com, Inc., and Rivian's affiliate, Rivian Automotive, Inc., entered into a letter agreement dated February 15, 2019 (the "Commercial Letter Agreement"), as amended, modified or supplemented from time to time. The Framework Agreement, Work Order #1 and the Commercial Letter Agreement, collectively, may be referred to herein as the "Existing Agreement." The Parties desire to amend the Existing Agreement on the terms and subject to the conditions set forth herein. In consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Amendments to Commercial Letter Agreement**. As of the Amendment Effective Date, the Commercial Letter Agreement is hereby amended or modified as follows:

1.1.      Section 2.2 of the Commercial Letter Agreement is hereby deleted in its entirety and replaced with the following:

"2.2 [*Reserved*]"

2.      **Amendments to Framework Agreement**. As of the Amendment Effective Date, the Framework Agreement is hereby amended or modified as follows:

2.1.      The last sentence of Section 4.7(B) of the Framework Agreement is hereby deleted in its entirety.

2.2.      Section 10.4 of the Framework Agreement is hereby deleted in its entirety and replaced with the following:

"For any payments made under this Agreement, the payee may charge and the payor will pay applicable national, state or local sales or use taxes or value added taxes that the payee is legally obligated to charge ("**Taxes**"), provided that such Taxes are stated on the original invoice that the payee provides to the payor and the payee's invoices state such Taxes separately and meet the requirements for a valid tax invoice. Either Party may provide the other Party with an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case, such Party will not charge or collect the Taxes covered by such certificate. Either Party may deduct or withhold any taxes that such Party may be legally obligated to deduct or withhold from any amounts payable to the other Party under this Agreement, and payment to the other Party as reduced by such deductions or withholdings will constitute full payment and settlement of amounts payable to the other Party under this Agreement. Throughout the term of this Agreement, each Party will provide the other Party with any forms, documents, or certifications as may be required for such other Party to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement. Except as otherwise expressly set forth in this Section 10.4 or in a Work Order, each Party will be responsible for all other taxes or fees (including interest and penalties) imposed on such Party under applicable Laws and arising under this Agreement."

2.3.      The last sentence of Section 16.11(A) of the Framework Agreement is hereby deleted in its entirety and replaced with the following:

"It is the intent of the Parties that all Contract Documents be read and interpreted as a whole, and not as separate documents."

2.4.      The second sentence of Section 16.11(B) of the Framework Agreement (beginning with "*In the event of a conflict of inconsistency between the terms and conditions of Sections 5.3(B) . . .*") is hereby deleted in its entirety.

3.      **Amendments to Work Order #1**. As of the Amendment Effective Date, Work Order #1 is hereby amended or modified as follows:

3.1.      Section 2.6 of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"2.6 **Key Personnel**. The following is a list of Key Personnel under this Work Order:

1

Exhibit 8 - Page 582

| NAME | RESPONSBILITY |
|------|---------------|
| [***] | Overall Programs & Relationship |
| [***] | Overall Commercial |
| [***] | Overall Engineering |
| [***] | Overall Technology Lead |
| [***] | Vehicle Line Director: Volta Engineering Lead |

The following is a list of Amazon Steering Committee member positions under this Work Order:

| POSITION | GOVERNANCE ROLE |
|----------|-----------------|
| [***] | SteerCo: Overall Strategy and Commercial Responsibility |
| [***] | SteerCo: Technology and Business Lead |
| [***] | SteerCo: Technology and Business Lead |
| [***] | SteerCo: Overall Engineering Responsibility |

The following is a list of Rivian Steering Committee member positions under this Work Order:

| POSITION | GOVERNANCE ROLE |
|----------|-----------------|
| [***] | SteerCo: Overall Strategy and Commercial Responsibility |
| [***] | SteerCo: Overall Engineering Responsibility |
| [***] | SteerCo: Technology Lead |
| [***] | SteerCo: Business Lead |

To the extent there is any change in (a) the Personnel holding the positions listed in the Steering Committee tables above or (b) the name of the positions listed in the Steering Committee tables above that is functionally equivalent to the currently listed positions, the Parties agree that such replacement Personnel or the person occupying such updated position(s) will be the applicable Steering Committee members upon giving written notice to the other Party and no amendment to the tables is necessary in such circumstances."

3.2.    New Sections 2.7 and 2.8 are hereby added to Work Order #1 as follows:

"2.7 **Rivian Investment Commitment**.

(A) Investment Commitment. In consideration of Amazon's agreement to modify the exclusivity restrictions set forth in the Commercial Letter Agreement, the receipt and sufficiency of which are hereby acknowledged, during the period of time commencing on September 1, 2023 and expiring on December 31, 2026 ("**Investment Commitment Period**"), Rivian agrees to spend [***] (the "**Investment**

2

Exhibit 8 - Page 583

**Commitment**") towards internal and external non-recurring Engineering Work, Tooling, and other research and development expenses directly related to the Investment Projects defined below (collectively, "**NRE Expenses**"). Unless otherwise agreed between the Parties, Rivian will (a) complete design, testing, validation, and homologation of all Investment Projects no later than December 31, 2026 (the "**Investment Project Completion Deadline**"), and (b) ensure each Investment Project is capable of being incorporated into the Delivery Vehicle (as defined in the Framework Agreement) or related services and that the engineering is available to incorporate such Investment Project into the Delivery Vehicle by the deadlines set forth in Attachment 1 (the "**Implementation Deadlines**"). In the event that Rivian knows or has reason to believe it is unlikely to complete any Investment Project by either the Investment Project Completion Deadline or the Implementation Deadline, Rivian will provide Amazon with at least 90 days' advance written notice, and as much notice as reasonably possible in such situations where Rivian makes such determination within 90 days of the Investment Project Completion Deadline or Implementation Deadline. Such notice will include a remediation plan reasonably satisfactory to Amazon describing the specific steps that Rivian plans to take and associated resources that Rivian plans to dedicate to complete such Investment Project in an expedited manner.

Amazon and Rivian agree to allocate a portion of the Investment Commitment (the "**Shared Investment Commitment**") toward projects dedicated to the Delivery Vehicle that are mutually defined by both Parties and described on Attachment 1 ("**Shared Projects**"). Rivian and Amazon will apply [***] of the portion of the Investment Commitment that is not used toward Shared Projects (the "**Amazon Directed Investment Commitment**") toward projects dedicated to the Delivery Vehicle that are defined and directed by Amazon and described on Attachment 1 ("**Amazon Directed Projects**"). The remaining [***] of the Investment Commitment that is not used toward Shared Projects (the "**Rivian Directed Investment Commitment**") is allocated to projects dedicated to the Delivery Vehicle that are selected by Rivian and described on Attachment 1 ("**Rivian Directed Projects,**" together with the Shared Projects and Amazon Directed Projects, collectively, "**Investment Projects**"). All Rivian Directed Projects must [***]. Changes to or cancellation of Investment Projects in Attachment 1 may be made by the Parties in accordance with Section 2.7(C). If the Parties agree that all Investment Projects in Attachment 1 are completed and Rivian has not spent the total Investment Commitment, new Investment Projects not listed in Attachment 1 may be mutually agreed to and defined by both Parties in writing, until Rivian has spent the total Investment Commitment.

For clarity, the Investment Commitment will not be used toward (I) projects related to the Delivery Vehicle that are not listed on Attachment 1, as updated and amended from time to time by the Parties, (II) any pre-existing projects related to the Delivery Vehicle that were undertaken or agreed by the Parties to be undertaken prior to the commencement of the Investment Commitment Period, or (III) projects related to the Delivery Vehicle that are undertaken or agreed by the Parties to be undertaken separate from the scope of this Amendment (the foregoing (II) and (III), collectively, "**Pre-Existing Projects**"), and nothing in this Section will modify the Parties' obligations with respect to such Pre-Existing Projects. However, the Parties may mutually agree in writing to allocate portions of the Investment Commitment towards any Pre-Existing Project(s), and, if mutually agreed in writing by the Parties, any amounts spent by Rivian on such Pre-Existing Project(s) during the Investment Commitment Period and documented in accordance with Section 2.7(E) will be counted towards the Investment Commitment.

(B) Investment Projects. For each Investment Project, the Parties agree as follows:

(i) Amazon and Rivian will jointly prepare and memorialize in writing specific, actionable details sufficient to carry out each Investment Project, including a proposed roadmap and timeline for implementation, and the total estimated cost of the Investment Project and how that cost will be allocated. Rivian will deliver each Investment Project in accordance with the roadmap, timeline and associated costs set forth on Attachment 1. The Parties will continue to mutually agree on any additional details for the Investment Projects, including specifications, performance metrics, and other technical details ("**Customer Technical Specifications**"). However, Rivian will have sole responsibility for the Engineering Work and Manufacturing decisions related to its plan to meet the mutually agreed-upon Customer Technical Specifications. Rivian will report to Amazon no less than monthly on each Investment Projects' performance against the original estimated budget. Rivian will also report to Amazon no less than monthly on any potential material impacts that Rivian's planned approach to meeting the Customer Technical Specifications may have on the applicable Investment Project, the overall program, or the Delivery Vehicle, including any economic (i.e., the cost of implementation) or performance trade-offs arising from Rivian's planned approach.

Exhibit 8 - Page 584

(ii) Amazon is entitled to purchase a Delivery Vehicle including a feature or other attribute developed through any Investment Project in accordance with the pricing set forth on Attachment 3 (as may be updated from time to time upon mutual agreement by the Parties in writing).

(C) Changes to or Cancellation of Investment Projects. Rivian will deliver each Investment Project in accordance with Attachment 1. Prior to the Investment Project Completion Deadline, the Parties may add a new Investment Project to Attachment 1 and/or modify a then-existing Investment Project set forth on Attachment 1 in accordance with the processes set forth in this Section 2.7(C).

(i) Shared Projects. Any Changes to a Shared Project proposed by Amazon will be considered a Change pursuant to Section 4.4 of the Framework Agreement and must be submitted to Rivian in the form of an Amazon Change Notice. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such Amazon Change Notice. Costs and expenses incurred by Rivian arising out of a Change to a Shared Project due to an Amazon Change Notice will count towards the Amazon Directed Investment Commitment or be paid separately by Amazon, unless the Parties agree to share such costs equally. Any Changes to a Shared Project proposed by Rivian will be considered a Change pursuant to Section 4.3 of the Framework Agreement and must be submitted to Amazon in the form of a Rivian Change Notice. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such Rivian Change Notice. Costs and expenses incurred by Rivian arising out of a Change to a Shared Project due to a Rivian Change Notice will count towards the Rivian Directed Investment Commitment or be paid separately by Rivian, unless the Parties agree to share such costs equally. Amazon may cancel a Shared Project at its discretion by written notice to Rivian identifying in reasonable detail such cancellation. Rivian may cancel a Shared Project by providing written notice to Amazon identifying in reasonable detail such cancellation, and such proposed cancellation by Rivian, if approved by Amazon in its discretion, will be approved in writing by [***] Amazon and where reasonably feasible within [***] of receiving Rivian's written notice; provided, that prior to any such cancellation of a Shared Project the Parties will meaningfully consult with one another in good faith regarding the appropriateness of such cancellation. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such cancellation. Costs and expenses incurred by Rivian arising out of the cancellation of a Shared Project will count towards the Shared Investment Commitment.

(ii) Amazon Directed Projects. Any Changes to an Amazon Directed Project proposed by Amazon will be considered a Change pursuant to Section 4.4 of the Framework Agreement and must be submitted to Rivian in the form of an Amazon Change Notice. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such Amazon Change Notice. Costs and expenses incurred by Rivian arising out of a Change to an Amazon Directed Project due to an Amazon Change Notice will count towards the Amazon Directed Investment Commitment or be paid separately by Amazon, unless the Parties agree to share such costs equally. Any Changes to an Amazon Directed Project proposed by Rivian will be considered a Change pursuant to Section 4.3 of the Framework Agreement and must be submitted to Amazon in the form of a Rivian Change Notice. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such Rivian Change Notice. Costs and expenses incurred by Rivian arising out of a Change to an Amazon Directed Project due to a Rivian Change Notice will count towards the Rivian Directed Investment Commitment or be paid separately by Rivian, unless the Parties agree to share such costs equally. Amazon may cancel an Amazon Directed Project at its discretion by providing written notice to Rivian identifying in reasonable detail such cancellation. Rivian may cancel an Amazon Directed Project by providing written notice to Amazon identifying in reasonable detail such cancellation, and such proposed cancellation by Rivian, if approved by Amazon in its discretion, will be approved in writing by [***] Amazon and where reasonably feasible within [***] of receiving Rivian's written notice; provided, that prior to any such cancellation of an Amazon Directed Project by Rivian the Parties will meaningfully consult with one another in good faith regarding the appropriateness of such cancellation. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such cancellation. Costs and expenses incurred by Rivian arising out of the cancellation of an Amazon Directed Project will count towards the Amazon Directed Investment Commitment.

(iii) Rivian Directed Projects. Any Changes to a Rivian Directed Project proposed by Amazon will be considered a Change pursuant to Section 4.4 of the Framework Agreement and must be submitted to Rivian in the form of an Amazon Change Notice. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such Amazon Change Notice. Costs and expenses incurred by Rivian arising out of a Change to a Rivian Directed Project due to an Amazon Change Notice will count towards the Amazon Directed Investment Commitment or be paid separately by Amazon, unless the Parties agree to share such costs equally. Any Changes to a Rivian Directed Project proposed by Rivian will be considered a Change pursuant to Section 4.3 of the Framework Agreement and must be submitted to Amazon in the form of a Rivian Change Notice. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such Rivian Change Notice. Costs and expenses

4

Exhibit 8 - Page 585

incurred by Rivian arising out of a Change to a Rivian Directed Project due to a Rivian Change Notice will count towards the Rivian Directed Investment Commitment or be paid separately by Rivian, unless the Parties agree to share such costs equally. Rivian may cancel a Rivian Directed Project by providing written notice to Amazon identifying in reasonable detail such cancellation, and such proposed cancellation by Rivian, if approved by Amazon in its discretion, will be approved in writing by [***] Amazon and where reasonably feasible within [***] of receiving Rivian's notice. Amazon may cancel a Rivian Directed Project by providing written notice to Rivian identifying in reasonable detail such cancellation, and such proposed cancellation by Amazon must be approved by Rivian in writing; provided, that prior to any such cancellation of a Rivian Directed Project by Amazon the Parties will meaningfully consult with one another in good faith regarding the appropriateness of such cancellation. Rivian must take reasonable actions to mitigate the extent of the costs incurred due to any such cancellation. Costs and expenses incurred by Rivian arising out of the cancellation of a Rivian Directed Project will count towards the Rivian Directed Investment Commitment.

(D) Governance for Investment Commitment and Investment Projects. In addition to each Party's rights to participate in decisions regarding Investment Projects and the Investment Commitment through the Steering Committee and governance processes set forth in Schedule 8 to Work Order #1, the Parties will also meaningfully consult with one another on details of the Investment Commitment and Investment Projects as set forth in this Section 2.7(D) and any other applicable sections of this Section, with each Party affording the other Party's comments, positions and viewpoints thorough, careful consideration. During the Investment Commitment Period, the Parties will, on at least a quarterly basis, meet regarding the Investment Commitment, Investment Projects, Change and cancellation process, prioritization of Investment Projects, and other standing agenda items as mutually agreed between the Parties. Time spent during such meetings will not count towards the Investment Commitment, and Rivian will not otherwise charge Amazon for time spent during such meetings. For the avoidance of doubt, only NRE Expenses will count toward the Investment Commitment.

(E) Reporting. Within thirty (30) days following the end of each month during the Investment Commitment Period, Rivian will deliver a detailed written report to Amazon, which will be prepared using formal time tracking software (referenced as a Shared Project in Attachment 1) once such software is implemented (each, a "**Monthly Report**") and detailing (in each case with supporting documentation sufficient to substantiate such information): (i) the total amount of the Investment Commitment spent by Rivian during such month, (ii) the amount of the Investment Commitment spent on each Amazon Directed Project, Rivian Directed Project, and/or Shared Project during such month, (iii) the specific activities performed under any Amazon Directed Projects, Rivian Directed Projects and/or Shared Projects during such month, the status of completion of such activities, and the costs attributable to each specific activities, (iv) the overall amount of hours and corresponding hourly rates spent by Rivian on each specific activity for each Amazon Directed Project, Rivian Directed Project and/or Shared Project, (v) the number of full-time employees or contractors Rivian has dedicated to each Amazon Directed Project, Rivian Directed Project and/or Shared Project, including the number of hours such employees or contractors have billed to each specific activity for such Amazon Directed Project, Rivian Directed Project and/or Shared Project and their corresponding hourly rates, job titles and qualifications, and (vi) any other information or details related to Rivian's performance or investments made under this Section as reasonably requested by Amazon.

(F) Records and Audits. Without limitation of Section 10.9 of the Framework Agreement, Rivian will keep accurate records containing all information reasonably necessary to establish the amount of the Investment Commitment expended by Rivian. Such records required to be kept by Rivian will include all of the information that is required to be set forth in the Monthly Reports, and such records will be maintained for a period of five (5) years from the expiration of the Investment Commitment Period. During the Investment Commitment Period and for five (5) years thereafter, Amazon will have the right, upon reasonable advance notice and on a schedule reasonably acceptable to Rivian, through a qualified independent auditor, to review and audit the records of Rivian for purposes of verifying the accuracy of the Investment Commitment amounts expended by Rivian. Such reviews and audits will be conducted, at Amazon's option, through electronic means, through the delivery of copies of the requested records to the auditor's address as designated by Amazon, or onsite at Rivian's facilities during Rivian's normal business hours. If the auditor determines a discrepancy benefitting Rivian, due to Rivian's negligence or willful misconduct, of five percent (5%) or more in the amount of the Investment Commitment expended by Rivian during the relevant period under examination, such misrepresented amounts will not be counted toward satisfying the Investment Commitment and Rivian will be responsible for all reasonable fees related to the audit. In the event the auditor identifies a discrepancy benefitting Amazon, such amounts will first be reallocated toward the Investment Commitment or otherwise remitted to Rivian, as appropriate. Subject to reasonable cooperation from Rivian with any relevant legal requirements or requirements from the auditor, Amazon will make the full auditor's report available to Rivian and doing so

5

Exhibit 8 - Page 586

is a condition to removing any amounts from the Investment Commitment or any payment by Rivian of audit fees.

2.8 **Amazon Access to New LMD Vehicle Features and Models**.  In consideration of Amazon's legitimate interests in protecting (x) the significant amount of time, effort and resources it invested into the development of the Shared Top Hat IP and (y) the value of its brand, the Parties agree as follows:

(A) Scope of Preferential Rights. Pursuant to the terms and subject to the conditions of this Section 2.8, Amazon may exercise Preferential Rights with respect to (i) any new feature, upgrade, or improvement developed by Rivian for use in LMD Vehicles ("**New LMD Feature**"), and (ii) any new LMD Vehicle model, including any modifications to the Top Hat (as defined in Work Order #1) ("**New LMD Model**"), in each case until the earlier of (a) the date that Amazon meets the 100,000 Unit Threshold or (b) expiration of the Base Distribution Fee Period (as defined below). "**Preferential Rights**" means, when exercised by Amazon with respect to any New LMD Feature or New LMD Model, that Rivian will not disclose, sell, or otherwise provide that New LMD Feature or New LMD Model to any customer (including Permitted Third Parties) other than Amazon and its Authorized Purchasers (as defined in the Framework Agreement) until one (1) year following the date that Rivian delivers the New LMD Feature or New LMD Model to Amazon or its Authorized Purchasers.

(B) Exercise of Preferential Rights. Rivian will offer each New LMD Feature or New LMD Model to Amazon in writing before offering or making it available to any other customer. If Amazon intends to exercise Preferential Rights with respect to any New LMD Feature or New LMD Model, it will notify Rivian in writing ([***]; email being sufficient) no later than [***] after receipt of Rivian's offer.

(i) If Amazon exercises its Preferential Rights with respect to a New LMD Feature or New LMD Model:

(1)  The Parties will negotiate in good faith Customer Technical Specifications, KPIs, and a maximum price for the New LMD Feature or New LMD Model until (x) the Parties execute a written agreement memorializing those terms (a "**New LMD Agreement**"), or (y) the Parties mutually agree to end such good faith negotiations;

(2) Amazon will not be obligated to purchase any New LMD Feature or New LMD Model absent a New LMD Agreement; and

(3) Once the Parties have signed a New LMD Agreement with respect to any New LMD Feature or New LMD Model, Rivian may initiate discussions for future sales of that New LMD Feature or New LMD Model to other customers (in each case subject to any other applicable restrictions), but may not deliver or otherwise provide the New LMD Feature or New LMD Model to other customers until Amazon's Preferential Rights expire with respect to the New LMD Feature or New LMD Model.

(ii) If Amazon does not exercise its Preferential Rights with respect to a New LMD Feature or New LMD Model:

(1) Nothing in this Section 2.8 will prohibit Rivian from offering to sell or otherwise providing the New LMD Feature or New LMD Model to any other customer, in each case subject to any other applicable restrictions; and

(2)  Amazon may still purchase or obtain the New LMD Feature or New LMD Model, but will be deemed to have waived its Preferential Rights with respect to that New LMD Feature or New LMD Model.

(C) Notwithstanding the foregoing, Rivian is not obligated to provide Preferential Rights with respect to any New LMD Feature: (x) where Rivian reasonably establishes, after consulting with Amazon, that Rivian would incur material, incremental manufacturing or supply chain costs to provide that New LMD Feature only to Amazon or (y) to the extent the New LMD Feature is primarily intended to improve the safety of the LMD Vehicles, as required by a Governmental Authority or as otherwise required for regulatory compliance.

3.3.    The first two sentences of Section 3.9(A) of Work Order #1 are hereby deleted in their entirety and replaced with the following:

6

Exhibit 8 - Page 587

"(i) Rivian will have the sole and exclusive ownership of all right, title, and interest in and to the Dedicated Top Hat Tooling and Amazon will have no right or property interest therein, and (ii) any alterations, additions and improvements to the Dedicated Top Hat Tooling of any kind, whether made by Rivian, Amazon, or a third party, will immediately become the property of Rivian. Rivian will not incur or allow any Lien on any Shared Top Hat IP other than Permitted Liens."

3.4.     Sections 3.9(B), 3.9(C), 3.9(D), 3.9(E), and 3.9(F) of Work Order #1 are all hereby deleted and replaced with "Reserved".

3.5.     A new Section 3.10 is hereby added to Work Order #1 as follows:

"3.10 **LMD Vehicle and LMD Skateboard Supply and Distribution**. In consideration of Amazon's legitimate interests in protecting (x) the significant amount of time, effort and resources it invested into the development of the Shared Top Hat IP and (y) the value of its brand, the Parties agree as follows:

(A)  Rivian will not sell, lease, rent, transfer or otherwise make available, directly or knowingly indirectly (including knowingly through any third party or other intermediary, such as a fleet management company) (collectively "**Transactions**"), any electric delivery vehicles and other delivery carriers and systems designed for, produced for use in, or used in a fleet for logistics or last mile transportation of goods to the final delivery destination and that incorporate or otherwise Exploit Shared Top Hat IP ("**LMD Vehicles**"), or skateboards that incorporate or otherwise Exploit Skateboard Foreground IP (whether sold separately as a skateboard or as part of a vehicle) ("**LMD Skateboard**"), to any customer:

(i) [***] ("**Last Mile Delivery Customers**"), prior to the expiration of the Last Mile Distribution Fee Period (as defined below); or

(ii) [***] ("**Retailers**"), prior to the expiration of the Base Distribution Fee Period (as defined below);

(iii) unless with respect to each of (i) and (ii) above, (a) such Transaction is with a party listed on Attachment 2, (b) Rivian's cumulative lifetime Transactions involving LMD Vehicles and/or LMD Skateboards with such customer is for [***] LMD Vehicles and/or LMD Skateboards (and, for clarity, will remain less than [***] LMD Vehicles and/or LMD Skateboards after any Transaction is consummated), or (c) Rivian obtains prior written approval from [***] Amazon.

(B) For the avoidance of doubt, nothing in this Work Order prevents Rivian from entering into Transactions for LMD Vehicles or LMD Skateboards with companies that are in the business of offering rental vehicles to a broad customer base that is not predominantly comprised of Last Mile Delivery Customers or Retailers (e.g., [***]), provided that any rental by such companies to Last Mile Delivery Customers or Retailers must not exceed [***], and such LMD Vehicles must not be branded with any logos, decals, or other markings that identify any Last Mile Delivery Customer or Retailer.

(C)  If a customer meets the definition of both a Last Mile Delivery Customer and a Retailer, the customer's predominant business will determine whether it is categorized by the Parties as a Last Mile Delivery Customer or Retailer for purposes of this Work Order (and in making such determination, the Parties also will determine whether Rivian is permitted to enter into Transactions with such customer for LMD Skateboards). Notwithstanding the foregoing, the Parties' categorization of customers in Attachment 2 shall in no way be used to interpret the definitions of Last Mile Delivery Customer and Retailer under this Agreement.

(D) With respect to obtaining written approval from [***] Amazon under Sections 3.10(A) above, Rivian may request such written approval at any time prior to effectuating such a Transaction (i.e., at any time at or after which Rivian reasonably determines an agreement effectuating a Transaction with a party is reasonably likely to materialize but before signature). Rivian will submit such written requests for approval to [***]. Amazon will use commercially reasonable efforts to provide an approval or rejection notice within [***] to Rivian. If Amazon fails to respond within [***], then Rivian may submit a second request [***], provided that Amazon must promptly designate [***] for this purpose upon request by Rivian. If Amazon again fails to respond within [***], then Amazon is deemed to have approved. Upon receipt of approval [***], Rivian will be permitted to enter into Transactions with such Last Mile Delivery Customer or Retailer, as applicable, in accordance with this Section 3.10 at any time and from time to time and will not be required to seek additional or subsequent approvals for such Last Mile Delivery Customer or Retailer, as applicable. Upon receipt of rejection by Amazon, Rivian may submit another request for the same Last Mile Delivery Customer or Retailer, as applicable, on or after the date that is

7

Exhibit 8 - Page 588

[***] from the date that Rivian's previous request for such Last Mile Delivery Customer or Retailer, as applicable, was rejected by Amazon.

(E) For purposes of this Section 3.10, "knowingly" will mean actual or constructive knowledge following reasonable and diligent inquiry of the applicable third party.

(F) A "**Permitted Third Party**" is any party that (i) is not a Last Mile Delivery Customer or Retailer, (ii) is set forth on Attachment 2 (either as a Last Mile Delivery Customer, a Retailer, or a party entitled to purchase LMD Skateboards), (iii) is a Last Mile Delivery Customer or Retailer and has obtained through Transactions with Rivian a cumulative lifetime amount of LMD Vehicles and/or LMD Skateboards that is less than [***] LMD Vehicles and/or LMD Skateboards (and, for clarity, such amount will remain less than [***] LMD Vehicles and/or LMD Skateboards after any Transaction with Rivian), or (iv) is approved by [***] Amazon in accordance with this Section 3.10. For clarity, Rivian is not restricted hereunder from entering into Transactions for LMD Vehicles or LMD Skateboards with any customer that is not a Last Mile Delivery Customer or Retailer.

(G) In the event that Rivian is unable to fulfill in a timely manner all orders for LMD Vehicles or LMD Skateboards that it receives from (i) Amazon and its Authorized Purchasers substantially in accordance with the production and delivery schedule agreed between the Parties and (ii) Permitted Third Parties, Rivian will promptly notify Amazon of such circumstance and give first manufacturing priority to Amazon and its Authorized Purchasers over all other customers of LMD Vehicles or LMD Skateboards, up to a monthly maximum of [***] LMD Vehicle or LMD Skateboard units.

3.6.    Section 5.1(A) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"Rivian and Amazon will jointly own, in equal, undivided shares (and each Party hereby assigns and agrees to assign to the other Party an equal, undivided interest in), all right, title and interest in all Foreground IP incorporated in or necessary for the Top Hat ("**Shared Top Hat IP**"), and title to all patents, copyrights, mask work rights and other applicable statutory Intellectual Property Rights in Shared Top Hat IP will be jointly owned by the Parties. Subject to Section 8.7(B)(ii)(a)(ii), Amazon will have the unrestricted right to practice the Shared Top Hat IP and to license any third party to Exploit the Shared Top Hat IP without the consent of Rivian, and subject to the provisions of this Section 5, without any duty to account to or to share proceeds with Rivian on account of such practice or licensing of the Shared Top Hat IP; provided, however, that any Licensed Subject Matter incorporated into the Shared Top Hat IP may only be Exploited by either Amazon or such third parties pursuant to the terms of the Limited Licensed Subject Matter License (as defined in Section 5.2 below). Except as expressly set forth in Section 3.8(B) and Section 8.7(B)(ii), or as otherwise permitted hereunder (including Section 3.10), Rivian will not (and will not authorize others to) Exploit Shared Top Hat IP for any purpose other than performing the Services as set forth in this Work Order and designing, Developing, Manufacturing, and otherwise producing the Products and Development Deliverables as set forth in this Work Order."

3.7.    Section 5.3(B) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"Except with respect to transactions involving LMD Vehicles or LMD Skateboards expressly permitted hereunder, prior to the earlier of (i) June 30, 2027, or (ii) the termination of the Work Order as set forth in Section 8.7(B) or Section 8.7(C), Rivian will not (directly or indirectly through any Affiliate or third party), make, sell, offer for sale, lease, license, distribute, or otherwise make available to any Person other than Amazon, its Affiliates or its Authorized Purchasers, any logistics or delivery vehicle that incorporates any Skateboard Foreground IP, or otherwise make available (directly or indirectly) any Skateboard Foreground IP for practice in or incorporation into any logistics or delivery vehicle, in each case without prior written consent from a Vice President of Amazon. For clarity, the foregoing does not restrict Rivian (x) with respect to its practice of Rivian's Background IP (such as a pre-existing original component design of Rivian on which a Product may be based) or (y) from Exploiting any Skateboard Foreground IP on vehicles that are not sold as delivery or logistics vehicles or otherwise sold for consumer use and, in each case, are subsequently used as vehicles to deliver goods (unless Rivian Knew (as defined in Section 9.1(B) or reasonably should have Known that such vehicles were likely to be used in such a manner). The Parties intend not to integrate any of Amazon's Background IP in the Skateboard, but to the extent that Amazon Background IP is incorporated, the Parties will discuss and negotiate license terms in good faith for such Background IP."

8

Exhibit 8 - Page 589

3.8.    The last sentence of Section 5.5(A)(v) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"For the avoidance of doubt, this Section 5.5(A)(v) does not limit the restrictions set forth in Section 3.10."

3.9.    The following sentence is hereby added to the end of Section 6.1(A)(i) of Work Order #1:

"Notwithstanding anything herein to the contrary, the Parties acknowledge and agree that the pricing for Delivery Vehicles ordered by Amazon or its Authorized Purchasers for delivery in 2024 or later in Authorized Territories shall be based on the pricing structure set forth on Attachment 3, and the pricing structure agreed to in Amendment No. 2 to the Framework Agreement, dated as of February 6, 2023, for Delivery Vehicles ordered for delivery in 2023 only applies to Delivery Vehicles ordered for delivery in 2023."

3.10.    Section 6.2 of Work Order #1 is hereby amended and restated as follows:

"[***]."

3.11.    A new Section 6.3 is hereby added to Work Order #1 as follows:

"6.3 **Distribution Fees Payable by Rivian**. Rivian will pay to Amazon the following Base Distribution Fees, Last Mile Distribution Fees, and Skateboard Distribution Fees (together "**Distribution Fees**") as consideration for the right to Sell vehicles (or skateboards separately from vehicles) to Permitted Third Parties as set forth herein. The Base Distribution Fees and Last Mile Distribution Fees will apply based on whether the Vehicle Volume Floor has been exceeded at the time of the Sale (defined below) of each applicable vehicle. Distribution Fees will accrue as of the delivery of the relevant vehicle or skateboard; however, if Rivian, after using all commercially reasonable efforts, is unable to collect cash consideration from a customer due to bankruptcy, insolvency, or other non-payment, the Distribution Fees will only be payable to Amazon upon Rivian's receipt of such cash consideration. The "**Vehicle Volume Floor**" as used herein will mean that Rivian has Sold at least [***] vehicles incorporating or otherwise Exploiting Shared Top Hat IP in the applicable calendar year. The calculation of the Vehicle Volume Floor includes such vehicles sold to Amazon, its Affiliates or Authorized Purchasers (collectively, "**Amazon Parties**") during the calendar year; provided, however, that all Sales to Amazon Parties during a calendar year, regardless of when those Sales occur during that calendar year, will be treated for purposes of the Vehicle Volume Floor calculation as having occurred on January 1 of that relevant calendar year, and each vehicle Sale by Rivian to a Permitted Third Party will be treated as occurring chronologically during that calendar year and therefore incremental to the Sales to Amazon Parties. For example, if Rivian sells [***] vehicles to Amazon in Q4 of 2024 and Rivian sells [***] vehicles to Permitted Third Parties throughout all of 2024, the [***] vehicles Sold to Amazon would be counted towards the Vehicle Volume Floor as of January 1 of 2024, the first [***] vehicles Sold to Permitted Third Parties in chronological order would count towards volume below the Vehicle Volume Floor, and the remaining [***] vehicles Sold to Permitted Third Parties in chronological order would count towards volume above the Vehicle Volume Floor. For the purposes of this Section 6.3: "**Amazon Order Volume**" means the total number of vehicles Rivian has Sold (as defined below) to Amazon in the applicable time period and/or under the applicable threshold; and "**Sale**", "**Sold**" and "**Sells**" means sale and transfer of title by Rivian to Amazon and Permitted Third Parties (as applicable) and also includes Transactions (as defined above) with Permitted Third Parties.

(A) Base Distribution Fee. The Parties agree that, commencing on January 1, 2024 (the "**Base Distribution Fee Effective Date**") and continuing for a period of ten (10) years thereafter (the "**Base Distribution Fee Period"),** Rivian will pay to Amazon Base Distribution Fees in accordance with this Section 6.3(A).

(i) Below the Vehicle Volume Floor. Rivian will pay to Amazon a per-vehicle fee of [***] (the "**Below Volume Floor Base Distribution Fee**") for each vehicle that incorporates or otherwise Exploits Shared Top Hat IP (for clarity, regardless of whether such vehicle is an LMD Vehicle but excluding any vehicle that is a Rivian service van), which will accrue upon the Sale by Rivian to any Permitted Third Party prior to Rivian having exceeded the Vehicle Volume Floor for the calendar year in which such vehicle was Sold.

(ii) Above the Vehicle Volume Floor. Rivian will pay to Amazon a per-vehicle fee of [***] (the "**Above Volume Floor Base Distribution Fee**", and together with the Below Volume Floor Base Distribution Fee, collectively the "**Base Distribution Fee**") for each vehicle (for clarity, regardless of whether such vehicle is an LMD Vehicle but excluding any vehicle that is a Rivian service van) that

9

Exhibit 8 - Page 590

incorporates or otherwise Exploits Shared Top Hat IP, which will accrue upon a Sale by Rivian to any Permitted Third Party after Rivian has exceeded the Vehicle Volume Floor for the calendar year in which such vehicle was Sold

(B) Last Mile Distribution Fee. The Parties agree that, commencing on January 1, 2024 (the "**LMD Fee Effective Date**") and continuing for a period of five (5) years thereafter (the "**Last Mile Distribution Fee Period**"), Rivian will pay to Amazon Last Mile Distribution Fees in accordance with this Section 6.3(B).

(i) Below the Vehicle Volume Floor. Rivian will pay to Amazon a per-vehicle fee of [***] (the "**Below Volume Floor Last Mile Distribution Fee**") for each vehicle (for clarity, regardless of whether such vehicle is an LMD Vehicle but excluding any vehicle that is a Rivian service van) that incorporates or otherwise Exploits Shared Top Hat IP, which will accrue upon a Sale by Rivian to any Last Mile Delivery Customer prior to Rivian having exceeded the Vehicle Volume Floor for the calendar year in which such vehicle was Sold.

(ii) Above the Vehicle Volume Floor. A per-vehicle fee of [***] (the "**Above Volume Floor Last Mile Distribution Fee**", and together with the Below Volume Floor Last Mile Distribution Fee, collectively the "**Last Mile Distribution Fee**") for each vehicle (for clarity, regardless of whether such vehicle is an LMD Vehicle but excluding any vehicle that is a Rivian service van) that incorporates or otherwise Exploits Shared Top Hat IP, which will accrue upon a Sale by Rivian to any Last Mile Delivery Customer after Rivian has exceeded the Vehicle Volume Floor for the calendar year in which such vehicle was Sold.

(C)  Skateboard Distribution Fee. The Parties agree that, commencing on January 1, 2024 (the "**Skateboard Distribution Fee Effective Date**") and continuing for a period of five (5) years thereafter (the "**Skateboard Distribution Fee Period"),** Rivian will pay to Amazon [***] (the "**Skateboard Distribution Fee**") for each skateboard that is Sold and that incorporates or otherwise Exploits Skateboard Foreground IP (unless either the Base Distribution Fee or Last Mile Distribution Fee is payable in connection with such Sale). The Skateboard Distribution Fee will accrue upon a Sale by Rivian of any such skateboard to a third-party customer.

(D) Obligations Not Cumulative. For clarity, only the Base Distribution Fee or the Last Mile Distribution Fee will be payable with respect to the same vehicle. By way of example, where Rivian Sells a vehicle incorporating or otherwise Exploiting Shared Top Hat IP to a Permitted Third Party that is a Last Mile Delivery Customer, Rivian will be responsible for only the payment of the Last Mile Distribution Fee with respect to such vehicle.  For clarity, the Skateboard Distribution Fee will be payable only with respect to skateboards Sold separately from a vehicle.

(E) Distribution Fee Reports. Within thirty (30) days following the end of each calendar quarter during the Base Distribution Fee Period, Last Mile Distribution Fee Period and Skateboard Distribution Fee Period, Rivian will send to Amazon a written report (a "**Distribution Fee Report**") covering the immediately preceding calendar quarter. The Distribution Fee Report must show (in each case with supporting documentation sufficient to substantiate such information): (i) the total number of vehicles incorporating or otherwise Exploiting Shared Top Hat IP Sold by Rivian to Permitted Third Parties during such calendar quarter, (ii) the total number of vehicles incorporating or otherwise Exploiting Shared Top Hat IP Sold and the date of each Sale of vehicles Sold by Rivian to each individual approved Last Mile Delivery Customer, Retailer, or other Permitted Third Party during such calendar quarter, (iii) the total number of skateboards incorporating or otherwise Exploiting Skateboard Foreground IP Sold and the date of each Sale of skateboards Sold by Rivian to each individual approved Permitted Third Party during such calendar quarter, (iv) the date Rivian's Sales of vehicle(s) incorporating or otherwise Exploiting Shared Top Hat IP exceeded the Vehicle Volume Floor (if any), (v) the total of all Base Distribution Fees, Last Mile Distribution Fees and Skateboard Distribution Fees accrued during such calendar quarter, (vi) with respect to the last Distribution Fee Report for each calendar year, (a) whether or not Rivian's Sales of vehicle(s) incorporating or otherwise Exploiting Shared Top Hat IP have exceeded the Vehicle Volume Floor during such calendar year, (b) the total of all Base Distribution Fees, Last Mile Distribution Fees and Skateboard Distribution Fees payable by Rivian during such calendar year, (c) the total number of vehicle(s) incorporating or otherwise Exploiting Shared Top Hat IP Sold by Rivian to Last Mile Delivery Customers, Retailers, and Permitted Third Parties during such calendar year, and (e) the total number of skateboard(s) incorporating or otherwise Exploiting Skateboard Foreground Sold by Rivian to approved Permitted Third Parties during such calendar year and (vii) any other information or details related to the calculation or payment of Base Distribution Fees, Last Mile Distribution Fees and Skateboard Distribution Fees that is reasonably requested by Amazon.

(F) Distribution Fee Payment Timing. Within sixty (60) days following its receipt of the last Distribution Fee Report for each calendar year, Amazon will invoice Rivian for the applicable Base Distribution Fees, Last Mile Distribution Fees and Skateboard Distribution Fees payable to Amazon for

Exhibit 8 - Page 591

such calendar year as set forth in such Distribution Fee Report. Any failure by Amazon to invoice Rivian within such sixty (60) day period will in no way waive, limit, or qualify Amazon's right to receive payment of such Base Distribution Fees, Last Mile Distribution Fees and Skateboard Distribution Fees and/or Rivian's obligation to make the payment of such Base Distribution Fees and Last Mile Distribution Fees and Skateboard Distribution Fees to Amazon. Payment terms for the Base Distribution Fees and Last Mile Distribution Fees and Skateboard Distribution Fees will be net thirty (30) days from the date of delivery of an invoice. Rivian will pay all invoices by bank transfer or wire or electronic funds transfer to the bank account noted in the invoice. Rivian will pay all invoices in U.S. Dollars unless otherwise agreed by the Parties in writing.

(G) <u>Records and Audits</u>. Without limitation of Section 10.9 of the Framework Agreement or Section 2.7(F) of this Work Order, Rivian will keep accurate records containing all information necessary to establish the Base Distribution Fees, Last Mile Distribution Fees and Skateboard Distribution Fees payable under this Work Order. Such records required to be kept by Rivian will include all of the information that is required to be set forth in the Distribution Fee Reports, and such records will be maintained for a period of ten (10) years from the end of the Base Distribution Fee Period and/or Last Mile Distribution Fee Period and/or Skateboard Distribution Fee Period (as applicable). During the Base Distribution Fee Period, Last Mile Distribution Period and Skateboard Distribution Fee Period and for ten (10) years thereafter, Amazon will have the right, through a qualified independent auditor, to review and audit the records of Rivian for purposes of verifying the accuracy of Base Distribution Fee, Last Mile Distribution Fee and Skateboard Distribution Fee payments made by Rivian. Such reviews and audits will be conducted, at Amazon's option, through electronic means, through the delivery of copies of the requested records to the auditor's address as designated by Amazon, or onsite at Rivian's facilities during Rivian's normal business hours. Each review and audit under this subsection (G) will be at Amazon's sole cost and expense; provided, however, Rivian will promptly reimburse Amazon for all reasonable costs and expenses incurred in connection with a review and audit if the auditor determines that Rivian has underpaid by five percent (5%) or more during the relevant period under examination. Rivian will promptly pay Amazon the amount of any underpayment revealed by a review and audit."

3.12.     Section 8.7(A)(i) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"i. [*Reserved*]"

3.13.     Section 8.7(B)(i)(b) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"b. [*Reserved*]"

3.14.     Section 8.7(B)(i)(c) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"c. [*Reserved*]"

3.15.     Section 8.7(B)(ii)(a)(i) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"i. [*Reserved*];"

3.16.     Section 8.7(B)(ii)(a)(iii) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"iii. [*Reserved*];"

3.17.     Section 8.7(B)(ii)(b)(i) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"i. [*Reserved*];"

3.18.     Section 8.7(B)(ii)(b)(v) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"v. [*Reserved*];"

3.19.     Section 8.7(C)(i)(a) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

"a. [*Reserved*];"

3.20.     Section 8.7(C)(i)(g) of Work Order #1 is hereby deleted in its entirety and replaced with the following:

Exhibit 8 - Page 592

"g [*Reserved*]."

3.21.    New subsections (viii) - (xii) are hereby added to Section 2 of Schedule 8 to Work Order #1 as follows:

"(viii) Agreeing on details of Investment Projects, including with respect to specifications, performance metrics, other technical details and implementation;

(ix) Reviewing, evaluating and managing Investment Projects, the Investment Commitment, Delivery Vehicle program performance, and the Change approval process;

(x) Resolving issues that arise in connection with the management, administration and timely implementation of Investment Projects;

(xi) Resolving issues and ensuring transparency with respect to tracking and reporting on expenditures under the Investment Commitment; and

(xii) Prioritization of Investment Projects vis-a-vis projects Rivian undertakes for other commercial customers or its consumer business."

4.    **Date of Effectiveness; Limited Effect**. The Parties acknowledge and agree that this Amendment is effective as of the Amendment Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Existing Agreement or as a waiver of or consent to any further or future action on the part of either Party that would require the waiver or consent of the other Party. On and after the Amendment Effective Date, each reference in the Existing Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import will mean and be a reference to the Existing Agreement as amended by this Amendment.

5.    **Miscellaneous**. This Amendment is governed by the substantive Laws of the state of New York, excluding its conflicts of law provisions. All the terms and conditions of this Amendment will be binding upon, will inure to the benefit of, and will be enforceable by the Parties and their respective successors and permitted assigns. The headings in this Amendment are for reference only and do not affect the interpretation of this Amendment. This Amendment may be executed by facsimile and in counterparts, each of which (including signature pages) will be deemed an original, but all of which together will constitute one and the same instrument. This Amendment constitutes the entire agreement between the Parties with respect to the subject matters hereof and supersedes any previous or contemporaneous oral or written agreements, understandings, and discussions regarding such subject matters.

[*Signature pages follow.*]

12

Exhibit 8 - Page 593

This Amendment is executed by duly authorized representatives of the Parties and is effective as of the Amendment Effective Date.

**AMAZON LOGISTICS, INC.**

By: /s/ Matthew Norman

Printed Name: Matthew Norman

Title: Authorized Signatory

Date Signed: November 7, 2023

**RIVIAN AUTOMOTIVE, LLC**

By: /s/ Robert J. Scaringe

Printed Name: RJ Scaringe

Title: CEO

Date Signed: November 6, 2023

[*Signature page 1 of 2.*]

13

Exhibit 8 - Page 594

Amazon.com, Inc. and Rivian Automotive, Inc. are made Parties to this Amendment solely with respect to the amendment of the Commercial Letter Agreement pursuant to Section 1 of this Amendment.  Solely for purposes of the amendment to the Commercial Letter Agreement, this Amendment is executed by the duly authorized representatives of Amazon.com, Inc. and Rivian Automotive, Inc.

**AMAZON.COM, INC.**                                   **RIVIAN AUTOMOTIVE, INC**

By: /s/ Udit Madan                                      By: /s/ Robert J. Scaringe

Printed Name: Udit Madan                                Printed Name: RJ Scaringe

Title: Vice President                                   Title: CEO

Date Signed: 11/6/2023                                  Date Signed: November 6, 2023

[*Signature page 2 of 2.*]

14

Exhibit 8 - Page 595

**Attachment 1**

**Investment Projects**

**Amazon Directed Projects**

[***]

**Rivian Directed Projects**

[***]

**Shared Projects**

[***]

15

Exhibit 8 - Page 596

**Attachment 2**

**Permitted Third Parties**

[***]

16

Exhibit 8 - Page 597

**Attachment 3**

**Delivery Vehicle Pricing and Warranty Structure**

[***]

17

Exhibit 8 - Page 598

**Exhibit 31.1**

**CERTIFICATION**

I, Robert J. Scaringe, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Rivian Automotive, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Exhibit 8 - Page 599

**Exhibit 31.1**

_/s/_ Robert J. Scaringe

Robert J. Scaringe
Chief Executive Officer
_(Principal Executive Officer)_

Dated: November 7, 2023

Exhibit 8 - Page 600

**Exhibit 31.2**

**CERTIFICATION**

I, Claire McDonough, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Rivian Automotive, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Exhibit 8 - Page 601

**Exhibit 31.2**

/s/ Claire McDonough
_____

Claire McDonough
Chief Financial Officer
_(Principal Financial Officer)_

Dated: November 7, 2023

Exhibit 8 - Page 602

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Rivian Automotive, Inc. (the "Company") for the period ended September 30, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert J. Scaringe, as Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Robert J. Scaringe
Robert J. Scaringe
Chief Executive Officer
*(Principal Executive Officer)*

Dated: November 7, 2023

Exhibit 8 - Page 603

**Exhibit 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Rivian Automotive, Inc. (the "Company") for the period ended September 30, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Claire McDonough, as Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Claire McDonough
Claire McDonough
Chief Financial Officer
*(Principal Financial Officer)*

Dated: November 7, 2023

Exhibit 8 - Page 604