# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE STEM, INC. SECURITIES LITIGATION | Case No. 23-cv-02329-MMC |
| This Document Relates To: <br> ALL ACTIONS | **ORDER DISMISSING PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT** |

Before the Court is defendants'[1] Motion, filed December 20, 2024, "to Dismiss Plaintiffs' First Amended Consolidated Complaint" pursuant to Rules 12(b)(6), 8(a), and 9(b) of the Federal Rules of Civil Procedure. Plaintiffs, who are identified below, have filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion,[2] the Court rules as follows.[3]

**BACKGROUND**

As set forth in the Court's order filed August 30, 2024 (see Order Granting Defendants' Mot. to Dismiss Pls.' Consol. Compl. ("August 30 Order") at 1:19-4:7), plaintiffs plead the following factual allegations, which, for purposes of the instant motion, the Court accepts as true.

---

[1] Defendants are, in the order set forth in the First Amended Consolidated Complaint ("FACC"), Stem, Inc. ("Stem"), John Carrington ("Carrington"), William Bush ("Bush"), Larsh Johnson ("Johnson"), Prakesh Patel ("Patel"), Alan Russo ("Russo"), Bryan Ho ("Ho"), Star Peak Energy Transition Corp. ("Star Peak"), Eric Scheyer ("Scheyer"), Michael C. Morgan ("Morgan"), Alec Litowitz ("Litowitz"), and Adam E. Daley ("Daley"). (See FACC ¶¶ 14-31.)

[2] "Defendants' Request for Judicial Notice" (Doc. No. 129) is hereby DENIED as moot for the reason that the Court, in making the findings set forth herein, has not relied on any of the documents as to which such request is made.

[3] By prior order, the Court took the matter under submission.

Star Peak Energy Transition Corp. ("Star Peak") is a special purpose acquisition company ("SPAC"), i.e., a "blank check company with no business operations of its own" (see FACC ¶ 27), which went public through an IPO completed August 20, 2020 (see id. ¶ 54).

A SPAC, after "listing [itself] on a public exchange," seeks to "acquire" a "private company" as a means to "'go public.'"  (See id. ¶¶ 50-51.)  The SPAC's shareholders must approve the acquisition at a specified price per share in "a vote on the so-called 'de-SPAC transaction'" and, at that time, have the option to "sell [their shares] on the secondary market or have their shares redeemed" at the price specified.  (See id. ¶ 51.) After the transaction, the target company "carries on its operations as a public company," and the SPAC dissolves.  (See id.)

Stem is a Delaware corporation that "provide[s] customers with energy storage systems, primarily . . . batteries and related hardware, and software-enabled services to operate those energy storage systems."  (See id. ¶ 15.)  Stem's software services include its "Athena artificial intelligence ('AI') software," which "purportedly allows its customers to 'automatically' maximize [energy] storage assets."  (See id. ¶ 1.)  Stem sells its products to two types of customers: "behind-the-meter" ("BTM") and "front-of-the-meter" ("FTM"). (See id. ¶¶ 1, 24.)  BTM customers are typically "individual business[es]" seeking to "reduc[e] energy costs and enhanc[e] energy resiliency," whereas projects for FTM customers are "more complex" because they "use technology and data analysis to balance supply and demand, manage outages, and maintain the stability and reliability of the [electrical] grid."  (See id. ¶ 69.)

On September 28, 2020, Star Peak chose Stem as its acquisition "target" (see id. ¶ 55), and, on December 3, 2020, the parties signed a merger agreement by which Star Peak agreed to acquire Stem (see id. ¶ 102), after which Star Peak filed a prospectus[4] on

---

[4] A prospectus is an "offering document describing the company, the IPO terms and other information that an investor may use when deciding whether to invest."  See SEC. & EXCH. COMM'N., Pub. No. 133 (2/13), INVESTOR BULLETIN: INVESTING IN AN IPO.

2

December 17, 2020 (hereinafter, the "Prospectus"). (See id. ¶ 107.)

On April 27, 2021, after the Prospectus was filed, Star Peak's shareholders approved the merger, and, on April 28, 2021, the companies merged. (See id. ¶¶ 109-10.) Stem survived "as a wholly owned subsidiary of Star Peak," and Star Peak "renamed itself 'Stem, Inc.' and began operating [Stem's] business." (See id. ¶ 110.) On April 29, 2021, Stem "went public with a closing price of $27.05" per share. (See id. ¶ 1.) As of the filing of the FACC on November 8, 2024, the stock was "trad[ing] below one dollar per share." (See id.)

Lead plaintiffs Vishal Lawale and Vishale Thakkar held Star Peak shares[5] as of the March 4, 2021, record date, and were "entitled to vote on the [m]erger [between Stem and Star Peak] at the [April 27, 2021] special meeting of shareholders." (See id. ¶¶ 12-13.) Plaintiffs allege "certain of [Stem's] senior executives and directors . . . engag[ed] in a host of activities that reaffirmed the purported viability" of Stem's "defective business model" and "ma[de] false and misleading statements" in several categories, including statements about said business model, statements about "risks to Stem's business," statements about the success of "Stem's Massachusetts FTM project," and statements about "Stem's key software Athena," which plaintiffs allege "was neither automated nor viable for FTM projects." (See id. ¶ 2.)

On behalf of themselves and a putative class "of all persons who purchased Stem securities between" December 4, 2020, and April 3, 2023 (hereinafter, the "Class Period") (see id.), plaintiffs assert five claims for relief, titled, respectively, (1) "Violation of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9 against the 14(a) Defendants,"[6] (2) "Violation of § 20(a) of the Exchange Act Against the 14(a) Individual Defendants,"

---

[5] After the April 28, 2021, merger, Star Peak, as noted, re-named itself "Stem, Inc.," and, consequently, individuals who held "Star Peak" shares prior to the merger became "Stem" shareholders on that date. (See FACC ¶ 14.)

[6] The 14(a) Defendants are Stem, Star Peak, Bush, Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer. (See FACC at i.)

3

(3) "Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5 Against the Fraud Defendants,"[7] (4) "Violation of § 20(a) of the Exchange Act Against the Individual Fraud Defendants," and (5) "Violation of § 20A of the Exchange Act Against Defendants Bush, Carrington, Daley, Johnson, and Russo for Insider Selling." (See id. ¶¶ 432-74.)

By its August 30 Order, the Court dismissed all of the above-listed claims as set forth in plaintiffs' initial Consolidated Complaint ("CC"). (See August 30 Order at 27:6-8.) By the instant motion, defendants again move to dismiss those claims.

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)); see also Fed. R. Civ. P. 8(d)(1) (providing "[e]ach allegation must be simple, concise, and direct"). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See Twombly, 550 U.S. at 555. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action . . . ." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss," however, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

---

[7] The Fraud Defendants are Stem, Star Peak, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, Russo, and Scheyer. (See FACC at ii.)

4

556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," see Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

Rule 9(b) applies to claims based on "misrepresentation," see In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1553 (9th Cir. 1994) (en banc), and requires a plaintiff to "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false," see Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation and citation omitted; alteration in original).

## DISCUSSION

### I.      Challenged Statements

Plaintiffs allege the Fraud Defendants violated section 10(b) of the Securities and Exchange Act of 1934 (hereinafter, the "Exchange Act") and Securities and Exchange Commission Rule 10b-5 by "disseminat[ing] or approv[ing] the materially false and misleading statements . . . which they knew, or were deliberately reckless in not knowing, were misleading." (See FACC ¶ 450.)

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 603 (9th Cir. 2014).

Allegations of fraud must also "satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act of 1995 ('PSLRA')]." See Zucco Partners, LLC v. Digimarc Co., 552 F.3d 981, 990 (9th Cir. 2009). A plaintiff must, under Rule 9(b), "state with particularity the circumstances constituting fraud," see Fed. R. Civ. P. 9(b), and must, under the PSLRA, "specify each statement alleged to have been misleading," specify "the reason or reasons why the

5

United States District Court
Northern District of California

statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," see Zucco Partners, 552 F.3d at 990-91 (quoting 15 U.S.C. §§ 78u-4(b)(1)-(2)).

Here, plaintiffs allege defendants made ninety-four false or misleading statements.[8]  In their briefing, the parties divide these statements into two groups: (1) statements regarding Athena's automation and (2) statements regarding Athena's success in the FTM market.  (See Mot. at 7-11; Opp. at 9-11.)  The Court first sets forth below the statements in those two groupings.

## A.  Statements Regarding Athena's Automation

Plaintiffs identify fifty-four statements regarding Athena's automated functions. (See Statement Nos. 1-14, 19-36, 41-47, 50, 54, 57-58, 63-65, 67-68, 73, 77, 81-82, and 89-90.)  Plaintiffs argue the statements falsely represented Athena as "fully automated" (see Opp. at 10:14), whereas defendants argue the statements "represent[ed] that Athena automated only certain functions" (see Mot. at 7:12) (emphasis in original).[9]

Thirty of the challenged statements in this grouping include the following language: "By combining advanced energy storage solutions with Athena™, a worldclass AI-powered analytics platform, **Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation**

---

[8] All challenged statements referenced herein are set forth in Exhibit A to the FACC (hereinafter, "Exhibit A") (see Doc. No. 127-1), which plaintiffs submitted in compliance with the Court's prior order that plaintiffs "set out in chart form their securities fraud allegations" (see August 30 Order at 27:11-15).

[9] As set forth in the Prospectus, Athena's functions include "predict[ing] customer facility and system peaks," "collecting data from meters, breakers, storage systems and solar generation systems," processing "1 terabyte of data every day . . . along with weather, energy prices and grid information" to ensure such data is "complete and accurate and that anomalies are detected," providing "an interactive user interface for partners and customers to understand the operation of the energy storage systems along with the insights Athena provides," enabling "customers to participate in markets and grid programs with automated dispatching," "observ[ing] asset and system health to manage charging and discharging cycles," "provid[ing] transparent performance reporting" to customers, "supporting data collection and transfer between diverse software applications," and "employ[ing] state-of-the-art informational safeguards and security monitoring technologies."  (See Prospectus at 100-101.)

**and grid power**."   (See Statement Nos. 3-4, 6-11, 19-20, 22-23, 26-27, 29-34, 42-43, 45-47, 50, 58, 63, 73, and 77) (emphasis in original).  Plaintiffs contend said language would mislead a reasonable investor to believe Athena was "fully automated."  (See Opp. at 10:14.)  By identifying the particular function that is asserted to be automated, however—"switching between battery power, onsite generation and grid power" (see, e.g., Statement No. 3)—the statement limits the scope of automation to that function.

Two challenged statements include the following language: "**Athena automates system discharges across multiple different utility territories, collaborating with the utilities to provide instant grid support when and where it is needed**. . . . And when power prices drop at night **Athena automates their recharging**."  (See Statement Nos. 2 and 25) (emphasis in original).  Again, by identifying the particular function that is asserted to be automated—"system discharges" and "recharging" (see id.)—the statements limit the scope of automation to that function.[10]

Two challenged statements pertain to the development of Athena Bidder[11] and include the following language:

> **Athena is also executing in Massachusetts with its fully automated energy dispatch platform called Athena Bidder, where this past quarter Stem began AI automated bidding into the ISO New England energy and frequency regulation markets using real time price forecasting algorithms.**

(See Statement No. 54) (emphasis in original).

> Last month, we introduced new advanced applications for wholesale energy markets [including] . . . Athena Bidder, which incorporates an owner's asset strategy and continuously generates market bids to maximize wholesale market revenues.
>
> . . . **Athena continuously forecast solar generation, the**

---

[10] Stem bundles "large lithium-ion batteries" with its Athena software.  (See FACC ¶ 388.)  The above-referenced function is the charging and discharging of those batteries.

[11] Athena Bidder is an "application" that was introduced in October 2021.  (See FACC ¶ 225.)

7

> **battery state of charge, energy and frequency regulation prices, market options and incentive goals.**
>
> **With this information, Athena optimizes executing millions of scenarios per hour to determine the best operation for each site and then automatically generates bids for each market interval over the coming hours and days.**

(See Statement No. 57) (emphasis in original).

As with the above-referenced statements, the statements pertaining to Athena Bidder identify the function asserted to be automated—"automatically generat[ing] bids for each [energy] market interval" (see id.)—and thereby limit the scope of automation to that function.

Two challenged statements read as follows: "Company generates revenue by providing customers with integrated energy storage systems, long-term recurring software services and energy market participation through its **proprietary software platform, called Athena™, which enables AI-automated system operations**." (See Statement Nos. 1 and 24) (emphasis in original). In describing Athena, the FACC uses the terms "operations" and "functions" interchangeably (see FACC ¶¶ 170-71), and, as with the above-cited statements, there is no representation that all operations are automated.

One challenged statement reads as follows: "Our shared vision [with AlsoEnergy] is to empower clean energy asset owners and operators to scale their businesses by leveraging **AI-automated, data-driven operations enabled by Athena**." (See Statement No. 64) (emphasis and alteration in original). As with the above-quoted references to "operations," there is no representation that all such operations are automated. (See id.)

One challenged statement reads as follows:

> Starting with the Stem energy storage business, our software drives exceptional economics for our customers. **Athena automates everything**, including reducing costs, increasing revenues, complying with regulatory incentives and constraints and minimizing greenhouse gas emissions. Our broad market reach and scope allows us to co-optimize multiple value streams in real time and over time to maximize economic

8

value for our customers.

(See Statement No. 65) (emphasis in original).

Although it uses the word "everything," the statement does not refer to a function of Athena, let alone the entirety of its functions. Rather, it speaks to the results customers can achieve by using a software program.

Lastly, one statement includes the following language:

> **This is a fully automated process lights out. There's no humans involved in this loop. Once we set it up, it just keeps running**. And then second, we're at the point of asset performance management. All the time we're doing this, we're continually getting streaming data from these sites. Data that can range from every second to every few minutes.

(See Statement No. 82) (emphasis in original).

Although plaintiffs point to Stem's use of the phrase "is fully automated," plaintiffs omit any context for the preceding noun, "This," and, consequently, again fail to show Stem represented all of Athena's functions as being automated. Indeed, the phrase "in this loop" suggests the reference is only to a particular aspect of the program.

In sum, defendants' statements clearly pointed out certain functions of Athena that were automated. There is no language in any statement identified by plaintiffs, however, that would lead a reasonable investor to believe Athena's functions were exclusively automated.

Accordingly, to the extent plaintiffs' section 10(b) and Rule 10b-5 claims are based on the allegation that defendants falsely represented Athena was fully automated, said claims are subject to dismissal.

**B. Statements Regarding Athena's Success in the FTM Market**

Plaintiffs identify forty allegedly false or misleading statements pertaining to Athena's success in the FTM market. (See Statement Nos. 15-18, 37-40, 48-49, 51-53, 55-56, 59-62, 66, 69-72, 74-76, 78-80, 83-88, and 91-94.) Unlike the statements in the previous group, there is no disagreement as to their meaning.

//

//

9

Seven challenged statements concern Stem's success and include the following language:

> As an early participant in the BTM market, **we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services. We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage.**

(See Statement Nos. 15, 37, 69, and 91) (emphasis in original).

> I mean, ultimately, I think as we've always said and I think most have agreed, **this is a software story**. It's not a sale of somebody else's hardware. It's really what—**the differentiating component of Stem is the Athena platform. That's always been true, and I think that's going to continue to be true in the future.**

(See Statement No. 66) (emphasis in original).

> **And then finally, on the front-of-the meter side, this is a market, as I mentioned, that we really continue to have great success on.**
>
> **And as I mentioned, really to go from 0 to leading market share in 18 months in New England ISO is very impressive. And it says a lot about the software.**

(See Statement No. 83) (emphasis in original).

> **While we went from 0 to over 50% market share in 18 months in the New England ISO.**
>
> **So a real accomplishment that is very much attributable to our software platform because we could translate our behind-the-meter software deck to that front-of-the-meter need.**

(See Statement No. 84) (emphasis in original).

Twenty-seven challenged statements concern risk assessment and include, with immaterial differences,[12] the following language:

> **If Stem is unsuccessful in developing and maintaining its proprietary technology, including the Athena platform, Stem's ability to attract and retain partners could be**

---

[12] For example, Statement No. 86 begins with "If we are unsuccessful" and substitutes "our" for "Stem's," "its," and "the."

United States District Court
Northern District of California

> **impaired, Stem's competitive position could be adversely affected and Stem's revenue could be reduced.**

(See Statement Nos. 16, 38, 51, 59, 70, 74, 78, 86, and 92) (emphasis in original).

> **Stem's technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption, damage Stem's reputation with current or prospective customers and/or expose Stem to product liability and other claims that could materially and adversely affect Stem's business.**

(See Statement Nos. 17, 39, 52, 60, 71, 75, 79, 87, and 93) (emphasis in original).

> **The distributed generation industry is an emerging market and our distributed generation offerings may not receive widespread market acceptance.**
>
> . . . Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, **including the perception that our technology is unproven**. . . . Because this is an emerging industry, **broad acceptance of our hardware and software-enabled services is subject to a high level of uncertainty and risk.**

(See Statement Nos. 18, 40, 53, 61, 72, 76, 80, 88, and 94) (emphasis in original).

The Court first turns to the question of falsity, i.e., whether a challenged statement represents something different than what actually exists, or, alternatively, whether a statement was misleading, i.e., gave an "impression of a state of affairs that differs in a material way from the one that actually exists." See Sneed v. Talphera, Inc., 147 F.4th 1123, 1131 (9th Cir. 2025) (internal quotation and citation omitted).[13]

### C. Whether the Statements Were False or Misleading

In alleging claims under section 10(b) and Rule 10b-5, a plaintiff must "identify[ ] the statements at issue and set[ ] forth what is false or misleading about the statement

---

[13] Defendants do argue some of the statements in this grouping are "protected" as forward-looking or opinion. (See Mot. at 12:11, 13:13.) The Court, in light of its finding below that plaintiffs have failed to plead any such statement is false or misleading, does not further address this argument herein.

11

and why the statements were false or misleading at the time they were made." See In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 876 (9th Cir. 2012). To determine whether a statement is misleading, courts analyze the challenged statement from the perspective of "a reasonable investor," i.e., one that "acts with care and seeks out relevant information." See Sneed, 147 F.4th at 1131. "A reasonable investor cares about a statement's surrounding text, including hedges, disclaimers, and apparently conflicting information." Id. (internal quotation and citation omitted). Consequently, a plaintiff must "demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." See In re Convergent Techs. Sec. Litig., 948 F.2d 507, 512 (9th Cir. 1991). By the instant motion, defendants argue plaintiffs have failed to plead a false or misleading statement.[14]

Here, in arguing the statements set forth above were false or misleading, plaintiffs rely on three sources of information: (1) reports from confidential witnesses ("CWs"); (2) a statement made by Carrington after the Class Period; and (3) Stem's financial results. The Court analyzes each source in turn.

### 1. Confidential Witnesses

To satisfy the PSLRA, a complaint "relying on statements from confidential witnesses" must describe the witnesses "with sufficient particularity to establish their reliability and personal knowledge," and the statements "must themselves be indicative of scienter." See Zucco Partners, 552 F.3d at 995. To describe a witness with "sufficient particularity," a plaintiff must "provide[ ] sufficient detail about [the] confidential witness'

---

[14] At the outset, defendants ask the Court to dismiss the FACC, as it did the CC (see August 30 Order at 8:21-23), on the asserted ground that the FACC constitutes impermissible "puzzle pleading." (See Mot. at 5:1-5.) While the Court agrees plaintiffs could have more precisely identified why each statement was false or misleading (see Mot. at 5:14-26), plaintiffs have improved their pleading in general and have complied with the Court's order "to set out in chart form their securities fraud allegations" (see August 30 Order at 27:11-15). Consequently, the Court finds dismissal on said structural ground is no longer appropriate.

United States District Court
Northern District of California

position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." See id. Although hearsay is not "automatically precluded from consideration," a hearsay statement "may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration." See id. at 997 n.4.

Here, by its August 30 Order, the Court found plaintiffs failed to show falsity based on information provided by four CWs, namely, CW1, CW2, CW3, and CW4. (See August 30 Order at 8:24-11:2.) Specifically, as to CW1, CW2, and CW4, the Court held plaintiffs failed to describe each such CWs' job responsibilities "with sufficient specificity to establish their reliability" (see id. at 10:1-2), and although the Court found plaintiffs sufficiently pleaded CW3's job responsibilities, it nonetheless held plaintiffs failed to demonstrate "the information provided by CW3 [was] based on personal knowledge" (see id. at 11:1-2).

In the FACC, plaintiffs, while abandoning CW4, replead information from CW1, CW2, and CW3.[15] As to all ninety-four challenged statements, plaintiffs allege each such statement was false or misleading because of information provided by CW1, CW2, and CW3.[16] Defendants argue the CWs "lack reliability and personal knowledge." (See Mot. at 15:4.) In response, plaintiffs contend the FACC addresses the "deficiencies" identified in the Court's prior order "by adding allegations as to why these witnesses were in a position to know the detailed information they provide." (See Opp. at 6:7-9.) The Court addresses each CW in turn.

---

[15] The identities of the CWs in the FACC are the same as in the CC. For example, CW1 in the FACC is the same individual as CW1 in the CC. (Compare CC ¶¶ 46-49 with FACC ¶¶ 46-49.)

[16] For example, as to Statement Nos. 1 to 23, a range comprising statements from both of the above-referenced two groupings, plaintiffs allege such statements were false or misleading because of, in part, the following: "CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM" and "CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects." (See Exhibit A re: Statement Nos. 1-23.)

13

United States District Court
Northern District of California

### a. CW1

The FACC sufficiently pleads CW1's job responsibilities by alleging CW1 "worked on FTM deals" and was responsible for "answering client questions, assisting the FTM sales team with drafting" proposals, "sending proposals via emails to clients, managing deal flow across the entire sales cycle," and "serv[ing] as an expert on the entire sales cycle." (See FACC ¶ 46.)

Plaintiffs attribute the following information to CW1, who, as explained below, appears to have acquired it from other individuals: "Athena did not work for the [FTM] Massachusetts project because Stem's Athena software was not automated and, thus, required a Stem employee to use an Excel spreadsheet to manually perform functions Athena was supposed to offer" (see id. ¶ 67); "Stem did not have a working product for FTM projects because Athena was not fully automated for FTM" (see id. ¶ 70); "all of Stem's FTM clients CW1 worked with described Athena as an empty suit when it came to the software for FTM projects because Stem simply did not have the software it said it had" (see id. ¶ 71); and "many deals did not close because customers . . . realized Athena did not work for FTM projects" (see id. ¶ 89).

With regard to the first two statements, there is no indication CW1 would have personal knowledge, from a job in sales, as to which functions were performed manually for FTM projects, and, to the extent CW1 reports information from other Stem employees, there is no showing that any such employee(s) had personal knowledge as to such information.[17] With regard to the other information provided by CW1, there is no showing the referenced "clients" had personal knowledge as to Athena's technology, nor does CW1 make clear whether he/she is conveying what any customer reported or, rather, his/her own conclusions or assumptions based on what he/she was told. See In re

---

[17] Additionally, as CW1 does not specify a particular function of Athena that was performed manually by an employee with "an Excel spreadsheet" (see FACC ¶ 67), such information does not contradict defendants' representation that certain functions are automated.

Pivotal Sec. Litig., No. 3:19-CV-03589-CRB, 2020 WL 4193384, at *13 (N.D. Cal. July 21, 2020) (dismissing plaintiffs' section 10(b) claim; finding "unreliable hearsay" and "conclusory assertions" insufficient to support finding of falsity).

Plaintiffs also attribute the following information to CW1, who "explained that [he/she] served as an expert on the entire sales cycle" (see FACC ¶ 46): CW1 "ask[ed] the software team for a working Athena model" for FTM projects but "never received such a model" (see id. ¶ 79); and "Stem's FTM deal close rate for its eight account executives was only 15% to 20%" (see id. ¶ 89).

Although the above-referenced information appears to be based on personal knowledge, it does not demonstrate the falsity of any challenged statement, whether pertaining to automation or success/risk, as the non-delivery of the model does not show Athena lacked the automated functions it described and, in the absence of any context to explain the significance of the above-referenced percentages, the above-referenced close rate fails to show any statements concerning success or risk were false or misleading.

Moreover, and with equal importance, CW1 provides no time frame for his/her information, nor have plaintiffs otherwise included any allegations to show any challenged statements were "false or misleading at the time they were made." See In re Rigel, 697 F.3d at 876.

Accordingly, plaintiffs have not shown falsity based on the information provided by CW1.

### b. CW2

In the FACC, plaintiffs sufficiently plead CW2's job responsibilities, in that they allege, inter alia, he/she "held several positions . . . including as a Stem analyst," was "part of Stem's Market Enablement Group that included approximately 20 individuals," reported "ultimately to [defendant] Russo," and "worked with sales involving, among other things, FTM projects." (See FACC ¶ 48.)

Plaintiffs allege CW2 "heard Stem had an employee who worked on an Excel

15

spreadsheet to handle functions on the Massachusetts FTM project that were supposed to be handled by Athena" and "hear[d] from a Stem senior sales associate that a Stem operations manager had complained because the operations manager was annoyed at having to do so many manual tasks." (See id. ¶ 74.)

As with the information CW1 provided regarding Athena's automation, there are no allegations demonstrating the reliability of the information conveyed, namely, allegations showing that the individuals who communicated the above-referenced information had personal knowledge thereof. Moreover, as with CW1, CW2 provides no time frame for his/her information, nor have plaintiffs otherwise included any allegations to show any challenged statements were "false or misleading at the time they were made." See In re Rigel, 697 F.3d at 876.

Accordingly, plaintiffs have not shown falsity based on the information provided by CW2.

### c. CW3

The Court previously found the CC sufficiently pleaded CW3's job responsibilities (see August 30 Order at 10:3-18), and given that the FACC realleges the same responsibilities (compare CC ¶ 49 with FACC ¶ 49), the Court again finds those allegations suffice.

Plaintiffs repeat, however, the allegation that the Court previously found was not shown to be based on personal knowledge (see August 30 Order at 10:15-18), namely, that CW3 was "told that some of the content on Athena's FTM software could not be used because the products were still in development and were not functional" (see FACC ¶ 81). Plaintiffs fail to cure said earlier-identified deficiency, such as by "specify[ing] which members of the product team conveyed the above-alleged information to CW3, or facts demonstrating their personal knowledge of the information conveyed." (See August 30 Order at 10:19-21.)

Accordingly, plaintiffs have not shown falsity based on the information provided by CW3.

16

### 2. Carrington's Statement

Plaintiffs allege Carrington, who served as Stem's CEO from December 2013 until September 2024, "admitted post-Class Period[18] during Stem's 02/28/24 earnings call discussing the Company's Q4/ 2023and FY 2023 results, Stem's 'program management team adds a 'human-in-the-loop' to Athena's operations." (See FACC ¶¶ 16, 75) (alteration omitted). Plaintiffs allege all ninety-four challenged statements were false or misleading given Carrington's statement.[19] An after-the-fact statement, however, "does not constitute an admission unless it contradicts the substance of an earlier statement and essentially states 'I knew it all along.'" See Lopes v. Fitbit, Inc., No. 18-CV-06665-JST, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020), aff'd, 848 F. App'x 278 (9th Cir. 2021). Here, the most recent of the challenged statements were made on February 17, 2023 (see Statement Nos. 90-94), a year before Carrington's statement, which describes Athena in the present, not past, tense. Moreover, Carrington's statement does not contradict any of the above-referenced statements, as it does not make any representation as to any particular specified function or Athena's success in the FTM market. Indeed, Carrington's statement is in accord with the challenged statements concerning automation, which, as discussed above, do not constitute representations that Athena was fully automated.

Accordingly, plaintiffs have not show falsity based on Carrington's statement.

### 3. Stem's Financial Results

Plaintiffs allege defendants, on December 4, 2020, predicted "Stem would be

---

[18] The Class Period, as noted, is from December 4, 2020, to April 3, 2023. (See FACC ¶ 2.)

[19] For example, as to Statement Nos. 1 to 23, a range, as noted, comprising statements from both of the above-referenced two groupings, plaintiffs allege such statements were false or misleading because "[d]efendant Carrington **admitted** during Stem's [February 28, 2024] earnings call that Stem's 'program management team adds a 'human-in-the-loop' to Athena's operations, thereby confirming Athena was never fully automated for FTM." (See Exhibit A re: Statement Nos. 1-23) (emphasis in original; alteration omitted).

17

profitable with adjusted EBITDA[20] of $28 million" for FY 2022 (see FACC ¶¶ 99, 293), but defendants did not "deliver as promised" and "reported adjusted EBITDA of negative $46 million for FY 2022" (see id. ¶¶ 101, 310).  Plaintiffs characterize thirty-one challenged statements as false or misleading in light of Stem's financial results.  (See Statement Nos. 51-53, 59-61, 70-94.)  As to statements pertaining to Athena's automation, plaintiffs allege those statements were false or misleading because "Stem was unable to convert its business to a high-margin software Company, as reflected by its low gross margins and earnings."  (See, e.g., Exhibit A re: Statement No. 73.)  Plaintiffs fail, however, to explain how Stem's performance demonstrates Athena did not automate certain functions for FTM projects.

As to challenged statements pertaining to Stem's success/risk, plaintiffs allege those statements were false or misleading because "[t]he warned-of risks had already materialized as evidenced by the fact that Stem was unable to convert its business to a profitable high-margin software Company, as reflected by the magnitude of its miss" in forecasting earnings for FY 2022.  (See, e.g., Exhibit A re: Statement No. 51.)  The only allegations on which plaintiffs rely to show Stem, at the time it predicted favorable results, knew it would not do well are based on information provided by CW1, which information, as discussed above, has not been shown to be reliable.

Accordingly, plaintiffs have not shown falsity based on Stem's financial results.

### 4. Conclusion: False or Misleading

For all of the reasons set forth above, the Court finds the above-discussed three sources of information, whether viewed separately or collectively, fail to demonstrate a false or misleading representation or omission, and, accordingly, plaintiffs' section 10(b) claims are subject to dismissal.[21]

---

[20] EBITDA is an acronym for "[e]arnings before interest, taxes, depreciation, and amortization."  (See Opp. at ii.)

[21] In light of the above finding, the Court does not address herein the other elements of a section 10(b) claim.

18

## II. Scheme Liability

Rules 10b-5(a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." See 17 C.F.R. § 240.10b-5(a), (c). To state a claim for scheme liability, a plaintiff must allege "each defendant committed a manipulative or deceptive act in furtherance of the scheme." See Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997).

A scheme liability claim can be based on false or misleading statements that also violate section 10(b), see Lorenzo v. Securities and Exchange Comm'n., 587 U.S. 71, 80 (2019), but where the "alleged scheme consists entirely of" failed section 10(b) statements, a plaintiff likewise fails to adequately plead a scheme, see Kang v. PayPal Holdings, Inc., 620 F.Supp.3d 884, 902 (N.D. Cal. 2022). Here, by its August 30 Order, the Court dismissed plaintiffs' claim alleging scheme liability to the extent said claim was based on allegedly false or misleading statements, finding plaintiffs failed to plead any such statement violated section 10(b). (See August 30 Order at 22:18-23.) As discussed above, the Court again finds plaintiffs fail to plead an actionable section 10(b) statement.

Where, as here, a plaintiff additionally relies on conduct other than an allegedly false statement, such plaintiff must allege a transaction or other event "the principal purpose and effect of which is to create [a] false appearance of fact." See Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1048 (9th Cir. 2006), vacated on other grounds, 519 F.3d 1041 (9th Cir. 2008). "Conduct that is consistent with the defendants' normal course of business," however, "would not typically be considered to have the purpose and effect of creating a misrepresentation," and thus, standing alone, does not suffice to plead scheme liability. See id. at 1050 (collecting cases) (noting creation of "[s]ham business transactions with no legitimate business purpose" would suffice to plead scheme liability).

In its prior order, the Court found the scheme liability allegations in the CC, namely, that defendants "provided extensive due diligence in connection with the IPO"

19

and made certain remarks during earnings calls, were unavailing, as there was "nothing in the CC to demonstrate any [such] acts [were] outside the defendants' 'normal course of business.'" (See August 30 Order at 23:5-20) (quoting Simpson, 452 F.3d at 1050). To the extent plaintiffs' scheme liability claim relies on their failed section 10(b) statements and repleading the above-referenced allegations from the CC (see, e.g., FACC ¶ 255), said claim is subject to dismissal.[22] The Court next turns to three new theories of scheme liability as alleged in the FACC, each based on a particular event.

First, on December 16, 2021, "Stem announced its acquisition of AlsoEnergy, a company that purportedly provides customers with solar asset performance monitoring and control software, for $695 million." (See id. ¶ 114.) Plaintiffs allege defendants purchased AlsoEnergy "to combine the financial results of the two companies and not report them separately," thereby "muddling the financial results of the two companies" and "masking Stem's issues with Athena in the FTM market." (See id. ¶ 256.) Plaintiffs fail, however, to allege defendants' acquisition of AlsoEnergy was outside defendants' normal course of business. Indeed, according to plaintiffs, AlsoEnergy was "'a global leader in solar asset management software' with '60% gross margin across its software' and other service businesses" (see id. ¶ 114), which suggests defendants' acquisition was a business decision that did not have the "purpose and effect of creating a misrepresentation," see Simpson, 452 F.3d at 1050.

Second, on February 24, 2022, Stem announced its "flagship $500 million . . . FTM project" with Available Power, a company that "purportedly designs, develops, and deploys distributed energy resources and microgrid systems for commercial and industrial real estate." (See FACC ¶¶ 43, 84.) Plaintiffs allege defendants ordered

---

[22] Additionally, to the extent plaintiffs again rely on their allegation that "engagements listed in the [FTM] pipeline were not actual deals or even commitments on the part of the developer, rather, they represented just a chance with no guarantee of getting a platform deal signed" (compare FACC ¶ 277 with CC ¶ 83), such reliance is unavailing, as there is no allegation to support a finding that reporting potential engagements was outside defendants' normal course of business, or that such engagements were "[s]ham business transactions," see Simpson, 452 F.3d at 1050.

20

batteries "for the Available Power project" based on a "letter of intent" rather than a "customer purchase order." (See id. ¶¶ 85, 262.) While plaintiffs allege such act was "in violation of Company policy" (see id. ¶ 85), their only basis for such allegation comes from CW2, and plaintiffs fail to show how CW2 has personal knowledge of the above-referenced policy given that CW2, as noted, worked in sales, a division not shown to be involved in decisions concerning the equipment needed to accompany the software. Moreover, even assuming, arguendo, CW2's personal knowledge, CW2 "indicated it was Stem's standard procedure not to procure hardware without a customer purchase order but that exceptions to this procedure were not uncommon." (See id. ¶ 85) (emphasis added). Consequently, plaintiffs fail to allege the timing of the order was outside the course of normal business.

Lastly, plaintiffs allege defendants violated generally accepted accounting principles in connection with an SEC form filed February 16, 2023. (See id. ¶¶ 264, 308.) In that regard, plaintiffs allege that, after Available Power did not place a purchase order for the batteries Stem acquired for the FTM project, "Stem unloaded the batteries on two customers," namely, REX and Lullwater, who agreed to resell the batteries "to an end-user customer" (see id. ¶¶ 264-66), and Stem agreed to "bear responsibility for the shortfall" if REX or Lullwater "resold the hardware for 'less than the amount initially sold to the customer'" (see id. ¶¶ 265-66). Plaintiffs allege Stem reported the revenue from those contracts in the above-referenced SEC form and did not disclose the "contingent nature" thereof until "[a] year later" when it "announced material revenue reduction adjustments" in connection therewith. (See id. ¶¶ 264, 268.) According to the FACC, defendants violated Financial Accounting Standards Board Accounting Standard Codification ("ASC") No. 606, as defendants "should never have recognized revenue" from those contracts "because at the time of the sale, collection of substantially all of the sales price was not probable." (See id. ¶ 269.) Although plaintiffs have not responded to defendants' arguments countering this theory (see Mot. at 27:1-28:4; Opp. at 16:15-19:15), the Court nonetheless addresses it.

21

ASC No. 606 provides that a business entity may "account for [revenue from] a contract" if "[i]t is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer." See ASC 606-10-05-1, 606-10-25-1. Here, plaintiffs do not show why, at the time defendants filed the above-referenced SEC form, it was not "probable" Stem would "collect substantially all" of the revenue from the REX and Lullwater deals. See id. Although Plaintiffs allege defendants knew "the batteries were subpar" (see FACC ¶ 266), that allegation relies solely on a lawsuit brought against Stem by Lullwater,[23] which commenced after defendants filed the above-referenced SEC form (see id. ¶¶ 266-67), and plaintiffs fail to show that, at the time defendants filed said form, they had any knowledge that the batteries sold to one of the buyers were other than of satisfactory quality. Indeed, plaintiffs have not pleaded any allegations demonstrating the actual quality of those batteries. See Veal v. LendingClub Corp., 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019) (holding "[p]laintiffs may not rely on facts alleged in [a separate action] without providing any independent corroboration" of such facts).

Accordingly, plaintiffs' claim alleging scheme liability is subject to dismissal.

**III. Section 14(a) Claim**

Section 14(a) of the Exchange Act makes it unlawful for "any person" to "solicit or to permit the use of his name to solicit any proxy or consent or authorization" in "contravention of [the] rules and regulations" prescribed by the Securities and Exchange Commission. See 15 U.S.C. § 78n(a)(1). Rule 14a-9, in turn, provides that "[n]o solicitation . . . shall be made by means of any proxy statement" containing any "false or misleading [statement] with respect to any material fact." See 17 C.F.R. § 240.14a-9. To state a claim under section 14(a) and Rule 14a-9, a plaintiff must allege: "(1) the defendant made a material misrepresentation or omission in a proxy statement, (2) the

---

[23] According to plaintiffs, Lullwater's lawsuit was filed July 20, 2023, and alleged "the batteries sold by Stem were of subpar quality." (See FACC ¶¶ 87-88.)

22

United States District Court
Northern District of California

misrepresentation or omission was made with the requisite level of culpability,[24] and (3) the misrepresentation or omission was an essential link in the accomplishment of a transaction proposed in the proxy solicitation." See Kelley v. Rambus, Inc., No. C 07-1238 JF (HRL), 2008 WL 5170598, at *3 (N.D. Cal. Dec. 9, 2008), aff'd, 384 F. App'x 570 (9th Cir. 2010). Although section 14(a) does not necessarily require a plaintiff to plead fraud with particularity, "Rule 9(b) applies where a claim is 'grounded in fraud' or 'sound[s] in fraud,' even if fraud is not an essential element of the cause of action." See In re Finjan Holdings, Inc., 58 F.4th 1048, 1057 (9th Cir. 2023) (alteration in original).

Here, by its August 30 Order, the Court dismissed plaintiffs' section 14(a) claim, for failure to comply with Rule 9(b). (See August 30 Order at 25:8-19.) Although plaintiffs argue the FACC "cures the earlier pleading defect" by "detailing negligent conduct separately" (see Opp. at 24:9-10), they continue to make only a "formalistic differentiation" between their section 14(a) and section 10(b) claims (see August 30 Order at 25:13), in that their section 14(a) claim relies on the statements set forth above that form the basis of their section 10(b) claim (compare FACC ¶¶ 156-182 (section 14(a) statements) with ¶¶ 187-250 (section 10(b) statements)). In particular, the Ninth Circuit, in the context of claims under section 11 of the Exchange Act, has held that, even where a negligence claim "does not adopt all of the allegations contained in the rest of the complaint," if such claim "does not allege different misrepresentations" but "merely relies on the same alleged misrepresentations . . . that are central to [plaintiffs'] section 10(b) fraud claim," Rule 9(b) is applicable, see In re Rigel, 697 F.3d at 886, and district courts have applied that holding to claims under section 14(a), see, e.g., Mehedi v. View, No. 21-cv-06374-BLF, 2023 WL 3592098, at *14 (N.D. Cal. May 22, 2023) (holding "[t]he same reasoning [in Rigel] applies to a Section 14 claim"). Consequently, given the Court's finding above that plaintiffs have not pleaded a false or misleading statement

---

[24] The requisite level of culpability for a section 14(a) claim is negligence. See Knollenberg v. Harmonic, Inc., 152 Fed. App'x. 674, 682-83 (9th Cir. 2005).

23

under Rule 9(b), plaintiffs cannot sustain their claim under section 14(a).[25]

Accordingly, plaintiffs' section 14(a) claim is subject to dismissal.

## IV.    Section 20(a) and Section 20A Claims

Plaintiffs' remaining claims are brought pursuant to section 20(a) and section 20A of the Exchange Act.  (See FACC ¶¶ 443-47, 455-74.)  To state a claim under either section, a plaintiff must first plead an independent violation of the Exchange Act.  See Zucco Partners, 552 F.3d at 990 (holding "Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b)"); In re VeriFone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993) (holding, where plaintiffs "failed to allege an actionable independent underlying violation" of the Exchange Act, "the § 20A claim was properly dismissed").  Here, as plaintiffs have failed to allege an independent violation of the Exchange Act, their section 20(a) and section 20A claims are subject to dismissal.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is hereby GRANTED, and the FACC is hereby DISMISSED without further leave to amend.  See Zucco Partners, 552 F.3d at 1007 (affirming dismissal without leave to amend where district court advised plaintiff of pleading deficiencies and plaintiff failed to correct such deficiencies in amended pleading).

**IT IS SO ORDERED.**

Dated: December 17, 2025

MAXINE M. CHESNEY
United States District Judge

---

[25] In light thereof, the Court does not address herein defendants' additional arguments that plaintiffs have not sufficiently alleged (1) an "essential link" between "the proxy and any harm" suffered by plaintiffs and (2) the 14(a) Defendants "solicited or permitted the use of their name[s] to solicit votes."  (See Mot. at 29:22-30:11) (internal quotation, citation, and alterations omitted).